# Exhibit  A
# Plaintiff's Request for Judicial Notice

**Case No. A158275**

_____

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT, DIVISION TWO**

_____

LARRY LEE,
Appellant/Plaintiff,

v.

AMAZON.COM, INC.,
Respondent/Defendant.

_____

**BLACK WOMEN FOR WELLNESS AND THE MERCURY POLICY
PROJECT/TIDES CENTER'S APPLICATION FOR LEAVE TO
FILE _AMICI CURIAE_ BRIEF AND [PROPOSED] BRIEF IN
SUPPORT OF APPELLANT/PLAINTIFF LARRY LEE**

_____

On Appeal from the Superior Court Of California, County of Alameda
Case No. RG14738130, Hon. Robert McGuiness

_____

ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Deborah A. Sivas (CA Bar No. 135446)
dsivas@stanford.edu
Molly Loughney Melius (CA Bar No. 297915)
loughney@stanford.edu
Thomas P. Schubert (CA Bar Stud. Cert. No. 671743)
tps@stanford.edu
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 725-8571
Facsimile: (650) 723-4426

_Attorneys for Amici Curiae_

Document received by the CA 1st District Court of Appeal.

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

There are no entities or persons that must be listed in this certificate under Rule 8.208 of the California Rules of Court.

DATED: June 4, 2021

_____

Molly Melius

Document received by the CA 1st District Court of Appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS .................. 2

TABLE OF CONTENTS ............................................................ 3

TABLE OF AUTHORITIES........................................................ 4

APPLICATION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF ............ 15

INTRODUCTION .................................................................. 18

BACKGROUND ................................................................... 19

    I.      Skin-Lightening Products Pose Significant Public
            Health Risks ........................................................... 19

    II.     Skin-Lightening Products Reflect and Reproduce
            Social Inequalities .................................................. 24

    III.    The Regulation of Mercury Reflects a Global
            Consensus About Its Danger.................................... 27

ARGUMENT ....................................................................... 31

    I.      Federal Preemption of State Environmental
            Laws Is Strongly Disfavored................................... 32

    II.     Section 230 Concerns the Internet as an Information
            Ecosystem, Not a Marketplace for Physical Goods............. 34

    III.    Amazon's Role in the Chain of Distribution
            Falls Outside Section 230........................................ 37

          A.    Proposition 65 Targets Amazon as a Business
                 in the Chain of Distribution—Not as a Publisher ......37

          B.    Amazon's Liability Arises from Its Own
                 Conduct—Not from Third-Party Information............40

    IV.   Congress Did Not Immunize Online Commerce
            in Physical Goods.................................................. 42

CONCLUSION .................................................................... 45

CERTIFICATE OF WORD COUNT ........................................... 47

PROOF OF SERVICE ............................................................ 48

SERVICE LIST ................................................................... 49

Document received by the CA 1st District Court of Appeal.

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) ................................................... 33

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ............................................................... 37

*Barrett v. Rosenthal*,
  40 Cal. 4th 33 (2006) ...................................................................... 31, 38

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) .............................................................................. 33

*Bolger v. Amazon.com, LLC*,
  53 Cal. App. 5th 431 (Ct. App. 2020) ....................................... 38, 39, 43

*Brown v. Mortensen*,
  51 Cal. 4th 1052 (2011) ........................................................................ 32

*Cal. Chamber of Com. v. Brown*,
  196 Cal. App. 4th 233 (Ct. App. 2011) ................................................. 31

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002) ................................................................... 32, 34, 45

*Elsworth v. Beech Aircraft Corp.*,
  37 Cal. 3d 540 (1984) ........................................................................... 32

*Erie Ins. Co. v. Amazon.com, Inc.*,
  925 F.3d 135 (4th Cir. 2019) ................................................................ 39

*Fair Hous. Council of San Fernando Valley v. Roommate.com*,
  521 F.3d 1157 (2008) .................................................................. 36, 44, 45

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019) ................................................................... 44

*Gentry v. eBay, Inc.*,
  99 Cal. App. 4th 816 (2002) ...................................................... 37, 40, 42

*Gordon v. Virtumundo, Inc.*,
  575 F.3d 1040 (9th Cir. 2009) .............................................................. 33

Document received by the CA 1st District Court of Appeal.

*Hardin v. PDX, Inc.*,
　227 Cal. App. 4th 159 (2014) ................................................................. 40

*People ex rel. Harris v. Pac Anchor Transp., Inc.*,
　59 Cal. 4th 772 (2014) ........................................................................... 33

*Hassell v. Bird*,
　5 Cal. 5th 522 (2018) ........................................................ 31, 37, 38, 43

*HomeAway.com, Inc. v. City of Santa Monica*,
　918 F.3d 676 (9th Cir. 2019) ....................................................... 36, 40, 41

*Loomis v. Amazon.com LLC*,
　No. B297995, 2021 WL 1608878 (Cal. Ct. App. Apr. 26, 2021) .......... 39

*People ex rel. Lungren v. Superior Court*,
　14 Cal. 4th 294 (1996) ..................................................................... 31, 45

*Medtronic, Inc. v. Lohr*,
　518 U.S. 470 (1996) ......................................................................... 32, 33

*Reno v. ACLU*,
　521 U.S. 844 (1997) ............................................................................... 34

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
　390 F. Supp. 3d 964 (W.D. Wis. 2019) ................................................. 39

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
　No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ............ 36

*Va. Uranium, Inc. v. Warren*,
　139 S. Ct. 1894 (2019) ........................................................................... 32

*Vandermark v. Ford Motor Co.*,
　391 P.2d 168 (Cal. 1964) ....................................................................... 43

*Viva! Int'l Voice for Animals v. Adidas Promotional Retail
　Operations, Inc.*,
　41 Cal. 4th 929 (2007) ........................................................................... 32

*Zeran v. Am. Online, Inc.*,
　129 F.3d 327 (4th Cir. 1997) ................................................................. 38

## Constitutional Provisions

U.S. CONST. art. VI, cl. 2 ........................................................................... 33

## Statutes

21 U.S.C. § 331(a) ..................................................................................... 29

Document received by the CA 1st District Court of Appeal.

21 U.S.C. § 361 ................................................................. 29

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ........ 34

    47 U.S.C. § 230(a)(1) ................................................ 35

    47 U.S.C. § 230(a)(3) ................................................ 35

    47 U.S.C. § 230(a)(5) ................................................ 35

    47 U.S.C. § 230(b)(1) ................................................ 44

    47 U.S.C. § 230(b)(4) ................................................ 35

    47 U.S.C. § 230(c)(1) ............................................ *passim*

    47 U.S.C. § 230(e)(3) ................................................ 33

    47 U.S.C. § 230(f)(2) ................................................ 37

Safe Drinking Water and Toxic Enforcement Act of 1986 (Prop. 65)

    CAL. HEALTH & SAFETY CODE §§ 25249.5-.14 .............................. 30

    CAL. HEALTH & SAFETY CODE § 25249.6 .......................... 30, 38, 45

    CAL. HEALTH & SAFETY CODE § 25249.7 .................................. 45

CAL. HEALTH & SAFETY CODE § 111792 ...................................... 30

## Legislative Materials

Personal Care Products Safety Act, S.726, 116th Cong. (2017) ................ 19

S. REP. NO. 104-23 (1995) ................................................ 35

S. REP. NO. 104-230 (1996) ............................................... 36

141 CONG. REC. 3,203 (1995) .............................................. 35

141 CONG. REC. 22,045 (1995) .......................................... 35, 36

141 CONG. REC. 22,047 (1995) ............................................. 37

## Regulations

21 C.F.R. § 700.13(d) (2020) ............................................. 29

CAL. CODE REGS., tit. 27, § 270019(c) .................................... 31

## Administrative Materials

38 Fed. Reg. 853 (Jan. 5, 1973) ......................................... 29

Document received by the CA 1st District Court of Appeal.

Notice of Intent to List Chemicals, 90 Cal. Reg. Notice Reg.,
no. 17-Z, April 27, 1990 ........................................................ 30

**Treaties**

Minamata Convention on Mercury, *opened for signature*
Oct. 10, 2013, T.I.A.S. 17-816, 27 U.N.T.S. 17 (entered
into force Aug. 16, 2017) ....................................................... 27

**Other Authorities**

Allison Dotta, Note, *Chapter 314: The Foundation for New
Cosmetic Safety Laws*, 51 U. PAC. L. REV. 413 (2021) ........................ 30

Ami R. Zota & Bhavna Shamasunder, Viewpoint, *The
Environmental Injustice of Beauty: Framing Chemical
Exposures from Beauty Products as a Health Disparities
Concern*, 217 AM. J. OBSTETRICS & GYNECOLOGY 418
(2017) ................................................................. 20, 26

Angela P. Harris, Essay, *From Color Line to Color Chart?:
Racism and Colorism in the New Century*, 10 BERKELEY
J. AFR.-AM. L. & POL'Y 52 (2008) ...................................... 25

Anita Mudan et al., *Notes from the Field: Methylmercury
Toxicity from a Skin Lightening Cream Obtained from
Mexico—California, 2019*, 68 MORBIDITY & MORTALITY
WKLY. REP. 1166 (2019) ................................................ 21

Aya Batrawy, *"Whitening" Creams Undergo a Makeover but
Colorism Persists*, ASSOCIATED PRESS (July 28, 2020),
https://apnews.com/article/africa-race-and-ethnicity-
dubai-ap-top-news-united-arab-emirates-
a72b0f39d637a45cb48710d4229bf373 ................................. 27

Bill Hagerty, Opinion, *Goodbye Section 230, Hello Liberty*,
WALL ST. J. (Apr. 26, 2021), https://www.wsj.com/
articles/goodbye-section-230-hello-liberty-11619476294 ................... 42

Cal. Dep't of Public Health, *Health Alert: Mercury Poisoning
Linked to Use of Skin-Lightening or Acne Creams from
Mexico* (May 7, 2014), https://biomonitoring.ca.gov/sites/
default/files/downloads/Alert_Mercury_skin_creams.pdf .............. 21, 22

Document received by the CA 1st District Court of Appeal.

Carsten R. Hamann et al., *Spectrometric Analysis of Mercury Content in 549 Skin-Lightening Products: Is Mercury Toxicity a Hidden Global Health Hazard?*, 70 J. AM. ACAD. DERMATOLOGY 281 (2014) .......................................... 23

Catherine Saint Louis, *Creams Offering Lighter Skin May Bring Risks*, N.Y. TIMES (Jan. 15, 2010), https://www.nytimes.com/2010/01/16/health/16skin.html ................... 24

Cris Prystay, *Critics Say Ads for Skin Whiteners Capitalize on Malaysian Prejudice*, WALL. ST. J. (Apr. 30, 2002), https://www.wsj.com/articles/SB1020093658286726600 .................... 25

Ctrs. for Disease Control & Prevention, *Mercury Exposure Among Household Users and Nonusers of Skin-Lightening Creams Produced in Mexico—California and Virginia, 2010*, 61 MORBIDITY & MORTALITY WKLY. REP. 33 (Jan. 20, 2012) ................................................................ 22

Deborah Rhode, *Appearance as a Feminist Issue*, 69 SMU L. REV. 697 (2016) ..................................................................... 27

Dominic Sagoe et al., *The Global Prevalence and Correlates of Skin Bleaching: A Meta-Analysis and Meta-Regression Analysis*, 58 INT'L J. DERMATOLOGY 24 (2019) ................................... 23

Edward J. Janger & Aaron D. Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform*, 4 BROOK. J. CORP. FIN. & COM. L. 259 (2020) ........................................... 45

Ellen Gabler & Sam Roe, *FDA Widens Mercury-Skin Lightening Cream Investigation*, CHI. TRIB. (May 28, 2010, 2:00 AM), https://www.chicagotribune.com/ lifestyles/health/chi-skin-creams-mercury-story.html. ......................... 23

*Environmental Laws that Apply to Mercury*, U.S. EPA, https://www.epa.gov/mercury/environmental-laws-apply-mercury (last visited May 8, 2021) ........................................ 29

*EPA Leadership in the Global Mercury Partnership*, U.S. EPA, https://www.epa.gov/international-cooperation/epa-leadership-global-mercury-partnership (last visited May 8, 2021) ...................................................................... 28

Document received by the CA 1st District Court of Appeal.

*Face Creams Containing Mercury*, CAL. DEP'T PUB.
 HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/
 DEODC/EHIB/CPE/Pages/CreamsTested4Mercury.aspx
 (last visited May 8, 2021) ........................................................ 30

*Global Mercury Partnership*, U.N. ENVIRONMENT
 PROGRAMME, https://web.unep.org/
 globalmercurypartnership (last visited May 8, 2021) ............ 28

Harvard Women's Health Watch, *Toxic Beauty: Are Your
 Personal Care Products Putting Your Health at Risk?*,
 HARV. HEALTH PUB'G (Apr. 2020), https://www.health.
 harvard.edu/womens-health/toxic-beauty ............................... 19

*Hazardous Products: Mercury in Soaps and Creams*, NYC
 HEALTH, https://www1.nyc.gov/site/doh/health/health-
 topics/mercury-in-soaps-and-creams.page (last visited
 May 18, 2021) ........................................................................... 30

I. al-Saleh & I. al-Doush, *Mercury Content in Skin-Lightening
 Creams and Potential Hazards to the Health of Saudi
 Women*, 51 J. TOXICOLOGY & ENV'T HEALTH 123 (1997) .................. 23

Imani Perry, *Buying White Beauty*, 12 CARDOZO J.L. &
 GENDER 579 (2006) .......................................................... 25, 26

Irmina Maria Michalek et al., *A Systematic Review of Global
 Legal Regulations on the Permissible Level of Heavy
 Metals in Cosmetics with Particular Emphasis on Skin
 Lightening Products*, 170 ENV'T RSCH. 187 (2019) ........................ 21, 25

JEFF KOSSEFF, THE TWENTY-SIX WORDS THAT CREATED THE
 INTERNET (2019) ....................................................................... 42

Jemima McEvoy, *L'Oreal, Unilever Reassess Skin Lightening
 Products—But Won't Quit the Multi-Billion Dollar
 Market*, FORBES (June 26, 2020), https://www.forbes.com/
 sites/jemimamcevoy/2020/06/26/loreal-unilever-reassess-
 skin-lightening-products-but-wont-quit-the-multi-billion-
 dollar-market/?sh=ad82a4223a13 .......................................... 24

JESSIE POULIN & HERMAN GIBB, WORLD HEATH ORG.,
 MERCURY: ASSESSING THE ENVIRONMENTAL BURDEN OF
 DISEASE AT NATIONAL AND LOCAL LEVELS 56- (2008),
 https://apps.who.int/iris/handle/1066543875 ........................ 21

Document received by the CA 1st District Court of Appeal.

Kate Ruane, *Dear Congress: Platform Accountability Should Not Threaten Online Expression*, ACLU (Oct. 27, 2020), https://www.aclu.org/news/free-speech/dear-congress-platform-accountability-should-not-threaten-online-expression ................................................................................ 43

Lina M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 710 (2017) ........................................................................... 44

Lori Copan et al., *Mercury Toxicity and Contamination of Households from the Use of Skin Creams Adulterated with Mercurous Chloride (Calomel)*, 12 INT'L J. ENV'T RSCH. & PUB. HEALTH 10,943 (2015) .......................................... 22

Marc Lacey, *Fighting "Light Skin" as a Standard of Beauty*, N.Y. TIMES (June 15, 2002), https://www.nytimes.com/2002/06/15/world/the-saturday-profile-fighting-light-skin-as-a-standard-of-beauty.html ........................................... 25

Margaret Hunter, *The Persistent Problem of Colorism: Skin Tone, Status, and Inequality*, 1 SOCIO. COMPASS 237 (2007) ................................................................................ 26

M.C. Van Hout & M. Wazaify, *Parallel Discourses: Leveraging the Black Lives Matter Movement to Fight Colorism and Skin Bleaching Practices*, 192 PUB. HEALTH 1 (2021) ................................................................................ 26

Meagan Jacobs et al., *Fifty Shades of African Lightness: A Bio-psychosocial Review of the Global Phenomenon of Skin Lightening Practices*, 7 J. PUB. HEALTH AFR. 67 (2016) ........................................................................... 22, 23

*Mercury and Health*, WORLD HEATH ORG. (Mar. 31, 2017), https://www.who.int/news-room/fact-sheets/detail/mercury-and-health ................................................................ 24

*Mercury in Products*, U.N. ENVIRONMENT PROGRAMME, https://web.unep.org/globalmercurypartnership/our-work/mercury-products (last visited May 8, 2021) ......................... 28

*Mercury in Skin Creams*, CAL. DEP'T PUB. HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/Pages/MercuryinSkinCream.aspx (last visited May 8, 2021) .............................................................. 30

Document received by the CA 1st District Court of Appeal.

*Mercury in Skin-Lightening Products: Towards the 2020
    Deadline*, U.N. ENVIRONMENT PROGRAMME,
    https://web.unep.org/globalmercurypartnership/webinar-
    mercury-skin-lightening-products-towards-2020-deadline
    (last visited June 1, 2021) ...................................................... 29

MINAMATA CONVENTION ON MERCURY,
    http://www.mercuryconvention.org (last visited May 8, 2021) .............. 28

*Minamata Convention on Mercury*, U.S. EPA,
    https://www.epa.gov/international-cooperation/minamata-
    convention-mercury (last visited May 25, 2021)................................... 28

M. Osei et al., *Skin-Lightening Practices Among Female High
    School Students in Ghana*, 155 PUB. HEALTH 81 (2018) ...................... 22

*Northern California Woman Permanently Injured from
    Tainted Skin-Lightening Cream*, ABC 7 NEWS (Dec. 29,
    2019), https://abc7news.com/skin-cream-lightening-
    warning-tainted/5794926 ........................................................ 21

*Parties and Signatories*, MINAMATA CONVENTION ON
    MERCURY, http://www.mercuryconvention.org/Countries/
    Parties/tabid/3428/language/en-US/Default.aspx (last
    visited June 1, 2021) ............................................................. 28

Phylicia Ricketts et al., *Mercury Exposure Associated with
    Use of Skin Lightening Products in Jamaica*, 10 J.
    HEALTH POLLUTION, no. 26, 2020......................................... 22

Press Release, Allied Market Rsch., Global Cosmetics Market
    to Reach $463.5 Billion by 2027 (Feb. 4, 2021),
    https://www.globenewswire.com/news-release/2021/02/
    04/2170144/0/en/Global-Cosmetics-Market-to-Reach-
    463-5-Billion-by-2027-Allied-Market-Research.html ........................ 19

Press Release, Sen. Dianne Feinstein, 81 Years Since Last
    Update to Personal Care Products Law (June 25 2019),
    https://www.feinstein.senate.gov/public/index.cfm/press-
    releases?ID=FEF521A8-9137-401C-950B-
    FDF7D5903339 .................................................................... 19

Document received by the CA 1st District Court of Appeal.

Priya Arora & Sapna Maheshwari, *Criticism of Skin Lighteners Brings Retreat by Unilever and Johnson & Johnson*, N.Y. TIMES (June 25, 2020), https://www.nytimes.com/2020/06/25/business/unilever-jj-skin-care-lightening.html ................................................... 27

Ramya M. Vijaya, *Dangerous Skin Bleaching Has Become a Public Health Crisis. Corporate Marketing Lies Behind It.*, WASH. POST (June 15, 2019), https://www.washingtonpost.com/politics/2019/06/15/dangerous-skin-bleaching-has-become-public-health-crisis-corporate-marketing-lies-behind-it ............................................. 26

Rebecca Kessler, *The Minamata Convention on Mercury: A First Step Toward Protecting Future Generations*, 121 ENV'T HEALTH PERSPS. A304 (2013) .................................................... 28

SACRAMENTO CNTY. DEP'T OF HEATH SERVS., https://dhs.saccounty.net/PUB/Pages/Mercury-in-Skin-Creams.aspx (last visited June 1, 2021) ................................................ 22

Saja H. Hamed et al., *Skin-Lightening Practice Among Women Living in Jordan: Prevalence, Determinants, and User's Awareness*, 49 INT'L J. DERMATOLOGY 414 (2010) ................. 23

Samara Pollock et al., *The Dark Side of Skin Lightening: An International Collaboration and Review of a Public Health Issue Affecting Dermatology*, 7 INT'L J. WOMEN'S DERMATOLOGY 158 (2021) ....................................... 20

Scott Faber, *The Toxic Twelve Chemicals and Contaminants in Cosmetics*, ENV'T WORKING GRP. (May 5, 2020), https://www.ewg.org/the-toxic-twelve-chemicals-and-contaminants-in-cosmetics ................................................... 20

Siti Zulaikha Rusmadi et al., *Preliminary Study on the Skin Lightening Practice and Health Symptoms Among Female Students in Malaysia*, J. ENV'T & PUB. HEALTH, no. 591790, 2015 .............................................................. 22, 23

*Skin Lightening Products Found to Contain Mercury*, MINN. DEP'T OF HEALTH, https://www.health.state.mn.us/communities/environment/skin (last visited May 18, 2021) ................. 30

Document received by the CA 1st District Court of Appeal.

*State Health Officials Warn Consumers of Mercury in Skin Cream from Mexico*, TEX. DEP'T STATE HEALTH SERVS. (Jan. 9, 2020), https://www.dshs.texas.gov/news/releases/ 2020/20200109.aspx ................................................................ 29

Stephanie M. Lee, *Mercury Warning for Skin-Lightening Creams*, S.F. CHRON. (Jan. 9, 2014), https://www.sfchronicle.com/health/amp/Mercury-warning-for-skin-lightening-creams-5128945.php .............................. 24

Swathi Shivakumar & Mohammad Jafferany, *"The Unfair Drive to Be Fair": Psychosocial Aspects and Implications of the Use of Skin Lightening Agents*, 33 DERMATOLOGIC THERAPY e14091 (2020) ................................................ 20, 27

Terry Mohammed et al., *The Evaluation of Total Mercury and Arsenic in Skin Bleaching Creams Commonly Used in Trinidad and Tobago and Their Potential Risk to the People of the Caribbean*, 6 J. PUB. HEALTH 1097 (2017) .................. 23

Thomas Murphy et al., *Mercury Contamination of Skin-Whitening Creams in Phnom Penh, Cambodia*, 5 J. HEALTH POLLUTION 33 (2015) ............................................ 22

Tim Sullivan, *India Wrestles with Its Bias for Fair Skin*, L.A. TIMES (Aug. 3, 2003), https://www.latimes.com/archives/ la-xpm-2003-aug-03-adfg-skin3-story.html .......................... 25

Trina Jones, *The Significance of Skin Color in Asian and Asian-American Communities: Initial Reflections*, 3 U.C. IRVINE L. REV. 1105 (2013) ................................................ 25

Tugba Sabanoglu, *Third-Party Seller Share of Amazon Platform 2007-2021*, STATISTA (May 7, 2021), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform ............................................ 44

*What Is Proposition 65?*, PROPOSITION 65 WARNINGS, https://www.p65warnings.ca.gov/what-proposition-65 (last visited May 8, 2021) .................................................... 30

WORLD HEATH ORG., EXPOSURE TO MERCURY: A MAJOR PUBLIC HEALTH CONCERN (2d ed. 2021), https://www.who.int/publications/i/item/9789240023567 .................. 24

Document received by the CA 1st District Court of Appeal.

WORLD HEATH ORG., MERCURY IN SKIN LIGHTENING
    PRODUCTS (2019), https://www.who.int/publications/i/
    item/WHO-CED-PHE-EPE-19.13 ............................................ 16, 21, 24

*Why Skin Deep?*, ENV'T WORKING GRP.,
    https://www.ewg.org/skindeep/contents/why-skin-deep
    (last visited May 8, 2021) ....................................................................... 19

ZERO MERCURY WORKING GRP., DANGEROUS, MERCURY-
    LADEN AND OFTEN ILLEGAL SKIN-LIGHTENING PRODUCTS:
    READILY AVAILABLE FOR (ONLINE) PURCHASE (2019),
    https://www.zeromercury.org/wp-content/uploads/2019/11/
    Dangerous-mercury-laden-and-often-illegal-skin-
    lightening-products-readily-available-for-online-
    purchase.pdf ........................................................................................... 23

ZERO MERCURY WORKING GRP., MERCURY-ADDED SKIN-
    LIGHTENING CREAMS: AVAILABLE, INEXPENSIVE, AND
    TOXIC (2018), https://www.zeromercury.org/wp-content/
    uploads/2019/02/zmwg_skin_lightening_cream_report_
    final_nov_2018.pdf ................................................................................. 27

Document received by the CA 1st District Court of Appeal.

**APPLICATION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF**

TO THE HONORABLE PRESIDING JUSTICE AND ASSOCIATE
JUSTICES OF THE FIRST DISTRICT COURT OF APPEAL:

Pursuant to Rule 8.200(c) of the California Rules of Court, Black
Women for Wellness and the Mercury Policy Project/Tides Center
respectfully request leave to file the attached *amici curiae* brief in support
of Appellant Larry Lee.

**STATEMENT OF INTEREST OF AMICI CURIAE**

*Amicus* Black Women for Wellness is a grassroots nonprofit
organization based in Los Angeles, California, that works to address the
health and well-being of Black women and girls through health education,
empowerment, and advocacy.  By advocating for legislative change and
improving awareness of appropriate and affordable health resources, Black
Women for Wellness seeks to build healthy communities, eliminate health
disparities, and achieve environmental justice.  Among its many programs,
Black Women for Wellness publishes literature about the dangers that
everyday cosmetics and personal care products, including skin-lightening
creams, pose for reproductive health and wellness.  Black Women for
Wellness has a substantial interest in this litigation because it recognizes
that exempting online platforms like Amazon from compliance with
existing public health laws like Proposition 65 undermines environmental
justice in California.

*Amicus* Mercury Policy Project was formed in 1998 as a project of
the Tides Center, a nonprofit corporation, and is dedicated to promoting
policies to eliminate mercury uses, reduce the export and trafficking of
mercury, and significantly reduce mercury exposures at the local, national,
and international levels.  In 2005, the Mercury Policy Project helped found
the Zero Mercury Working Group, an international coalition of over 100
public interest environmental and health organizations from more than 50

Document received by the CA 1st District Court of Appeal.

countries dedicated to reducing mercury in the global environment.  As part of that coalition, which it continues to co-coordinate, the Mercury Policy Project has coauthored major reports on the prevalence of mercury in skin-lightening products available both online and on store shelves around the world.  Those reports have been cited by the World Health Organization, among other authorities.[1]

The Mercury Policy Project has a substantial interest in this litigation because it believes that the lower court's decision threatens its mission of protecting consumers from a dangerous source of mercury exposure.

## HOW THIS BRIEF WILL ASSIST THE COURT

The proposed *amici curiae* brief will assist the Court by (1) detailing the serious health risks posed by mercury, including in skin-lightening products, (2) reporting the social ramifications of, and controversy surrounding, skin-lightening products, (3) summarizing the laws and regulations that apply to mercury, including in California, and (4) explaining, in light of the text, purpose, and history of 47 U.S.C. § 230(c)(1), that Congress did not intend to preempt the application of environmental laws like Proposition 65 to businesses working in the chain of distribution of physical goods.  The party briefs do not fully address these issues, which are critical to understanding the legal questions before the Court.  Accordingly, Black Women for Wellness and the Mercury Policy Project offer the proposed *amici curiae* brief to provide background context that may be helpful to this Court's resolution of the matter.

---

[1] WORLD HEATH ORG., MERCURY IN SKIN LIGHTENING PRODUCTS (2019), https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.13.

Document received by the CA 1st District Court of Appeal.

## REQUEST FOR LEAVE TO FILE

Because the decision of this Court will directly affect the missions of Black Women for Wellness and the Mercury Policy Project, and because the proposed *amici curiae* brief brings a unique perspective to bear on this matter, Black Women for Wellness and the Mercury Policy Project respectfully request that the Court grant the filing of this *amici curiae* brief.

DATED: June 4, 2021  Respectfully submitted,

       ENVIRONMENTAL LAW CLINIC
       Mills Legal Clinic at Stanford Law School

By: _____
       Thomas Schubert, Certified Law Student
       Molly Melius
       Deborah A. Sivas,
        PTLS Supervising Attorney

       *Attorneys for Prospective Amici Curiae*
       *Black Women for Wellness and The*
       *Mercury Policy Project/Tides Center*

Document received by the CA 1st District Court of Appeal.

## BRIEF OF AMICI CURIAE[2]

## INTRODUCTION

Proposition 65 is a central beacon of environmental protection in California, shining a bright light on toxic chemicals to ensure that individuals are not exposed to them without warning. Mercury, the toxic chemical at issue in this case, is a perpetual target of Proposition 65's spotlight—and for good reason. There is a global consensus that mercury, whether buried in everyday consumer products or spewed from coal-fired power plants, represents a unique hazard to public health. Among its many symptoms, mercury can increase blood pressure, damage kidneys, atrophy muscles, induce tremors, and trigger headaches, insomnia, and memory loss. It serves no known role in the human body.

Despite these substantial health risks, mercury appears frequently in skin-lightening products because it suppresses the production of melanin. That prevalence is especially worrisome because the world is awash in skin-lightening products—in part a troubling symbol of societies continuing to grapple with deeply internalized racism and colorism.

Legal regulations represent one promising avenue for minimizing the harm these products cause. Mercury in particular is subject to pervasive regulations enacted at the global, federal, state, and local levels. The law at issue here, California's Proposition 65, is a small but crucial piece of this patchwork quilt—requiring that businesses like Amazon provide fair warning to individuals in California before the businesses knowingly expose the individuals to mercury. In this case, Amazon failed to provide

---

[2] No party or counsel in the pending case authored this brief in whole or in part, or made any monetary contribution intended to fund the preparation or submission of the brief. No person other than the proposed *amici curiae* made any monetary contribution intended to fund the preparation or submission of this brief.

Document received by the CA 1st District Court of Appeal.

any such warning to the Plaintiff despite knowing that mercury was present in the skin-lightening creams it helped sell.

The lower court determined that Amazon was immune from Proposition 65 liability under Section 230 of the Communications Decency Act, but it misunderstood both Amazon's role and Section 230's scope. The Plaintiff's claims target Amazon as a business that exposed an individual to mercury—not Amazon as a publisher of third-party content, as Proposition 65 requires.  By creating a marketplace, providing services to sellers, curating product listings, mediating buyer–seller communications, and processing transactions itself, Amazon provided a vital link in the vertical chain of distribution of the skin-lightening products at issue.  It should not escape liability on a sprawling interpretation of Section 230 that preempts the state's important environmental policies.

**BACKGROUND**

**I.      Skin-Lightening Products Pose Significant Public Health Risks**

As the global trade in cosmetics marches toward $400 billion annually,[3] researchers, activists, and government officials continue to call attention to the dangerous chemicals contained in many personal care products, such as skin creams, toothpastes, deodorants, and makeup.[4]  One

---

[3] Press Release, Allied Market Rsch., Global Cosmetics Market to Reach $463.5 Billion by 2027 (Feb. 4, 2021), https://www.globenewswire.com/news-release/2021/02/04/2170144/0/en/Global-Cosmetics-Market-to-Reach-463-5-Billion-by-2027-Allied-Market-Research.html.

[4] *See, e.g.*, Harvard Women's Health Watch, *Toxic Beauty: Are Your Personal Care Products Putting Your Health at Risk?*, HARV. HEALTH PUB'G (Apr. 2020), https://www.health.harvard.edu/womens-health/toxic-beauty; *Why Skin Deep?*, ENV'T WORKING GRP., https://www.ewg.org/skindeep/contents/why-skin-deep (last visited May 8, 2021); Personal Care Products Safety Act, S.726, 116th Cong. (2017); Press Release, Sen. Dianne Feinstein, 81 Years Since Last Update to Personal Care Products Law (June 25 2019), https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=FEF521A8-9137-401C-950B-FDF7D5903339.

Document received by the CA 1st District Court of Appeal.

group has estimated that the average American woman uses 12 such products (containing 168 different chemicals) every day, while the average American man uses six products containing 85 chemicals.[5]  Those chemicals include, for instance, "formaldehyde, phthalates, parabens, lead, mercury, triclosan, and benzophenone."[6]  For some of them, exposure to even small amounts is correlated with "endocrine disruption, cancer, reproductive harm, and impaired neurodevelopment in children."[7]

Across the range of cosmetic types, skin lighteners have been given substantial attention in the scientific literature—with study after study establishing their "profound negative impacts on well-being."[8]  Skin-lightening products take many forms and rely on various chemical agents,[9] but mercury is one of the most controversial and deeply studied.  Mercury is often added to skin-lightening products because it inhibits the enzyme that helps synthesize melanin.[10]  But when applied to skin, mercury (like other heavy metals, such as lead) can damage the circulatory and urinary systems, penetrate the blood–brain barrier, impair neurological functioning,

---

[5] Scott Faber, *The Toxic Twelve Chemicals and Contaminants in Cosmetics*, Env't Working Grp. (May 5, 2020), https://www.ewg.org/the-toxic-twelve-chemicals-and-contaminants-in-cosmetics.

[6] Ami R. Zota & Bhavna Shamasunder, Viewpoint, *The Environmental Injustice of Beauty: Framing Chemical Exposures from Beauty Products as a Health Disparities Concern*, 217 Am. J. Obstetrics & Gynecology 418, 418 (2017).

[7] Zota & Shamasunder, *supra* note 6, at 418.

[8] Samara Pollock et al., *The Dark Side of Skin Lightening: An International Collaboration and Review of a Public Health Issue Affecting Dermatology*, 7 Int'l J. Women's Dermatology 158, 159 (2021) (citation omitted).

[9] *Id.* at 162 tbl.2 (listing common skin-lightening methods and their adverse effects).

[10] Swathi Shivakumar & Mohammad Jafferany, *"The Unfair Drive to Be Fair": Psychosocial Aspects and Implications of the Use of Skin Lightening Agents*, 33 Dermatologic Therapy e14091, 2 (2020).

Document received by the CA 1st District Court of Appeal.

and even pierce the placental barrier or contaminate breast milk, posing serious hazards for children.[11]  Other reported symptoms of mercury exposure include not only skin discoloration and scarring but also headaches, insomnia, memory loss, tremors, motor-functioning issues, increased blood pressure, heart palpitations.[12]

Accumulated mercury can result in extreme symptoms.  In 2013, for example, a 16-year-old boy who used a mercury-containing acne cream for six weeks spent almost a month in a pediatric intensive care unit after experiencing "severe back pain; diffuse and visible fasciculations of the extremities, tongue, and lips; unsteady gait; delirium; agitation; sleep disturbances; diaphoresis; persistent tachycardia; and hypertension."[13]  In 2019, a 47-year-old California woman visited a doctor due to an "odd pricking sensation and arm weakness" and then for "blurry vision and slurred speech."[14]  Her condition rapidly declined, and within weeks she had been rendered semi-comatose—the result of mercury poisoning caused by the long-term use of a skin-lightening cream.[15]

---

[11] Irmina Maria Michalek et al., *A Systematic Review of Global Legal Regulations on the Permissible Level of Heavy Metals in Cosmetics with Particular Emphasis on Skin Lightening Products*, 170 ENV'T RSCH. 187, 188 (2019) (collecting empirical studies).

[12] JESSIE POULIN & HERMAN GIBB, WORLD HEATH ORG., MERCURY: ASSESSING THE ENVIRONMENTAL BURDEN OF DISEASE AT NATIONAL AND LOCAL LEVELS 5-6 (2008), https://apps.who.int/iris/handle/10665/43875; WORLD HEATH ORG., *supra* note 1.

[13] Cal. Dep't of Public Health, *Health Alert: Mercury Poisoning Linked to Use of Skin-Lightening or Acne Creams from Mexico* (May 7, 2014), https://biomonitoring.ca.gov/sites/default/files/downloads/Alert_Mercury_skin_creams.pdf.

[14] *Northern California Woman Permanently Injured from Tainted Skin-Lightening Cream*, ABC 7 NEWS (Dec. 29, 2019), https://abc7news.com/skin-cream-lightening-warning-tainted/5794926.

[15] *Id.*; *see also* Anita Mudan et al., *Notes from the Field: Methylmercury*

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

Even more frighteningly, studies have shown how skin-lightening products can readily contaminate entire households with mercury—harming individuals, including children, other than the immediate product user.[16]  The California Department of Public Health has reported multiple such cases, including that of a baby who, after extended exposure to his mother's skin-lightening cream, "exhibited hypertension, refusal to walk, irritability, difficulty sleeping and required a nasogastric tube for poor appetite."[17]

Those dangers are especially worrisome because "[t]he phenomenon of skin-lightening is decidedly global in scope."[18]  Researchers across numerous countries continue to study local practices and implications for public health and society.[19]  In some populations, more than 50% of

---

*Toxicity from a Skin Lightening Cream Obtained from Mexico—California, 2019*, 68 MORBIDITY & MORTALITY WKLY. REP. 1166 (2019).

[16] *See, e.g.*, Ctrs. for Disease Control & Prevention, *Mercury Exposure Among Household Users and Nonusers of Skin-Lightening Creams Produced in Mexico—California and Virginia, 2010*, 61 MORBIDITY & MORTALITY WKLY. REP. 33 (Jan. 20, 2012); Lori Copan et al., *Mercury Toxicity and Contamination of Households from the Use of Skin Creams Adulterated with Mercurous Chloride (Calomel)*, 12 INT'L J. ENV'T RSCH. & PUB. HEALTH 10,943 (2015).

[17] Cal. Dep't of Public Health, *supra* note 13; *Mercury in Skin Creams*, SACRAMENTO CNTY. DEP'T OF HEATH SERVS., https://dhs.saccounty.net/PUB/Pages/Mercury-in-Skin-Creams.aspx (last visited June 1, 2021).

[18] Meagan Jacobs et al., *Fifty Shades of African Lightness: A Biopsychosocial Review of the Global Phenomenon of Skin Lightening Practices*, 7 J. PUB. HEALTH AFR. 67, 68 (2016).

[19] *See, e.g.*, Thomas Murphy et al., *Mercury Contamination of Skin-Whitening Creams in Phnom Penh, Cambodia*, 5 J. HEALTH POLLUTION 33 (2015); M. Osei et al., *Skin-Lightening Practices Among Female High School Students in Ghana*, 155 PUB. HEALTH 81 (2018); Phylicia Ricketts et al., *Mercury Exposure Associated with Use of Skin Lightening Products in Jamaica*, 10 J. HEALTH POLLUTION, no. 26, 2020; Siti Zulaikha Rusmadi

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

individuals use skin-lightening products regularly.[20]  One meta-analysis estimated that 27.7% of individuals *globally* attempt to lighten their skin during their lifetime.[21]  And while not all skin-lightening products contain mercury, numerous investigations of products on the market have detected that many skin-lightening creams contain mercury at levels well beyond the one-part-per-million maximum set by global treaty and federal regulations—in some cases hundreds or thousands of times higher.[22]  As

---

et al., *Preliminary Study on the Skin Lightening Practice and Health Symptoms Among Female Students in Malaysia*, J. ENV'T & PUB. HEALTH, no. 591790, 2015; I. al-Saleh & I. al-Doush, *Mercury Content in Skin-Lightening Creams and Potential Hazards to the Health of Saudi Women*, 51 J. TOXICOLOGY & ENV'T HEALTH 123 (1997); Terry Mohammed et al., *The Evaluation of Total Mercury and Arsenic in Skin Bleaching Creams Commonly Used in Trinidad and Tobago and Their Potential Risk to the People of the Caribbean*, 6 J. PUB. HEALTH 1097 (2017).

[20] Jacobs et al., *supra* note 18, at 68 (52% of women in Dakar, Senegal, and 77% of women in Lagos, Nigeria); Saja H. Hamed et al., *Skin-Lightening Practice Among Women Living in Jordan: Prevalence, Determinants, and User's Awareness*, 49 INT'L J. DERMATOLOGY 414, 415 (2010) (60.7% of sample of women in Jordan); Rusmadi et al., *supra* note 19, at 2 (60.6% of sample of women in Malaysia).

[21] Dominic Sagoe et al., *The Global Prevalence and Correlates of Skin Bleaching: A Meta-Analysis and Meta-Regression Analysis*, 58 INT'L J. DERMATOLOGY 24 (2019).

[22] *See, e.g.*, ZERO MERCURY WORKING GRP., DANGEROUS, MERCURY-LADEN AND OFTEN ILLEGAL SKIN-LIGHTENING PRODUCTS: READILY AVAILABLE FOR (ONLINE) PURCHASE (2019), https://www.zeromercury.org/wp-content/uploads/2019/11/Dangerous-mercury-laden-and-often-illegal-skin-lightening-products-readily-available-for-online-purchase.pdf (finding over one part per million of mercury in 60% of sampled products); Carsten R. Hamann et al., *Spectrometric Analysis of Mercury Content in 549 Skin-Lightening Products: Is Mercury Toxicity a Hidden Global Health Hazard?*, 70 J. AM. ACAD. DERMATOLOGY 281 (2014) (finding over 1,000 parts per million of mercury in 6% of sampled products); Ellen Gabler & Sam Roe, *FDA Widens Mercury-Skin Lightening Cream Investigation*, CHI. TRIB. (May 28, 2010, 2:00 AM), https://www.chicagotribune.com/lifestyles/health/

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

the World Health Organization has recognized, mercury—especially in skin-lightening products—is a "a major public health concern."[23]

## II. Skin-Lightening Products Reflect and Reproduce Social Inequalities

Efforts to publicize these dangers, including in the popular press,[24] have done little to counter the marketing and sale of skin-lightening products.  They remain extremely popular and constitute a multibillion dollar industry globally.[25]  Yet their popularity has unsettled more than just public health scholars.  Other commentators have extensively discussed the highly complicated social dynamics that undergird the practice of skin lightening.

As scholar Trina Jones has explained, "skin color has been, and continues to be, used not only to create and to place people within racial categories, it has also been used to differentiate among individuals within

---

chi-skin-creams-mercury-story.html (finding over 6,000 parts per million in 10% of sampled products).

[23] WORLD HEATH ORG., EXPOSURE TO MERCURY: A MAJOR PUBLIC HEALTH CONCERN (2d ed. 2021), https://www.who.int/publications/i/item/9789240023567; WORLD HEATH ORG., *supra* note 1; *see also Mercury and Health*, WORLD HEATH ORG. (Mar. 31, 2017), https://www.who.int/news-room/fact-sheets/detail/mercury-and-health.

[24] *See, e.g.*, Stephanie M. Lee, *Mercury Warning for Skin-Lightening Creams*, S.F. CHRON. (Jan. 9, 2014), https://www.sfchronicle.com/health/amp/Mercury-warning-for-skin-lightening-creams-5128945.php; Catherine Saint Louis, *Creams Offering Lighter Skin May Bring Risks*, N.Y. TIMES (Jan. 15, 2010), https://www.nytimes.com/2010/01/16/health/16skin.html.

[25] Jemima McEvoy, *L'Oreal, Unilever Reassess Skin Lightening Products—But Won't Quit The Multi-Billion Dollar Market*, FORBES (June 26, 2020), https://www.forbes.com/sites/jemimamcevoy/2020/06/26/loreal-unilever-reassess-skin-lightening-products-but-wont-quit-the-multi-billion-dollar-market/?sh=ad82a4223a13.

24

the same racial category."[26]  That latter process is called colorism.  While racism and colorism are analytically distinct, they tend to reflect a similar governing hierarchy: "light skin is prized over dark skin, and European facial features and body shapes are prized" over non-European ones.[27]  In many cultures, skin color is directly intertwined with social class, as fairer skin is associated with wealth and education.[28]  Preferences for lighter skin also reflect deep legacies of imperialism, colonialism, and slavery built on the subordination of one racial or ethnic population to another.[29]

It has become increasingly clear that skin-lightening products do not merely reflect these deeply embedded inequalities and stereotypes across racial and ethnic groups:  They also reproduce them.  Colorism has been empirically verified in several contexts, including criminal sentencing as well as educational, employment, and financial outcomes.[30]  As one scholar

---

[26] Trina Jones, *The Significance of Skin Color in Asian and Asian-American Communities: Initial Reflections*, 3 U.C. IRVINE L. REV. 1105, 1110 & n.14 (2013) (collecting literature).

[27] Angela P. Harris, Essay, *From Color Line to Color Chart?: Racism and Colorism in the New Century*, 10 BERKELEY J. AFR.-AM. L. & POL'Y 52, 54 (2008); *see also id.* at 60 (explaining that "color" encompasses various aspects of physiognomy, including skin tone, nose shape, and hair texture).

[28] *See, e.g.*, Cris Prystay, *Critics Say Ads for Skin Whiteners Capitalize on Malaysian Prejudice*, WALL. ST. J. (Apr. 30, 2002), https://www.wsj.com/articles/SB1020093658286726600; Marc Lacey, *Fighting "Light Skin" as a Standard of Beauty*, N.Y. TIMES (June 15, 2002), https://www.nytimes.com/2002/06/15/world/the-saturday-profile-fighting-light-skin-as-a-standard-of-beauty.html; Tim Sullivan, *India Wrestles with Its Bias for Fair Skin*, L.A. TIMES (Aug. 3, 2003), https://www.latimes.com/archives/la-xpm-2003-aug-03-adfg-skin3-story.html.

[29] Imani Perry, *Buying White Beauty*, 12 CARDOZO J.L. & GENDER 579, 582 (2006); *see also* Michalek et al., *supra* note 11 (describing the "long-standing history of social divisions" between populations).

[30] Harris, *supra* note 27, at 54-55.

Document received by the CA 1st District Court of Appeal.

summarized, "light-skinned people earn more money, complete more years of schooling, live in better neighborhoods, and marry higher-status people than darker-skinned people of the same race or ethnicity."[31]  Within such a discriminatory reward system, "rational individuals will reasonably make attempts to lighten their skin to achieve social benefits."[32]  That process creates a "cycle that replicates historically-based hierarchies"— "perpetuat[ing] inequality by affirming global color castes."[33]  And it exposes the individuals who use skin-lightening products (and the members of their households) to the health dangers outlined in the section above. Thus, as public health researchers Ami Zota and Bhavna Shamasunder have explained, cosmetics like skin-lightening products are one mechanism through which discrimination becomes "biologically embedded."[34]

Major companies that produce skin-lightening products have long been accused of profiting from this system and trafficking in the "[m]ass distribution of images that idealize whiteness."[35]  These criticisms sharpened following Derek Chauvin's murder of George Floyd in May 2020,[36] and Unilever and Johnson & Johnson, for example, quickly

---

[31] Margaret Hunter, *The Persistent Problem of Colorism: Skin Tone, Status, and Inequality*, 1 SOCIO. COMPASS 237 (2007) (collecting studies).

[32] Perry, *supra* note 29, at 589.

[33] *Id.*

[34] Zota & Shamasunder, *supra* note 6, at 419.

[35] *Id.*; *see also* Ramya M. Vijaya, *Dangerous Skin Bleaching Has Become a Public Health Crisis. Corporate Marketing Lies Behind It.*, WASH. POST (June 15, 2019), https://www.washingtonpost.com/politics/2019/06/15/dangerous-skin-bleaching-has-become-public-health-crisis-corporate-marketing-lies-behind-it.

[36] *See, e.g.*, M.C. Van Hout & M. Wazaify, *Parallel Discourses: Leveraging the Black Lives Matter Movement to Fight Colorism and Skin Bleaching Practices*, 192 PUB. HEALTH 1 (2021).

Document received by the CA 1st District Court of Appeal.

promised to change how they advertise their skin-lightening products.[37] The long-term impact of those marketing changes has yet to be seen.  But as that moment of racial reckoning suggests, the usage of cosmetics—especially of skin-lightening products—is often best analyzed as a social issue.  As legal scholar Deborah Rhode once noted of beauty standards more generally, "[f]ocusing attention on personal decisions rather than collective practices asks too much of individuals and too little of society."[38]

### III.   The Regulation of Mercury Reflects a Global Consensus About Its Danger

Deterring the use of skin-lightening products has proven difficult given the "complex interplay of ingrained beliefs, social pressure and the role of mass media propaganda" that supports them.[39]  The regulation of mercury at the international, federal, state, and local levels therefore represents a narrow but crucial means of protecting consumers from the dangers of these products.

Through the Minamata Convention on Mercury,[40] mercury is the only heavy metal that is directly addressed globally.[41]  Minamata "includes

---

[37] *See* Priya Arora & Sapna Maheshwari, *Criticism of Skin Lighteners Brings Retreat by Unilever and Johnson & Johnson*, N.Y. TIMES (June 25, 2020), https://www.nytimes.com/2020/06/25/business/unilever-jj-skin-care-lightening.html; Aya Batrawy, *"Whitening" Creams Undergo a Makeover but Colorism Persists*, ASSOCIATED PRESS (July 28, 2020), https://apnews.com/article/africa-race-and-ethnicity-dubai-ap-top-news-united-arab-emirates-a72b0f39d637a45cb48710d4229bf373.

[38] Deborah Rhode, *Appearance as a Feminist Issue*, 69 SMU L. REV. 697, 709 (2016).

[39] Shivakumar & Jafferany, *supra* note 10, at 4.

[40] Minamata Convention on Mercury, *opened for signature* Oct. 10, 2013, T.I.A.S. 17-816, 27 U.N.T.S. 17 (entered into force Aug. 16, 2017).

[41] ZERO MERCURY WORKING GRP., MERCURY-ADDED SKIN-LIGHTENING CREAMS: AVAILABLE, INEXPENSIVE, AND TOXIC 8 (2018), https://www.zeromercury.org/wp-content/uploads/2019/02/zmwg_skin_lightening_cream_report_final_nov_2018.pdf.

Document received by the CA 1st District Court of Appeal.

both compulsory and voluntary measures to control mercury emissions from various sources, to phase the element out of certain products and industrial processes, to restrict its trade, and to eliminate mining of it."[42] As relevant here, Minamata requires party nations—of which there are currently 131—to "tak[e] appropriate measures" to prohibit "the manufacture, import or export of mercury-added products," including cosmetics with mercury content over one part per million.[43]

The United States signed Minamata soon after the treaty was opened for signature in 2013.[44]  Additionally, the United States participates in the Global Mercury Partnership, a multinational project that supplements Minamata in seeking to "protect human health and the global environment from the release of mercury and its compounds by minimizing and, where feasible, ultimately eliminating global, anthropogenic mercury releases to air, water and land."[45]  The United States, through the Environmental Protection Agency, leads the "products" partnership area,[46] demonstrating

---

[42] Rebecca Kessler, *The Minamata Convention on Mercury: A First Step Toward Protecting Future Generations*, 121 ENV'T HEALTH PERSPS. A304 (2013).

[43] Minamata Convention, *supra* note 40, art. 4, cl. 1; *id.* annex A, pt. I; MINAMATA CONVENTION ON MERCURY, http://www.mercuryconvention.org (last visited May 8, 2021).

[44] *Minamata Convention on Mercury*, U.S. EPA, https://www.epa.gov/ international-cooperation/minamata-convention-mercury (last visited May 25, 2021); *Parties and Signatories*, MINAMATA CONVENTION ON MERCURY, http://www.mercuryconvention.org/Countries/Parties/tabid/ 3428/language/en-US/Default.aspx (last visited June 1, 2021).

[45] *Global Mercury Partnership*, U.N. ENVIRONMENT PROGRAMME, https://web.unep.org/globalmercurypartnership (last visited May 8, 2021).

[46] *Mercury in Products*, U.N. ENVIRONMENT PROGRAMME, https://web.unep.org/globalmercurypartnership/our-work/mercury-products (last visited May 8, 2021); *EPA Leadership in the Global Mercury Partnership*, U.S. EPA, https://www.epa.gov/international-cooperation/epa-leadership-global-mercury-partnership (last visited May 8, 2021).

Document received by the CA 1st District Court of Appeal.

the nation's longstanding commitment to minimizing mercury in consumer goods.[47]

A variety of federal laws apply to mercury in the United States,[48] including restrictions on the chemical's use in cosmetic products.  Since 1973, the U.S. Food and Drug Administration has prohibited any cosmetic that contains over one part per million of mercury.[49]  The agency's language has not changed in the intervening decades:  "Because of the known hazards of mercury, its questionable efficacy as a skin-bleaching agent, and the availability of effective and less toxic nonmercurial preservatives, there is no justification for the use of mercury in skin-bleaching preparations or its use as a preservative in cosmetics . . . ."[50]

State governments too have sought to protect consumers from the dangers of skin-lightening products.[51]  California has been especially

---

[47] *Amicus* the Mercury Policy Project, on behalf of the Zero Mercury Working Group, is a key contributor to this partnership area of the Global Mercury Partnership. In November 2020, the Mercury Policy Project, in cooperation with the World Health Organization, hosted a webinar on the issue of mercury in skin lightening products. *See Mercury in Skin-Lightening Products: Towards the 2020 Deadline*, U.N. ENVIRONMENT PROGRAMME, https://web.unep.org/globalmercurypartnership/webinar-mercury-skin-lightening-products-towards-2020-deadline (last visited June 1, 2021).

[48] *Environmental Laws that Apply to Mercury*, U.S. EPA, https://www.epa.gov/mercury/environmental-laws-apply-mercury (last visited May 8, 2021).

[49] *See* 38 Fed. Reg. 853, 854 (Jan. 5, 1973) (originally codified at 21 C.F.R. § 3.92; later recodified at 21 C.F.R. § 700.13); *see also* 21 U.S.C. § 331(a) (prohibiting adulterated cosmetics); *id.* § 361 (defining "adulterated").

[50] 21 C.F.R. § 700.13(d) (2020).

[51] *See, e.g.*, *State Health Officials Warn Consumers of Mercury in Skin Cream from Mexico*, TEX. DEP'T STATE HEALTH SERVS. (Jan. 9, 2020), https://www.dshs.texas.gov/news/releases/2020/20200109.aspx (warning consumers after a product was found to contain 29,000 parts per million

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

proactive on this front.[52]  But the state's firm public policy against toxic chemicals like mercury[53] extends well beyond cosmetics.  Thirty-five years ago, voters overwhelmingly voted in support of Proposition 65,[54] thereby enacting the Safe Drinking Water and Toxic Enforcement Act of 1986.[55]  Proposition 65 provides, in relevant part, that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual."[56]  State regulators designated mercury as a known reproductive toxin—and therefore a required Proposition 65 chemical—in 1990.[57]

---

[52] *See Mercury in Skin Creams*, CAL. DEP'T PUB. HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/Pages/MercuryinSkinCream.aspx (last visited May 8, 2021); *Face Creams Containing Mercury*, CAL. DEP'T PUB. HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/Pages/CreamsTested4Mercury.aspx (last visited May 8, 2021).

of mercury); *Hazardous Products: Mercury in Soaps and Creams*, NYC HEALTH, https://www1.nyc.gov/site/doh/health/health-topics/mercury-in-soaps-and-creams.page (last visited May 18, 2021); *Skin Lightening Products Found to Contain Mercury*, MINN. DEP'T OF HEALTH, https://www.health.state.mn.us/communities/environment/skin (last visited May 18, 2021).

[52] *See Mercury in Skin Creams*, CAL. DEP'T PUB. HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/Pages/MercuryinSkinCream.aspx (last visited May 8, 2021); *Face Creams Containing Mercury*, CAL. DEP'T PUB. HEALTH, https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/Pages/CreamsTested4Mercury.aspx (last visited May 8, 2021).

[53] In 2005, for example, the state legislature enacted the Safe Cosmetics Act, which requires that manufacturers disclose any cosmetics that contains ingredients known or suspected to cause reproductive harm or cancer, including mercury. *See* Allison Dotta, Note, *Chapter 314: The Foundation for New Cosmetic Safety Laws*, 51 U. PAC. L. REV. 413, 419 (2021); *see also* CAL. HEALTH & SAFETY CODE § 111792.

[54] *What Is Proposition 65?*, PROPOSITION 65 WARNINGS, https://www.p65warnings.ca.gov/what-proposition-65 (last visited May 8, 2021).

[55] CAL. HEALTH & SAFETY CODE §§ 25249.5-.14.

[56] CAL. HEALTH & SAFETY CODE § 25249.6.

[57] *See* Notice of Intent to List Chemicals, 90 Cal. Reg. Notice Reg., no. 17-Z, April 27, 1990, at 691 (citing studies by the U.S. Environmental

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

As California courts have subsequently made clear, Proposition 65 is a "'remedial statute'" that "should be broadly construed to accomplish its protective purposes." *Cal. Chamber of Com. v. Brown*, 196 Cal. App. 4th 233, 258 (Ct. App. 2011) (quoting *People ex rel. Lungren v. Superior Court*, 14 Cal. 4th 294, 314 (1996)). It is a keystone element in California's environmental-protection regime.

## ARGUMENT

Amazon now seeks refuge from the Plaintiff's Proposition 65 claim under 47 U.S.C. § 230(c)(1), a provision of federal law that immunizes online service providers with respect to claims that arise from their publishing of third-party content. That provision does not extend nearly as far as Amazon would like: The Plaintiff's claims implicate Amazon as a business that exposed an individual to mercury—not Amazon as a publisher of third-party content, as Proposition 65 requires.

As California courts have recognized, Congress enacted Section 230 "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Hassell*, 5 Cal. 5th at 534. The solution that Congress came up with—providing "blanket immunity from tort liability for online republication of third party content," *Barrett v. Rosenthal*, 40 Cal. 4th 33, 57 (2006)—has provided impressively durable support for the development of the modern internet. But neither Amazon nor any other internet company can carry this protective shield beyond the realm of online publishing and into the stream of commerce, insulating itself from the duties imposed by public health statutes like Proposition 65.

---

Protection Agency, the U.S. Food and Drug Administration, the International Agency for Research on Cancer, the National Institute for Occupational Safety and Health, and the National Toxicology Program); *see also* CAL. CODE REGS., tit. 27, § 270019(c).

Document received by the CA 1st District Court of Appeal.

Congress evinced no intention of preempting such crucial state laws, and the court should not assume one.

## I.     Federal Preemption of State Environmental Laws Is Strongly Disfavored

Federal preemption of state laws "represents a serious intrusion into state sovereignty." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1904 (2019) (plurality opinion) (internal quotation marks omitted).  In view of that risk, courts maintain a "strong presumption against displacement of state law"—a presumption that "applies not only to the existence, *but also to the extent*, of federal preemption." *Brown v. Mortensen*, 51 Cal. 4th 1052, 1064 (2011) (emphasis added).  A court's inquiry "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 438 (2002) (internal quotation marks omitted).  Congressional intent is thus "the 'ultimate touchstone' " of analysis.  *Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 939 (2007) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)).  And the party claiming that Congress sought to preempt state law must prove that intent.  *Elsworth v. Beech Aircraft Corp.*, 37 Cal. 3d 540, 548 (1984).

In one sense, courts approach preemption like "any other [question] about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation." *Va. Uranium*, 139 S. Ct. at 1901.  But specific canons of preemption provide additional guardrails.  For one, courts must "narrowly interpret the scope of Congress's intended invalidation of state law." *Brown*, 51 Cal. 4th at 1064 (internal quotation marks omitted).  In the case of equally plausible readings of a statute, a court has a "duty to accept the reading that disfavors

Document received by the CA 1st District Court of Appeal.

pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). This duty is especially important when dealing with matters of health and safety, as the law gives states "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic*, 518 U.S. at 475 (cleaned up). Courts ultimately aim to develop a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *People ex rel. Harris v. Pac Anchor Transp., Inc.*, 59 Cal. 4th 772, 778 (2014).

As these guidelines make clear, preemption analysis "does not occur in a contextual vacuum." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009). Nor could it do so here: Section 230's preemption language itself "provides no substantive content." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 702 (S.D.N.Y. 2009). The preemptive language in Section 230 is instead a truism that flows directly from the Supremacy Clause: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3); *see also* U.S. CONST. art. VI, cl. 2. In fact, the same paragraph contains an equally forceful *limitation* on Section 230's scope, commanding that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). This textual stalemate provides scant guidance about Congress's preemptive intent in creating Section 230. The preemption analysis thus necessarily revolves around the meaning of some other provision within Section 230 that is alleged to be inconsistent with a plaintiff's claim.

The allegedly inconsistent provision in this case is Section 230(c)(1), a publishing-related safe harbor for internet service providers. But a careful reading of Section 230(c)(1)'s history, purpose, and text—particularly

Document received by the CA 1st District Court of Appeal.

when circumscribed by the canons of preemption—reveals no inconsistency with Proposition 65. And much less does it reveal a "clear and manifest purpose of Congress" to immunize conduct that violates state public health laws. *See Ours Garage*, 536 U.S. at 438.

## II.    Section 230 Concerns the Internet as an Information Ecosystem, Not a Marketplace for Physical Goods

The publishing safe harbor provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The history of this provision provides a necessary backdrop for interpreting its text and understanding Congress's preemptive aims: Congress designed Section 230(c)(1) to protect internet servicers providers against claims that arise from objectionable third-party information like defamation and obscenity. Congress did not intend to immunize an internet service provider's conduct merely because that conduct somehow involves information originally posted by a third party.

Congress enacted Section 230 in the Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56, specifically in a title known as the Communications Decency Act (CDA). The TCA was a sprawling law designed mainly to "promote competition in the local telephone service market, the multichannel video market, and the market for over-the-air broadcasting." *Reno v. ACLU*, 521 U.S. 844, 857-58 (1997). Although Congress gave less attention to the internet than to well-established industries like broadcasting and telecommunications, it understood that the internet promised "an extraordinary advance in the availability of educational and informational resources to our citizens"; provided "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual

Document received by the CA 1st District Court of Appeal.

activity"; and ultimately facilitated "a variety of political, educational, cultural, and entertainment services."  47 U.S.C. § 230(a)(1), (3), (5).

At the same time that Congress recognized the internet's capabilities as an information superhighway, it recognized how the same technology could facilitate unsavory and sometimes criminal behavior, such as "transmit[ting] pornography, engag[ing] children in inappropriate adult contact, terroriz[ing] computer network users through 'electronic stalking' and seiz[ing] personal information."  S. REP. NO. 104-23, at 59 (1995); *see also* 141 CONG. REC. 3,203 (1995) (statement of Sen. Exon) (introducing the CDA) ("[T]he information superhighway should not become a red light district."); 141 CONG. REC. 22,045 (1995) (statement of Rep. Wyden) (introducing what became Section 230) ("We are all against smut and pornography . . . .").

But despite these fears about a digital Wild West, Congress ultimately distrusted federal regulators with the task of policing online content.  *See* 141 CONG. REC. 22,045 (1995) (statement of Rep. Wyden) ("No matter how big the army of bureaucrats, it is not going to protect my kids because I do not think the Federal Government will get there in time.").  Congress therefore sought to promote self-policing of internet content—"to encourage [online service providers] like Prodigy, like CompuServe, like America Online, like the new Microsoft network, to do everything possible for us, the customer, to help us control, at the portals of our computer, at the front door of our house, what comes in and what our children see."  *Id.*; *see also* 47 U.S.C. § 230(b)(4) (establishing a policy "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet").

To create the necessary incentives for this self-regulation of objectionable content, Congress abrogated what it viewed as an unfavorable

Document received by the CA 1st District Court of Appeal.

liability rule exemplified by an unreported state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710, at *1 (N.Y. Sup. Ct. May 24, 1995); *see also* 141 CONG. REC. 22,045 (1995) (statement of Rep. Wyden) (discussing *Stratton*); S. REP. NO. 104-230, at 194 (1996) (Conf. Rep.) (same). *Stratton* involved defamatory posts that an unidentified third-party user made about the plaintiff investment firm (Stratton-Oakmont) on an online bulletin board operated by the defendant (Prodigy). *See Stratton* 1995 WL 323710, at *1; 141 CONG. REC. 22,045. Because Prodigy had exerted editorial control over some of the content on its bulletin board, the court held that Prodigy was a "publisher"—and therefore liable for the defamation. *Stratton* 1995 WL 323710, at *4. Congress believed that *Stratton*'s all-or-nothing liability rule would discourage online service providers from taking steps to monitor objectionable third-party content or to provide users with tools for doing so. *See* 141 CONG. REC. 22,045; S. REP. NO. 104-230, at 194. This chilling effect on internet platforms' self-policing of objectionable content would "create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services." S. REP. NO. 104-230, at 194.

In crafting Section 230(c)(1), Congress thus sought to "'spare interactive computer services [the] grim choice' between voluntarily filtering content and being subject to liability on the one hand, and ignoring all problematic posts altogether [to] escape liability." *HomeAway.com*, 918 F.3d at 684 (citation omitted) (quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com*, 521 F.3d 1157, 1163-64 (2008)). Internet platforms that hosted objectionable content—such as obscenity and defamation—would not be held liable in tort *for that information*, whether or not the platforms chose to exercise some editorial discretion. This policy was deemed to be a "thoughtful approach to keep[ing] smut off the net

Document received by the CA 1st District Court of Appeal.

without government censorship," 141 CONG. REC. 22,047 (1995) (statement of Rep. Goodlatte), as it balanced free-speech principles with emergent moral anxieties about the online world.  But Congress did not discuss the internet beyond its function as a portal of potentially problematic information.

## III.   Amazon's Role in the Chain of Distribution Falls Outside Section 230

As explained above, the publishing-related safe harbor provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Before granting immunity under this subsection, courts require that "(1) the defendant be a provider or user of an interactive computer service; (2) the cause of action treat the defendant as a publisher or speaker of information; and (3) the information at issue be provided by another information content provider." *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 830 (2002).

No party disputes that Amazon provides an "interactive computer service."  *See* 47 U.S.C. § 230(f)(2) (defining the term).  But Amazon fails the second and third prongs of the test:  Its liability under Proposition 65 arises directly from its own actions in exposing a consumer to mercury without warning—not from its role as a "publisher or speaker of information" that was "provided by another information content provider."

### A.   Proposition 65 Targets Amazon as a Business in the Chain of Distribution—Not as a Publisher

Section 230(c)(1) immunizes an interactive computer service only from liability that "derives from [its] status or conduct as a 'publisher or speaker'" of content provided by another.  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *see also Hassell v. Bird*, 5 Cal. 5th 522, 544 (2018) (plurality opinion) (limiting Section 230 to a platform's "legal role

and responsibilities [as] a publisher qua publisher"). For the purposes of Section 230(c)(1), the act of "publishing" involves exercising "a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Barrett*, 40 Cal. 4th at 43 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Critically, "not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third party content, even when these obligations are in some way associated with their publication of this material." *Hassell*, 5 Cal. 5th 522, 542-43.

The Plaintiff's Proposition 65 claim does not target Amazon as a publisher. It alleges that Amazon "knowingly and intentionally expose[d] [the Plaintiff] to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning." *See* CAL. HEALTH & SAFETY CODE § 25249.6. The Plaintiffs' claims thus "depend on Amazon's own activities, not its status as a speaker or publisher of content provided by [a third party] for its product listing." *See Bolger v. Amazon.com, LLC*, 53 Cal. App. 5th 431, 439 (Ct. App. 2020) (holding that Amazon was not immune from a claim arising from a product sold by a third party).

Amazon's activities were extensive in scope and critical to the Plaintiff's exposure to mercury. As the lengthy trial record illustrates, Amazon plays a vital and profitable role in the process through which products sold on its marketplace end up in the hands of consumers: providing listing services to sellers for various fees, *see, e.g.*, Trial Tr. 1441:3-8, 1465:7-25, 1466:1-1467:3; AA 0824; furnishing a browsable interface for buyers, *see, e.g.*, Trial Tr. 1445:1-4, 1445:6-9; mediating communications between buyers and sellers, *see, e.g.*, Trial Tr. 2132:15-2138:3; and processing transactions themselves, *see, e.g.*, AA0829 (noting that "Amazon—not the third-party seller—appears on customers' credit

Document received by the CA 1st District Court of Appeal.

card statements").  In short, Amazon did not merely "provide[] an online storefront"; it "placed itself squarely between" the buyer and seller in the transactions at issue.  *See Loomis v. Amazon.com LLC*, No. B297995, 2021 WL 1608878, at *7 (Cal. Ct. App. Apr. 26, 2021) (imposing strict liability on Amazon for a defective third-party product where Amazon "took the order for the hoverboard, took the payment, and passed the order up the chain of distribution").  Amazon's direct role in the chain of distribution—not its hosting of third-party information—is what triggered its Proposition 65 liability for knowingly exposing the Plaintiff to mercury.

In *Bolger v. Amazon.com, LLC*, the Fourth District recently held that Section 230 did not shield Amazon from a strict-liability claim over a faulty battery contained in a laptop that a third party had sold on Amazon's marketplace.  *See* 53 Cal. App. 5th at 437-38.  The claims in *Bolger*, like the claims here, targeted "Amazon's role in 'the vertical distribution of consumer goods' as an 'integral part of the overall producing and marketing enterprise'" for the product in question.  *Id.* at 464 (internal quotation marks omitted).  The court emphasized that "[w]hatever term we use to describe Amazon's role, be it 'retailer,' 'distributor,' or merely 'facilitator,' it was pivotal in bringing the product here to the consumer." *Id.* at 438.  Section 230 immunity was thus inappropriate because the "claims depend[ed] on Amazon's own activities, not its status as a speaker or publisher of content provided by" another.  *Id.* at 464; *see also State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 390 F. Supp. 3d 964, 972 (W.D. Wis. 2019) (rejecting Section 230(c)(1) immunity on similar facts because "Amazon is an integral part of the chain of distribution"); *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139 (4th Cir. 2019) (similar).

Document received by the CA 1st District Court of Appeal.

## B. Amazon's Liability Arises from Its Own Conduct—Not from Third-Party Information

Amazon's failure to satisfy the third element of the immunity test follows directly from its failure to satisfy the second.  Because Proposition 65 targets Amazon's own conduct in the chain of distribution of skin-lightening products—not its role as a publisher—this case does not *arise from* a piece of third-party content in the manner required by Section 230(c)(1).  *See Gentry*, 99 Cal. App. 4th at 830 (requiring under Section 230(c)(1) that "the information *at issue* be provided by another information content provider" (emphasis added)).

This point is deceptively simple:  Third-party information is not "at issue" merely because it is relevant.  Section 230(c)(1) "cuts off liability only when a plaintiff's claim *faults the defendant for information* provided by third parties."  *See Lemmon*, 2021 WL 1743576, at *6 (emphasis added).  Even where third-party content lies at the core of a claim, Section 230(c)(1) immunity does not attach if the claim targets the defendant in a non-publishing role.  *See, e.g.*, *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170 (2014) (rejecting Section 230(c)(1) immunity for an online service provider that modified its software to allow a third party to distribute a deficient prescription-drug pamphlet to the plaintiff).  Put another way, Section 230(c)(1) attaches only when the alleged duty would "necessarily require an internet company to monitor third-party content."  *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019).

The Plaintiff's Proposition 65 claim does not fault Amazon for the contents of the skin-lightening product listings on Amazon's marketplace, nor does the Plaintiff allege that Amazon had any particular duty to review, edit, or delete those listings.  Rather, Amazon violated Proposition 65 when, despite knowing that the skin-lightening creams at issue contained

Document received by the CA 1st District Court of Appeal.

mercury, it took concrete actions to sell those products and ultimately expose the Plaintiff to mercury without warning.  Amazon helped deliver a specific set of tangible products to a California consumer's doorstep.

As Amazon points out, the skin-lightening products at issue were posted to Amazon's marketplace by third-party sellers.  But an online service provider like Amazon does not assume the role of a publisher merely because "a claim would not otherwise have accrued but for the third-party content."  *HomeAway.com*, 918 F.3d at 682.  In *HomeAway.com*, for instance, the Ninth Circuit upheld a Santa Monica ordinance that required online home-rental platforms like Airbnb to cross-reference any third-party rental listing against an official municipal registry before the platforms were allowed to approve booking transactions for such listings.  *HomeAway.com*, 918 F.3d at 680, 682.  Although complying with the ordinance effectively required the platforms to review "data initially obtained from third parties," the ordinance did not regulate publishing as such.  *Id.* at 682.  As the Ninth Circuit noted, the ordinance did not "proscribe, mandate, or even discuss the content of the listings that the Platforms display on their websites.  It require[d] only that transactions involve licensed properties."  *Id.* at 683 (citation omitted).  Thus a platform's liability under the ordinance did not arise from any third-party information; it arose from a platform's "processing transactions for unregistered properties."  *Id.*

Similarly here, Proposition 65 merely prohibits business like Amazon from knowingly exposing individuals to mercury without warning. It does not "proscribe, mandate, or even discuss the content of the listings" on Amazon's website.  *Id.* at 683.  In practice, of course, Proposition 65 might reasonably lead a platform like Amazon "to respond with monitoring or other publication activities."  *Id.* at 682.  But an online service provider

Document received by the CA 1st District Court of Appeal.

does not transform into a publisher "whenever a legal duty 'affects' how [it] 'monitors' a website." *Id.* at 682.

In fact, the connection to Section 230(c)(1) is even more tenuous here than in *HomeAway.com*. The ordinance in that case categorically imposed on rental platforms a duty to verify third-party content before approving any transaction based on that content. *Id.* at 683. Here, by contrast, there is no claim that Amazon possesses a duty to verify third-party product listings—only a requirement that it not knowingly expose individuals to mercury without warning. Even if the online product listings had all remained the same as they actually were in this case, Amazon would have avoided liability so long as the products that were ultimately shipped to the Plaintiff contained adequate Proposition 65 warnings (for example, on the box), so long as Amazon had no knowledge of the mercury itself, *or* so long as the products did not actually contain mercury. This is simply not a case about Amazon's role as a "publisher" of harmful online "content"; it's about Amazon's role in knowingly exposing an individual to mercury without warning.

## IV. Congress Did Not Immunize Online Commerce in Physical Goods

Section 230 immunizes internet service providers from claims arising from their exercise or non-exercise of traditional editorial functions over third-party online content. *See Gentry*, 99 Cal. App. 4th at 830 (three-part test). It is a powerful tool that has arguably made possible the internet as we know it. *See generally* JEFF KOSSEFF, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET (2019). And because of that power, Section 230 has been mired in bitter debates about the role of internet companies as arbiters of speech in our society.[58] This case avoids those

---

[58] *See, e.g.*, Bill Hagerty, Opinion, *Goodbye Section 230, Hello Liberty*,

*footnote continued on next page*

Document received by the CA 1st District Court of Appeal.

normative questions and seeks merely to recognize the natural limits of
Section 230 based on its text, its purpose, and common sense.  None is on
Amazon's side.

　　　As for the text, Amazon is not alleged to be liable as a "publisher" of
"information," even if Amazon incidentally published information in this
case.  Its liability under Proposition 65 arises directly from its own actions
in exposing a consumer to mercury without warning."  This case involves
no objectionable content, such as obscenity or defamation, that Amazon
hosted on its site.  We can imagine an analogous transaction inside a brick-
and-mortar store, with Amazon performing all the same functions that it
performed here—such as displaying the products, mediating all
communications between the buyer and the seller, and processing the
payment.  In that scenario, Proposition 65 would target Amazon's actions
in "bringing the product . . . to the consumer" and thereby exposing an
individual to mercury.  *See Bolger*, 53 Cal. App. 5th 431, at 434, 438
(internal quotation marks omitted).  Amazon would be treated as an
"integral part of the overall producing and marketing enterprise," *see id.* at
453 (quoting *Vandermark v. Ford Motor Co.*, 391 P.2d 168, 171 (Cal.
1964)), not as a publisher of information, and it could be liable under
Proposition 65.

　　　As for Section 230's purpose, Congress sought "to promote the free
exchange of information and ideas over the Internet and to encourage
voluntary monitoring for offensive or obscene material."  *Hassell*, 5 Cal.

---

WALL ST. J. (Apr. 26, 2021), https://www.wsj.com/articles/goodbye-
section-230-hello-liberty-11619476294 (proposing to abolish
Section 230); Kate Ruane, *Dear Congress: Platform Accountability
Should Not Threaten Online Expression*, ACLU (Oct. 27, 2020),
https://www.aclu.org/news/free-speech/dear-congress-platform-
accountability-should-not-threaten-online-expression (defending
Section 230 against various proposals for reform).

Document received by the CA 1st District Court of Appeal.

5th at 534.  Section 230 emerged from debates over pornography and defamatory—information that is objectionable *by itself*.  The mere fact that this case involves a product listing does not sweep it within the scope of Congress's concerns about information qua information.  Congress simply made no mention of businesses that work in the chain of distribution of physical goods, trading in products that arrive on consumers' doorsteps.

As for common sense, Congress did not transform the internet into "a lawless no-man's-land" that resists all "laws of general applicability." *See Fair Hous. Council*, 521 F.3d at 1164.  While one of its stated goals was to "promote the continued development" of "interactive computer services," 47 U.S.C. § 230(b)(1), Congress did not provide internet-based companies like Amazon with a portable liability shield.  Section 230 "limits liability based on the *function* the defendant performs, not its identity." *Force v. Facebook, Inc.*, 934 F.3d 53, 81 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020) (Katzmann, C.J., concurring in part and dissenting in part).  The function it chose to protect is the publishing of online information—not the selling of physical goods.

It is critical to enforce this legislative distinction, notwithstanding Amazon's suggestion that "e-commerce" itself deserves special treatment under the law.  "[N]obody seriously doubts that Amazon is anything but the titan of twenty-first century commerce."[59]  Last year alone, "Amazon generated 80.46 billion U.S. dollars in third-party seller service revenues."[60]  And it did not do so by serving as a neutral platform.  The company "exercises control over each sale through a host of mechanisms

---

[59] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 710, 712 (2017).

[60] Tugba Sabanoglu, *Third-Party Seller Share of Amazon Platform 2007-2021*, STATISTA (May 7, 2021), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform.

Document received by the CA 1st District Court of Appeal.

that maximize its profit and determine who will buy what from whom."[61]
Amazon requires each third-party seller to enter into a "Business Solutions
Agreement (BSA) that governs every aspect of the sellers' relationship with
Amazon."[62] It thereby retains significant control over how products are
organized and presented on its website; "curtails the right of third-party
vendors to communicate with Amazon sites users"; and channels all sales
transactions through itself.[63]  Immunizing Amazon's conduct under
Section 230 not only expands the law beyond its purpose but also allows
Amazon, as a business working in the chain of distribution of physical
goods, to continue to strategically insulate itself from environmental laws—
"doing online what it may not lawfully do off-line."  *See Fair Hous.
Council*, 521 F.3d at 1162.

## CONCLUSION

In this case, Amazon "knowingly and intentionally expos[ing] [the
Plaintiff] to a chemical known to the state to cause cancer or reproductive
toxicity without first giving clear and reasonable warning."  *See* CAL.
HEALTH & SAFETY CODE § 25249.6.  By suing under Proposition 65, the
Plaintiff simply sought to vindicate his rights and to enforce California's
public policy against dangerous chemicals like mercury.  *See id.* § 25249.7;
*see also Lungren*, 14 Cal. 4th at 314 (describing Proposition 65 as a
"remedial statute" that warrants a broad construction).  Nothing about
Section 230 evinces a "clear and manifest purpose of Congress" to prevent
this type of claim.  *See Ours Garage*, 536 U.S. at 438.

The Court should reverse the judgment of the Superior Court.

---

[61] Edward J. Janger & Aaron D. Twerski, *The Heavy Hand of Amazon: A
Seller Not a Neutral Platform*, 4 BROOK. J. CORP. FIN. & COM. L. 259
(2020).

[62] *Id.*

[63] *Id.*

Document received by the CA 1st District Court of Appeal.

DATED: June 4, 2021  Respectfully submitted,

ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School

By: _____
  Thomas Schubert, Certified Law Student
  Molly Melius
  Deborah A. Sivas,
   PTLS Supervising Attorney

*Attorneys for Prospective Amici Curiae*
*Black Women for Wellness and*
*The Mercury Policy Project/Tides Center*

Document received by the CA 1st District Court of Appeal.

## CERTIFICATE OF WORD COUNT

Pursuant to Rule 8.204(c) of the California Rules of Court, I certify that the text of this brief consists of 8,677 words, not including caption, tables, signature block, and required certificates, as counted by Microsoft Word, the computer word processing program used to generate the brief.

DATED: June 4, 2021

_____
Molly Melius

Document received by the CA 1st District Court of Appeal.

**PROOF OF SERVICE**

At the time of service, I was over the age of eighteen years and not a party to this action.  I am employed in the county of Santa Clara, State of California.  My business address is 559 Nathan Abbott Way, Stanford, California 94305-8610.

On June 4, 2021, I served the foregoing BLACK WOMEN FOR WELLNESS AND THE MERCURY POLICY PROJECT/TIDES CENTER'S APPLICATION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF AND [PROPOSED] BRIEF IN SUPPORT OF APPELLANT/PLAINTIFF LARRY LEE on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION**:  I caused a copy of the document to be sent from e-mail address anamv@stanford.edu to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 4, 2021, at Stanford, California.


_Ana Villanueva_
Ana Villanueva

Document received by the CA 1st District Court of Appeal.

**SERVICE LIST**

Rachel S. Doughty
Jessica L. Blome
Greenfire Law, PC
2550 Ninth Street, Suite 204B
Berkeley, California 94710
(510) 900-9502
rdoughty@greenfirelaw.com
jblome@greenfirelaw.com

Jonathan Weissglass
Law Office of Jonathan Weissglass
1939 Harrison Street, Suite 150-B
Oakland, California 94612
(510) 836-4200
jonathan@weissglass.com

*Attorneys for Appellant Larry Lee*

Gregory L. Doll
Brett H. Oberst
Jamie O. Kendall
Lloyd Vu
Doll Amir & Eley LLP
725 S. Figueroa Street, Suite 3275
Los Angeles, California 90017
gdoll@dollamir.com
boberst@dollamir.com
jkendall@dollamir.com
lloydvu@dollamir.com

*Attorneys for Respondent Amazon.com, Inc.*

Document received by the CA 1st District Court of Appeal.