# Exhibit  B
# Plaintiff's Request for Judicial Notice

No. A158275

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT
DIVISION TWO

———————————

**LARRY LEE,**

APPELLANT/PLAINTIFF,

v.

**AMAZON.COM, INC.**

RESPONDENT/DEFENDANTS,

———————————

Appeal from the Superior Court for the County of Alameda
Honorable Robert McGuiness
Case No. RG14738130

———————————

**BRIEF OF AMICUS CURIAE ATTORNEY GENERAL
RON BONTA
IN SUPPORT OF APPELLANT LARRY LEE**

———————————

ROB BONTA (SBN 202668)
*Attorney General of California*
*DENNIS A. RAGEN (SBN 106468)
ROXANNE CARTER (SBN 259441)
*Deputy Attorneys General*
600 West Broadway, Suite 1800
San Diego, CA 92101
P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 738-9416
Fax: (619) 645-2271
Roxy.Carter@doj.ca.gov

Document received by the CA 1st District Court of Appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ........................................................5

INTRODUCTION AND SUMMARY OF ARGUMENT................6

ARGUMENT ................................................................... 11

    I.    THE TRIAL COURT DID NOT PROPERLY APPLY THE
LEGAL STANDARD FOR PROPOSITION 65..................... 11

        A.    Mr. Lee's Test Data Demonstrated that
the Products at Issue Contained Mercury
as an Intended Ingredient. ............................. 11

            1.    There was compelling evidence that
the Products contained mercury. ......... 11

        B.    The Sale of a Product for its Intended use
is Sufficient to Demonstrate Exposure if
that Intended Use Inherently Involves
Exposure.......................................................... 19

        C.    Amazon Knew that the Products
Contained Mercury. ....................................... 21

        D.    Internet Retailers are not Excluded from
Proposition 65. ............................................... 22

    II.    THE CDA DOES NOT IMMUNIZE AMAZON FROM
LIABILITY.................................................................. 25

        A.    Proposition 65 Does not Require Amazon
to Monitor Third Party Content..................... 25

        B.    Other Recent Cases Make Clear that
Proposition 65 is not Preempted by the
CDA. ................................................................ 28

        C.    Congress did not Intend to Preempt
Claims like the ones at Issue in this
Case. ................................................................ 30

CONCLUSION.................................................................. 32

CERTIFICATE OF COMPLIANCE............................................. 32

Document received by the CA 1st District Court of Appeal.

# TABLE OF AUTHORITIES

**Page**

CASES

*AFL-CIO v. Deukmejian*
(1989) 212 Cal. App. 3d 425 .................................................. 9, 28

*Bolger v. Amazon.com, LLC*
(2020) 53 Cal.Appp.5th 431 .......................................... *passim*

*Camp v. Board of Supervisors*
(1981) 123 Cal.App.3d 334 ........................................................6

*Consumer Cause v. Weider Nutrition Int'l Inc.*
(2001) 92 Cal.App.4th 363.......................................................21

*Doe v. Internet Brands, Inc.*
(9th Cir. 2016) 824 F.3d 846..............................................29, 30

*Gentry v. eBay, Inc.*
(2002) 99 Cal.App.4th 816 ......................................................30

*HomeAway.com, Inc. v. City of Santa Monica*
(9th Cir. 2019) 918 F.3d 676........................................26, 27, 31

*Loomis v. Amazon.com LLC*
(2021) 63 Cal.App. 5th 466 .....................................................25

*Vandermark v. Ford Motor Co.*
(1964) 61 Cal.2nd 256..............................................................25

STATUTES

United States Code, Title 21
§ 331(a)-(c) ...........................................................................14

United States Code, Title 47
§ 230.......................................................................................26
§ 230(e)(3) .......................................................................31, 32

Document received by the CA 1st District Court of Appeal.

## TABLE OF AUTHORITIES
### (continued)

**Page**

California Civil Code
    § 1739.7(b) ................................................................................ 30
    § 3546 ....................................................................................... 20

California Code of Regulations
    § 27001(c) ................................................................................. 14

California Code of Regulations, Title 27
    § 25600.2 .................................................................................. 24
    § 25600.2(e)(5) ......................................................................... 24
    § 25600.2(f) .............................................................................. 22

Code of Federal Regulation, Title 21
    § 700.13(d)(2) ..................................................................... 13, 14

Health and Safety Code
    § 25249.5 ................................................................................... 6
    § 25249.6 ............................................................... 23, 24, 25, 28
    § 25249.7 ................................................................................... 6
    § 25249.7 (b) ........................................................................... 10
    § 25249.11(f) ........................................................................... 24
    § 25249.12(c)-(d) ..................................................................... 10
    §§ 111670 and 111700 ............................................................. 14

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article V
    § 13 ........................................................................................... 6

**COURT RULES**

California Rules of Court
    Rule 8.200(c)(7) ......................................................................... 6

Document received by the CA 1st District Court of Appeal.

## STATEMENT OF INTEREST

Attorney General Rob Bonta submits this brief pursuant to California Rules of Court, Rule 8.200, subdivision (c)(7), in the exercise of the Attorney General's independent constitutional, statutory, and common law powers to represent the public interest.  The Attorney General is the State's chief law officer.  See Cal. Const., art. V, § 13; *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 353.  He is also the public official with statewide authority to enforce the Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249.5 et seq. (Proposition 65).  He is the only public official with authority to review and comment on settlements entered into by private enforcers under Proposition 65.  Health & Saf. Code, § 25249.7.  The Attorney General thus has a special interest in the proper interpretation and enforcement of this statute.

This Proposition 65 enforcement action involves mercury in skin-whitening products.  Mercury is a highly toxic substance and the levels in the products at issue here were so high as to pose dangers of mercury poisoning.  The Attorney General submits this brief as amicus curiae in support of Appellant to assist the Court in its analysis on two issues:

> (1) With respect to the requirements imposed by Proposition 65: (a) the standards that apply when a judge is deciding whether a plaintiff has adequately shown that a particular product contains a listed toxicant when the toxicant is the very mechanism by which the product achieves its advertised purpose; (b) the extent to which a plaintiff must prove individual consumers' exposure to a toxin-containing product (here, a skin cream) when bodily exposure is inherent in the normal, intended use of the product; and (c) the extent to which a provider of such products can escape liability by pleading ignorance about a product's composition when the product has been identified to  the provider by official, published health alerts; and

> (2) Whether the federal Communications Decency Act, 47 U.S.C. §230, preempts a plaintiff's Proposition 65 claims against online sellers of contaminated products.

Document received by the CA 1st District Court of Appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Proposition 65 was passed by a large majority of the voters in 1986, because they wanted to be protected from, or alternatively warned about, hazardous substances.  The law has been instrumental in removing these hazardous substances–especially heavy metals like lead and mercury–from foods and consumer products. The standards adopted by the trial court, and advanced by Amazon on this appeal, would apply to the Attorney General, and other public prosecutors, and would significantly undermine their efforts to enforce the law and to protect public health.  Proposition 65 has been an effective tool in promoting the safety of many imported products that are not subject to effective health and safety regulations and that, accordingly, pose health risks that California consumers know nothing about. These risks are especially pronounced when an online seller, like Amazon, can arrange to have these dangerous, unregulated, products shipped to California homes without any warning to consumers.  In this context, the decision below could eviscerate the ability of the Attorney General, District Attorneys, and private enforcers to continue their effective work in protecting Californians from these dangerous products.

Specifically, the trial court's ruling, and the arguments that Amazon raises here, lack merit, and have the potential to severely weaken Proposition 65 enforcement, for the following reasons:

First, the trial court's ruling that a Proposition 65 enforcer is required to test multiple samples from each lot–even when the ingredient (here, mercury) is the intended, active agent that has been deliberately added to make the product perform its advertised function–lacks any merit. This ruling is unsupported by precedent, and it would have severe implications for health agencies like the California Department of Public Health (CDPH) and the European Union's Rapid Alert System for dangerous non-food products (RAPEX), entities that issue–as they did in

Document received by the CA 1st District Court of Appeal.

this case–product-wide alerts based on test results for only a few units.  The trial court's ruling is especially troubling here, where the private enforcer had no access to the foreign sellers of these products, and Amazon, which did have access to sellers or distributors of these products, did not provide a single test result showing that any of the products did not contain the active ingredient, mercury.

Second, and of equal concern, is the trial court's ruling that irresponsible manufacturing practices can be used as a defense to a Proposition 65 enforcement action, and that Amazon could avoid liability because the suppliers here had no standard "Good Manufacturing Practices" (GMPs) in place to ensure the consistency of the mercury in the skin creams. This argument is irrelevant here, because mercury was intentionally added to the creams, and the sampling done by the private plaintiff (Larry Lee), CDPH and RAPEX shows that the chemical was present at thousands of times the legal limit.  This ruling would undermine the work the Attorney General has done under Proposition 65 to require companies to use Good Manufacturing Practices to address heavy metals in consumer products, and it would encourage businesses to ignore these crucial safety practices because doing so would provide them with an effective defense to liability under Proposition 65.

Third, the Court's next ruling–that the sale of a product for its intended use is not sufficient to prove exposure–is novel, defies common sense, and is contrary to common practice in Proposition 65 cases where the parties and the courts routinely use the sale of the product as the proxy for the exposure, if the intended use of the product will cause the exposure. To require the plaintiff to present evidence of actual use of the contaminated product would significantly undermine the statute, enabling violators to pay minimal penalties when they intentionally sell millions of units of a dangerous product.

Document received by the CA 1st District Court of Appeal.

Fourth, the court's ruling that Proposition 65 is preempted by the Communications Decency Act lacks merit, because what Amazon was required to do here–provide a warning or stop selling a dangerous product once it learned of the danger–does not involve any of the factors that would lead to preemption. Amazon was not required to review, or take responsibility for, third-party content, and it was not made liable for the statements of others. This preemption ruling would undercut the protections sought by voters when they enacted Proposition 65, and permit Amazon to operate an open portal into the American marketplace, selling dangerous and adulterated products manufactured by foreign companies, like the mercury creams at issue here, with impunity.

Fifth, while Amazon disparages Mr. Lee as a "bounty hunter" (Respondent's Br. 54), it overlooks the voters' purpose in enacting Proposition 65. Specifically, the voters expressed frustration with State agencies' work in protecting them from hazardous substances, and they therefore wanted to enable private enforcers to secure "strict enforcement of the laws controlling hazardous chemicals." *AFL-CIO v. Deukmejian* (1989) 212 Cal. App. 3d 425, 430-431, quoting Preamble, Proposition 65, Section 1. That is just what Mr. Lee did here. He identified a health threat of statewide (in this case international) concern: the sale of skin-whitening creams adulterated with dangerous levels of mercury.[1] Notwithstanding the fact that state and international agencies had issued health alerts urging people not to use these products because they can cause mercury poisoning,

---

[1] A host of health and environmental groups, including Sierra Club, Center for Environmental Health, Campaign for Safe Cosmetics, the Beautywell Project, and Black Women for Wellness shares these concerns. See, https://www.sierraclub.org/sites/www.sierraclub.org/files/program/documents/Amazon_Letter_15_November2018_Final_US-51.pdf (as of 6/5/2021).

Document received by the CA 1st District Court of Appeal.

the products were still available on Amazon's website for any California consumer to purchase, without any warning to consumers that the Products would expose them to toxic levels of mercury. Mr. Lee researched the products and the alerts; he located the products for sale on the Amazon website; he tested the Products to confirm they had very high mercury levels; and he served sixty-day notices and sued Amazon. His actions were consistent with the voters' intent and the statutory requirements, and were necessary to achieve the goal that had eluded the governmental regulators: to stop Amazon's sales of the hazardous products to California consumers who had no warning that the products would expose them to mercury, and who, if they received such a warning, would not buy the products.[2]

---

[2] Amazon notes that Mr. Lee sought high penalties (25% of which would have been payable to him, and the remaining 75% payable to the Office of Environmental Health Hazard Assessment (OEHHA) (Health & Saf. Code section 25249.12(c)-(d))) based on testing of only a few products. (Respondent's Br. 14-15, 34.) Penalties were not addressed by the trial court; they are not before this Court, and in this brief, the Attorney General does not address this issue, except to note that Proposition 65 sets out the factors that the Court should consider in setting a penalty, including the nature and number of the violations, whether the violator took good faith measures to comply, the willfulness of the misconduct, and "any other factor that justice may require." (Health & Saf. Code, section 25249.7, subd. (b).)

In this case, the proposed penalty was significantly higher than any that the Attorney General is aware of. Further, cases warranting the highest penalties usually involve companies who are responsible for the presence of the harmful chemical in the product, either by direct placement as an ingredient (for example by using lead as a component on soda bottles or in artificial turf) or by inadequate supervision of their ingredients (for example by allowing lead contamination in candies and cookies). Neither factor is present here, where Amazon violated Proposition 65 by selling products that had been adulterated with mercury by others. If this matter is remanded to the trial court, Amazon will have an opportunity to present evidence and argue that a lesser penalty–or no penalty–is warranted.

Document received by the CA 1st District Court of Appeal.

Finally, in considering the effect of the trial court's ruling, it is important to note that the Attorney General, sometimes working with District Attorneys, the Los Angeles City Attorney, and private enforcers, has filed and settled Proposition 65 cases that have been successful in removing high levels of hazardous substances, such as lead, from a wide range of products, including, for example, Mexican style candy; Mexican Coke, Pepsi and Dr. Pepper/7Up soda bottles; Nabisco Ginger Snaps; and artificial turf, including AstroTurf.  The resulting Consent Judgments require the settling companies to implement carefully designed measures, usually including Good Manufacturing Practices, to minimize the levels of lead and other dangerous chemicals in their products.[3]

The trial court's ruling in this case will undermine the public health benefits of enforcement of Proposition 65, not only by private enforcers, but by public enforcers as well.  It will enable sellers like Amazon to continue to operate as a conduit for adulterated foreign products to be sold

---

[3]

https://oag.ca.gov/sites/all/files/agweb/pdfs/prop65/People_v_Alpro_Alimentos_Proteinicos.pdf (Mexican style candy Consent Judgment) at pp 5-6, 7-10; https://oag.ca.gov/system/files/media/prop65-people-coke-042908.pdf (Mexican Coca-Cola Consent Judgment), at pp. 4, 6-14 ; https://oag.ca.gov/system/files/media/prop65-people-pepsi-071806.pdf (Mexican Pepsi Consent Judgment), at pp. 5-6, 8-19; https://oag.ca.gov/system/files/media/prop65-people-dp7up-032307.pdf (Mexican Dr. Pepper/Seven Up Consent Judgment) at pp. 6, 8-18; https://oag.ca.gov/sites/all/files/agweb/pdfs/prop65/people_v_mondelez.pdf (Nabisco Ginger Snaps Consent Judgment) at pp. 4-5, 6-7; https://oag.ca.gov/system/files/media/AstroTurf%20Signed,%20Entered.pdf (AstroTurf Consent Judgment) at p.3, (all as of 6/6/2021).   For a list of other major settlements, in products ranging from vitamins to anti-diarrheal medicines, to children's' toys see https://oag.ca.gov/prop65/litigation.   See also, Rechtschaffen and Williams, *The Continued Success of Proposition 65 in Reducing Toxic Exposures* 35 ELR 10830 (2005)

Document received by the CA 1st District Court of Appeal.

to consumers in California.  It will frustrate the intent of the voters, who wanted to avoid exposure to dangerous chemicals or, alternatively, be warned about potentially harmful products so that they could protect themselves from exposures.

## ARGUMENT

I. **THE TRIAL COURT DID NOT PROPERLY APPLY THE LEGAL STANDARD FOR PROPOSITION 65.**

### A.  Mr. Lee's Test Data Demonstrated that the Products at Issue Contained Mercury as an Intended Ingredient.

The trial court placed an inappropriate legal burden on Mr. Lee–and by implication on any other Proposition 65 enforcer, including the Attorney General–by requiring him to go beyond establishing the *prima facie* elements of his case (here, that the Products contained elevated levels of mercury and that a test from each of these Products showed very high levels of mercury).  Instead, under this ruling the enforcer would need to prove, through multiple tests from multiple lots, that *each unit* of these Products contained this intended ingredient.[4]  Statement of Decision, pp 7-8, AA935-936.  This ruling is of serious concern to the Attorney General and runs contrary to both common sense and the purpose of Proposition 65 to protect Californians from dangerous chemicals.

#### 1.  There was compelling evidence that the Products contained mercury.

In this case, there are three compelling factors that establish that Mr. Lee satisfied his burden of proof.

---

[4] For the purposes of this brief the "Products" are Face Fresh, Faiza and Monsepa.

Document received by the CA 1st District Court of Appeal.

First, Mr. Lee provided evidence that the Products contained mercury. In addition to his own testing, this included the following test results from RAPEX[5] and the California Department of Public Health:

| | Mercury concentration in milligrams per kilogram (parts per million (ppm)) | | |
|---|---|---|---|
| | Fazia | Face Fresh | Monsepa |
| Mr. Lee's Testing[6] | 9,600 | 5,600 | 15,000 |
| CDPH/State Testing[7] | | | 8,900 |
| | | | 12,000 |
| | | | 13,000 |
| RAPEX.Testing[8] | 5,430 | 4,620 | |
| | 5,940 | | |

All these results were thousands of times above the maximum level allowed by federal law, which is 1 part per million. 21 C.F.R. §700.13(d)(2).[9]

---

[5] RAPEX is the European Union's system that informs member states and companies about safety issues in non-food products. 4 RT 1349:22-1351:22.

[6] Lee's test results are found at AA481 (Faiza), AA491 (Face Fresh), and AA504 (Monsepa).

[7] The California Department of Public Health's test results are found at AA454 and 644, and a third result on which it relied is found at AA653 (Monsepa).

[8] RAPEX issued two alerts based on the test results for Faiza. The first, indicating a mercury concentration of 5,430 mg/kg (ppm) is found at AA599; see also AA601-02, and Motion for Judicial Notice, Ex. E. The second indicating a mercury concentration of 5,940 mg/kg (ppm) is found at AA629, see also AA610-611 and Motion for Judicial Notice, Ex. G. RAPEX also issued an alert for Face Fresh, showing a mercury concentration of 4,620 mg/kg (ppm) found at AA597, see also AA567-568, 623 and Motion for Judicial Notice, Ex. D.

[9] This is not a case where the mercury levels hovered near that legal limit. Amazon is therefore wrong when it asserts that: "Here, the products purportedly containing mercury are not themselves the issue—that is, the products themselves are not prohibited or illegal, only if they are

(continued…)

Document received by the CA 1st District Court of Appeal.

Second, mercury was the intended ingredient.  The levels of mercury found in these Products were not trace contaminants that might have accidentally made their way into some lots but not into others.  Instead, mercury was intentionally added to the Products as an active, skin-whitening agent, which the manufacturer would have included in every lot, as demonstrated by the following evidence presented to the court:

- Mercury is the active ingredient that in fact achieves the product's goal: lightening skin.  5 RT 1676:9-1676:11;

- Lee's experts carefully explained that that mercury was the deliberately added, active ingredient.  4 RT 1315:17-1316:10, 1330:23-1331:10, 1332:22-1333:6;

---

(…continued)

adulterated." (Respondent's Br. 51.)  In fact, under federal law, "any cosmetic containing mercury" (unless it is intended for use only around the eye) is considered to be "adulterated" if it contains one part per million or more of mercury.  21 C.F.R. §700.13(d)(2).  An adulterated cosmetic is prohibited under federal law.  21 U.S.C. §331(a)-(c).  Cosmetics, other than eye cosmetics, which contain more than 1 ppm mercury are also considered "adulterated" and are prohibited under California Law.  Health and Safety Code sections 111670 and 111700.  Mercury is listed as a developmental toxin under Proposition 65 (27 Cal Code Regs § 27001(c)) and regular exposure can cause mercury poisoning.  AA412.  RAPEX, therefore determined that the Faiza product "poses a chemical risk because it contains a mercury compound (5,940 mg/kg) as a skin-lightening substance." AA629.  Motion for Judicial Notice, Ex. G.  It issued a similar warning for Face Fresh.  AA597.  Motion for Judicial Notice, Ex. D.  The California Department of Public Health warned people not to use the Monsepa product because it "tested positive for high levels of mercury.  Mercury is a toxic chemical, and regular or prolonged exposure can result in mercury poisoning."  AA412.

Document received by the CA 1st District Court of Appeal.

- Amazon's expert conceded that mercury was an ingredient, not a contaminant.  6 RT 2070:10-2071:6, 2076:4-9; and

- RAPEX reached the same conclusion, that mercury was an ingredient, not a contaminant.  It noted: "This product poses a chemical risk because it contains a mercury compound (4,620 mg/kg) *as a skin-lightening substance.*" AA597, Motion for Judicial Notice, Ex. D.  (Emphasis added).

Third, the products for which RAPEX and CDPH issued health alerts are the same ones that Amazon sold.  AA415, AA629 (Poona Brothers Faiza Beauty Cream); AA456, AA596-597 (Face Fresh Beauty Cream); AA439-443, AA411-413 (Monsepa Express Peeling).

Mr. Lee therefore presented clear evidence that (1) the Products he tested contained high levels of mercury; (2) mercury was the intended ingredient in these Products; and (3) these Products were the same ones for which RAPEX or CDPH had issued their product-wide alerts.  The only proper inference that can be drawn from these facts is that all the units of the product contain significant amounts of mercury, even if the actual levels vary somewhat.  Mr. Lee therefore carried his burden of showing that the Products–including the units that Amazon sold–contained mercury.

In fact, when the CDPH or RAPEX issued their advisories against the Products, they showed results for only a small number of units of those creams.  The alerts, however, were product-wide.  AA599, 629, Motion for Judicial Notice Exs. E, G (Faiza); AA597 Motion for Judicial Notice Ex. D (Face Fresh); AA411-413 (Monsepa).  While no one would seriously argue that CDPH could recall only units of product that it tested, this is what would result from the argument Amazon makes here.  Further, while there may be reason to make a health advisory lot- or batch-specific, if evidence indicates that a particular lot was accidentally contaminated, there is no reason for a health advisory to be limited to a particular lot of a product

Document received by the CA 1st District Court of Appeal.

14

when the regulatory agency has found, as RAPEX did here, that a manufacturer is using a listed chemical as an intended active ingredient in a product. In those situations, regulatory agencies routinely conclude, as CDPH and RAPEX did here, that the product will contain the chemical and that a product-wide alert is appropriate.

Faced with all this evidence, Amazon could have provided specific evidence of its own to indicate that mercury was not present in every unit of the Products. It did not do so. While Amazon criticizes Mr. Lee for providing too few tests, this is not part of an enforcing party's prima facie case, which Mr. Lee established here, where his testing showed that the Products contained high levels of mercury.

Along the same lines, Amazon claims that "*Lee presented no evidence regarding the manufacturing and distribution processes used for any of the products at issue*." (Respondent's Br. 22) (emphasis in original). Again, this is not part of an enforcing party's prima facie case. It would be especially inappropriate to place this burden on Mr. Lee in this case, where he had no means of contacting the manufacturers or sellers of these Products to inquire into their "manufacturing and distribution practices." Evidence showed that the Products were likely to have been manufactured in Pakistan (4 RT 1429:18-24, 1313:2-1314:2, AA597, AA599, AA629, Motion for Judicial Notice Exs. D, E, G), and possibly supplied from Hong Kong. 3 RT 911:9-25, 3 RT 912:1-9. Amazon made these sales possible in California; it knew who the foreign sellers or distributors were; it could have contacted these parties directly; and it had leverage to obtain needed information. (Opening Br. 32-33.) Given these facts, Amazon's criticism of Mr. Lee for providing only limited product information and a few test results rings hollow. Mr. Lee met his prima facie case and Amazon provided nothing in response.

Document received by the CA 1st District Court of Appeal.

Amazon also argues that the existence of the RAPEX tests and advisories should only apply to European sales, and do not demonstrate that the California products contained mercury, because some companies use different ingredients for different countries. Its expert, for example, "highlighted the example of Coca Cola, which uses different ingredients for the 'same' products sold in different countries." (Respondent's Br. 30.) While some companies may indeed use different ingredients in different countries, Amazon presented no evidence that this happened here, particularly where the ingredient at issue is the active ingredient that makes the product effective for its intended purpose. In fact, the only evidence in the record shows that every single unit of the Products, regardless of where manufactured or where sold, contained the identical active ingredient– mercury. Mr. Lee purchased the Products in California, and they contained high levels of mercury. CDPH separately purchased the Monsepa product in California, and it contained high levels of mercury. RAPEX based its alerts on Faiza and Face Fresh products from the United Kingdom, and they had similarly high levels of mercury.[10] The evidence shows all the Products contained high levels of mercury, irrespective of the source of these Products.

Amazon's remaining argument regarding the presence of mercury distorts the evidence of Mr. Lee's expert witness. Amazon notes that the manufacturers of the Products did not use current GMPs, and it quotes testimony from Mr. Lee's expert, Mr. Steinberg, that, because of the absence of these vital quality controls, "*all bets are off*" as to the "consistency [of mercury] across units and batches." (Respondent's Br. 23,

---

[10] See, the Table at page 12, above. The RAPEX alerts indicate that the Faiza and Face Fresh products were from the United Kingdom. AA599, 629, 597, Motion for Judicial Notice Exhs. D, E, G.

Document received by the CA 1st District Court of Appeal.

emphasis added.)  Amazon thus concedes that there were *no safeguards* to limit the concentrations of mercury in the Products, and there was nothing to prevent these mercury levels from reaching concentrations high enough to cause devastating results, especially to pregnant women.[11]  Amazon uses this cavalier handling of a toxic substance as a defense.  The Attorney General respectfully asks the court to reject this argument for the following reasons.

First, Amazon distorts Mr. Steinberg's testimony.  Mr. Steinberg was speaking about the *consistency* of the mercury concentrations across batches. (4 RT 1412:24–1418:23, 1429:18–1430:3.)  While the levels in the batches tested did vary, by several thousand parts per million, they all contained dangerously high levels of mercury.  And those levels were not slightly above the dangerous level.  Instead, the tested sample with the lowest mercury concentration was still approximately 4,600 times the level that the law sets as too dangerous for human use.  See Table at page 12, supra.  Further, Mr. Steinberg did *not* testify that the active, intended ingredient of these Products–mercury–was likely to be absent from any of those batches because of the lack of GMPs.  And, again, Amazon provided

---

[11] See, Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR) Mercury Exposure Among Household Users and Nonusers of Skin-Lightening Creams Produced in Mexico — California and Virginia, 2010, available at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6102a3.htm ; Centers for Disease Control and Prevention, MMWR, Notes from the Field: Methylmercury Toxicity from a Skin Lightening Cream Obtained from Mexico — California, 2019, available at https://www.cdc.gov/mmwr/volumes/68/wr/mm6850a4.htm ; March of Dimes, Mercury and Pregnancy, available at https://www.marchofdimes.org/pregnancy/mercury.aspx ;(all as of 06/05/2021)

Document received by the CA 1st District Court of Appeal.

no test results showing that the mercury in the Products ever ranged lower than 1 ppm.

Second, the lack of GMPs and quality controls should not be used–as the trial court did and as Amazon urges this Court to do–to make it easier to sell dangerous and illegal products by requiring the plaintiff to test multiple units in every single lot of the product, in order to prove that the units all contain the chemical.[12]  As noted above (page 10, footnote 3), the Attorney General's Proposition 65 settlements routinely require companies to implement GMPs, under the supervision of a qualified product quality auditor, to ensure that the contaminants in their products are kept to the lowest level feasible.  The trial court ruling now turns this safety requirement on its head:  suppliers' lack of quality control can be used *as a defense,* and a company that takes a reckless approach to exposing its consumers to toxins, like mercury, is entitled to hold the plaintiffs to a higher standard of proof.  This defense, if accepted, would encourage unscrupulous businesses to avoid GMPs so that they can argue that there is no evidence that their products contain dangerous substances.  This ultimately would undermine the work the Attorney General has done over the past decades to require companies to use GMPs and GMP audits to

---

[12] Indeed, the trial court's reference to Good Manufacturing Practices makes no sense for another reason.  Good manufacturing practice is intended to ensure that products do not contain banned chemicals.  See the U.S. FDA's Good Manufacturing Practice (GMP) Guidelines/Inspection Checklist for Cosmetics, available at: https://www.fda.gov/cosmetics/cosmetics-guidance-documents/good-manufacturing-practice-gmp-guidelinesinspection-checklist-cosmetics (as of 06/05/2021).

successfully reduce heavy metal contamination, and resulting exposures, in a wide variety of products.

### B. The Sale of a Product for its Intended use is Sufficient to Demonstrate Exposure if that Intended Use Inherently Involves Exposure.

The trial court also erred when it accepted Amazon's argument that Mr. Lee had to prove that purchasers of the Products opened the tubes and applied the creams to their skin.  The showing, which Amazon demanded, is novel, has never been part of a Proposition 65 plaintiff's case, and, if required, will affect the Attorney General's and other enforcers' ability to enforce Proposition 65, and ultimately endanger Californians.

The evidence Amazon now demands is, as Mr. Lee notes, contrary to a basic rule of construction enacted by the legislature in 1963: "Things happen according to the ordinary course of nature and the ordinary habits of life." Cal. Civil Code §3546.  Consistent with this rule, the Attorney General has always assumed that people who buy cookies eat them; people who buy sodas drink them; and people who buy skin creams apply them to their skin.  Further, companies do not sell products that their customers will not use, and consumers do not buy skin creams unless they intend to apply them to their skin.  Accordingly, in his cases, the Attorney General has not provided declarations from consumers that they ate the lead-containing cookies, took the vitamins, or used the anti-diarrheal medicine that have been the subject of his Proposition 65 claims.  Nor has any court ever even suggested that such evidence was necessary.

 The Office of Environmental Health Hazard Assessment (OEHHA) –the lead agency that implements Proposition 65–has repeatedly emphasized this common-sense interpretation of the word "expose" in its formal Final Statements of Reasons (FSORs) supporting related Proposition 65 regulations.  For example, in a FSOR for a regulation

Document received by the CA 1st District Court of Appeal.

involving consumer product exposures, OEHHA concluded that "expose" "could include the purchase by an individual of a product, not just the consumption of that product."  Revised Final Statement of Reasons, 22 California Code of Regulations Division 2, §12601 (Nov. 1, 1988), at p. 10, Exhibit B to Appellant's Motion for Judicial Notice.  Similarly, in the FSOR for a regulation defining certain terms in the law, OEHHA considered when exposures to agricultural chemicals occurred, and rejected the definition of "expose" that Amazon advances:

> The term "expose" generally means "to lay open", as to something which is injurious or dangerous.  Laying an individual open to a chemical hazard through a consumer product could result from any act which propels the product toward the individual.

Final Statement of Reasons, 22 California Code of Regulations Division 2, at p. 19, Lee's Supplemental Motion for Judicial Notice, Exhibit H.  A company that sells a product that includes directions to apply it to the skin is "[l]aying an individual open to a chemical hazard through a consumer product" and Amazon's counter argument–that an enforcer must prove that users opened and used the dangerous product to establish liability–is contrary to Proposition 65 and its implementing regulations, and the lead agency's clear and repeated interpretation of those regulations. [13]

Finally, Amazon relies on evidence from CDPH that there has been a public campaign to discourage the use of skin-whitening creams that may contain mercury, including a buy-back program for new and used products.

---

[13] To argue for a narrow reading of the exposure requirement, Amazon relies on *Consumer Cause v. Weider Nutrition Int'l Inc*. (2001) 92 Cal.App.4th 363, 369–371, which held that an exposure did not occur when one chemical caused the metabolism of a different, listed chemical in the body.  That case is irrelevant, because no comparable situation has occurred here, as mercury was present in the product itself, not metabolized through use.

Document received by the CA 1st District Court of Appeal.

Based on this, Amazon asserts that it is likely that not even one of the Products at issue was opened or used.  (Respondent's Br. 33.)  As Mr. Lee notes, there are several problems with this claim, including that there is no evidence that the campaign reached Amazon's buyers.  (Reply Br. 25-26.)  Moreover, if the campaign was efficient enough to reach each of the buyers who placed the 238 orders on Amazon's website (Respondent's Br. 14, 33), Amazon would likely have heard of it, and based on this widespread information, it should have ceased the sales of these Products.

### C.   Amazon Knew that the Products Contained Mercury.

Another aspect of the trial court's ruling that presents significant concerns for the Attorney General relates to Amazon's knowledge.  The trial court found that Amazon lacked "actual knowledge" that the Products contained mercury because mercury was not identified as an ingredient on any of the product pages or on the product labels.  Statement of Decision, at p. 10. AA929, 938.  In essence, the trial court created a partial exception to the warning requirement for chemicals that are deliberately omitted from the product label.  This reasoning must be rejected for two reasons:

First, it misconstrues the meaning of actual knowledge, which can be obtained from any reliable source.  Amazon specifically relies  on the regulation that defines a retailer's actual knowledge under Proposition 65 (Respondent's Br. 26), which provides:

> "Actual knowledge" means the retail seller receives information from *any reliable source that* allows it to identify the specific product or products that cause the consumer product exposure.  Such knowledge must be received by the retail seller, its authorized agent or a person whose knowledge can be imputed to the retail seller.

27 Cal Code Regs. § 25600.2(f) (emphasis added).  Here, Amazon had notice from RAPEX that the Faiza and Face Fresh products contained mercury, but it continued to sell these products until it received Mr. Lee's

Document received by the CA 1st District Court of Appeal.

sixty-day notice.  AA768:13-21.  Mr. Lee supplied photographs to show that the products that were the subject of the RAPEX notice were the same products that he bought and tested.  AA415, AA629 (Faiza); AA456, AA597 (Face Fresh).  Similarly, Amazon received information about the Monsepa product from Mr. Lee's sixty-day notice and continued to sell it even after receiving this notice.  AA387, 439-443, AA412-413 (Reply Br., 33-34).[14]

Second, the trial court's view of notice would significantly interfere with Proposition 65's objectives as to dangerous *contaminants*—that is, things that are not intentionally added, and therefore not listed on the label, like lead in candy, cookies and vitamins.  This would seriously undermine the effectiveness of Proposition 65 in compelling companies to adopt quality control procedures to detect, reduce, or eliminate contaminants that are carelessly, but not intentionally, added to their products.

## D.   Internet Retailers are not Excluded from Proposition 65.

Proposition 65 applies to a "person …doing business" within the meaning of California Health & Safety Code section 25249.6.  Amazon does not dispute that it is a person doing business in California.  It argues, however, that its "limited involvement with the sales at issue should not be held to have created a duty to warn."  (Respondent's Br. 52.)  Specifically, Amazon asserts that:

> [Proposition 65] itself reveals an intent to impose the responsibility to warn on entities in the chain of distribution, with primary

---

[14] The fact that Amazon did later cease sales or provide a warning for these products (Opening Br. 49) would be a factor for the trial court to consider in setting a penalty.

22

Document received by the CA 1st District Court of Appeal.

responsibility on "the producer or packager rather than on the retail seller." (Health & Saf. Code § 25249.11(f).)

(Respondent's Br. 53.)  The section Amazon quotes (Respondent's Br. 25-26, 52-53), however, also specifically states: "regulations implementing Section 25249.6 shall to *the extent practicable* place the obligation to provide any warning materials such as labels on the producer or packager rather than on the retail seller."  Section 25249.11(f), emphasis added. The applicable regulation, 27 Cal Code Regs. §25600.2, therefore provides that the retail seller *is* liable when it is not practicable to require the producer or packager to provide the warning.  Thus, while Amazon cites section 25600.2 (Respondent's Br. 26, 52), it omits the provision which states that retailers *are* responsible for providing the warning when the suppliers are foreign companies that cannot readily be sued in California.  Specifically, under this regulation, the retailer must warn when:

> **(5)** The retail seller has actual knowledge of the potential consumer product exposure requiring the warning, and there is no manufacturer, producer, packager, importer, supplier, or distributor of the product who:
>> **(A)** Is a "person in the course of doing business" under Section 25249.11(b) of the Act, and
>> **(B)** Has designated an agent for service of process in California or has a place of business in California.

27 Cal. Code Regs. § 25600.2(e)(5).  That is precisely the situation here: Amazon had actual knowledge of the potential exposure it was causing when it sold the Products in California; and there is no evidence that the foreign suppliers of the Products had designated a service agent in California.  The rationale behind a retailer's responsibility when someone earlier in the production chain cannot be reached is the same as the public policy supporting strict liability at common law—to ensure that the burden is borne, not by consumers who may be harmed, but by those participants in the production and marketing enterprise.  See *Bolger v. Amazon.com,*

Document received by the CA 1st District Court of Appeal.

*LLC* (2020) 53 Cal.Appp.5th 431, 448, citing *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2nd 256.  Accordingly, the very regulatory provision that Amazon relies on serves to establish that Amazon is subject to Proposition 65 and should be held liable in this case.

Finally, Amazon argues that "only parties in the chain of distribution have a duty to warn under Proposition 65." (Respondent's Br. 51) (capitalization omitted).  As an initial matter, Proposition 65 simply states that the defendant must be a "person . . .doing business."  Health & Saf. Code, section 25249.6.  In any event, Amazon is within the "chain of distribution" for the Products at issue here.  As the Court held in *Bolger, supra,* 53 Cal. App. 5th at 438, "Amazon is a direct link in the chain of distribution, acting as a powerful intermediary between the third-party seller and the consumer." More recently, in *Loomis v. Amazon.com LLC* (2021) 63 Cal. App. 5th 466, 476, the court noted that:

> Contrary to Amazon's assertion that it merely provided an online storefront for TurnUpUp and others to sell their wares, it is undisputed Amazon placed itself squarely between TurnUpUp, the seller, and Loomis, the buyer, in the transaction at issue. When Loomis wanted to buy a hoverboard for her son, she perused product listings on Amazon's website.  Amazon took Loomis's order and processed her payment.  It then transmitted the order to TurnUpUp, who packaged and shipped the product to Loomis.

*Id.* at 480.  Based on this conduct, the court held "we are persuaded that Amazon's own business practices make it a direct link in the vertical chain of distribution under California's strict liability doctrine." *Id.*  Amazon did the same thing here that it did in *Loomis. (*Opening Br. 32-33, AA304:9-14, 415-18, 440-443, 445-50, 510-12, 514-15, 517-20*.)*  Amazon is, therefore, for these same reasons, a party in the chain of distribution, and there is no question that it is subject to Proposition 65.

Document received by the CA 1st District Court of Appeal.

## II.   THE CDA DOES NOT IMMUNIZE AMAZON FROM LIABILITY.

The purpose of the Communications Decency Act (CDA)(47 U.S.C. §230) was to protect internet service providers from slander and defamation claims in order to foster a free exchange of ideas and promote the continued development of the internet.  See *Bolger v. Amazon*, *supra,* 53 Cal.App.5th at 463.  The CDA therefore provides, in pertinent part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  *Id.* at 230(c)(1).  As the following discussion will show, the CDA does not preempt Proposition 65.

### A.   Proposition 65 Does not Require Amazon to Monitor Third Party Content.

Amazon's key claim in invoking the CDA is that, to comply with Proposition 65, it was required to "monitor" and make changes to the product display pages posted by the suppliers of the Products. (Respondent's Br. 41-50.)  This, however, is false.  Amazon could have complied with Proposition 65 here without ever looking at those pages. Amazon had control of the sales of the Products and once it learned– whether from RAPEX, Mr. Lee's notices, or from any reliable source–that these Products contained mercury, it could have prevented those sales or could have provided its own warnings.

*HomeAway.com, Inc. v. City of Santa Monica* (9th Cir. 2019) 918 F.3d 676, 683 is instructive here.  In that case, the Ninth Circuit upheld a Santa Monica ordinance that prohibited HomeAway.com, a home-booking website, from allowing homeowners to list properties that were not licensed and listed on the city's registry.  The Ninth Circuit held that the ordinance did not run afoul of the CDA because it required only that Homeaway.com

Document received by the CA 1st District Court of Appeal.

*prevent* the booking of certain properties.  It did not obligate the company to monitor or remove any third-party content.  *Id.* at 681-682.

In an attempt to distinguish *HomeAway,* Amazon relies on the court's observation that the Santa Monica ordinance "does not require the Platforms to review the content provided by the hosts of listings on their websites." *HomeAway* at 682.  Amazon states that Proposition 65 does require such review or monitoring.  (Respondent's Br. 50-51.)  Specifically, it claims:

> Under Lee's theory of liability, Amazon would be required to monitor the product detail pages for every product sold by a third party, test or obtain testing information for each product that might contain a listed chemical (a process rife with logistical, factual, and legal issues), analyze the testing data (same), and determine whether to add a warning that the seller opted not to provide. This concept is untenable and directly contrary to the objectives of the CDA, not to mention common sense. (Respondent's Br. 44.)

This is false.  In this case, Proposition 65 did not require Amazon to monitor its product listing pages or to investigate whether they were offering mercury-containing products without a warning.  What Proposition 65 did require was for Amazon to act, *once it knew* that these creams had high levels of mercury.  Once it learned that was the case (from RAPEX or from Mr. Lee's sixty-day notice), it had the *option* of looking at the product pages in question to see if they contained a warning, but it was not required to do this.  Amazon's other options, once it learned of the mercury exposures, were to prevent the sale of Products, or to simply add a warning to the product page, without reviewing it to see if any warning was already present.

Finally, Amazon may argue that it had no duty to compare the products it saw in the RAPEX alerts with the products that are available for sale on its website–because that would constitute "monitoring."  *HomeAway.com* concisely rejected a similar argument:

Document received by the CA 1st District Court of Appeal.

> Nor could a duty to cross-reference bookings against Santa Monica's property registry give rise to CDA immunity. While keeping track of the city's registry is "monitoring" third-party content in the most basic sense, such conduct cannot be fairly classified as "publication" of third-party content.

*Id.* 682-683.  Once Amazon learned from RAPEX that the Face Fresh and Faiza products had dangerous levels of mercury, it had the duty under Proposition 65 to cross-reference these products with those for sale on its website, and to cease sales or warn.  As *HomeAway.com* held, this duty to cross-reference does not give rise to CDA immunity.[15]

Proposition 65 therefore survives CDA preemption for the same reason that the rental ordinance in *HomeAway.com* did.  It did not require any review of the platforms' product pages, but it did require Amazon to prevent transactions that violate the law.[16]

---

[15] While there were no RAPEX alerts for Monsepa, Mr. Lee shows that Amazon continued to sell the Monsepa product after receiving his sixty-day notice that informed Amazon that this product contained mercury *and* that it was for sale on Amazon's website.  (Reply Br. 33-34.)

[16] Amazon is also mistaken when it argues "Proposition 65 is merely a warning statute.  Liability is based *entirely* on the provision of information—namely, whether a warning was provided. . . ." (Respondent's Br. 46, emphasis in original.)   This is not correct, because businesses may comply with Proposition *either* by warning or by eliminating the exposure.  Health & Saf. Code, § 25249.6.  Amazon admits as much when it claims that it is not liable because Mr. Lee did not prove that there was an exposure.  (Respondent's Br. 32-36.)

One primary purpose of the law is to see that toxic products are reformulated to remove chemicals, like mercury, that cause reproductive harm.  *AFL-CIO v. Deukmejian*, supra*, 212 Cal.App.3d 425, 430-431.  Section 25249.10(c) provides that no warnings are required when exposures fall below certain levels.  Reformulating products to ensure that exposures do not exceed those levels is, and has been, the main requirement of the Attorney General's settlements in every case where such reformulation is possible.

Document received by the CA 1st District Court of Appeal.

### B.   Other Recent Cases Make Clear that Proposition 65 is not Preempted by the CDA.

Two recent cases underscore how the CDA fails to support Amazon's claim to immunity.  In *Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F.3d 846, the defendant, Internet Brands, knew about a rape scheme two users conducted on its website.  The plaintiff brought a claim against it for failure to warn about the scheme. *Id.* at 849.  The court noted that such a warning would arise from publishing activities, but that this did "not mean the failure to warn claim seeks to hold Internet Brands liable as the 'publisher or speaker' of user content." *Id at 853.*  Instead, the court held that barring the "failure to warn claim would stretch the CDA beyond its narrow language and its purpose." *Id.*

Amazon seeks to distinguish *Internet Brands* based on certain factual differences, mainly that the alleged underlying conduct there was criminal, and it did not arise from a particular posting on Internet Brand's website.  In deciding that Internet Brands did have a duty to warn, however, the court made several holdings that are relevant here.  First, the court reasoned that allowing the plaintiff's failure to warn claim would not have the chilling effect on the internet that the CDA is meant to avoid:

> But such a broad policy argument does not persuade us that the CDA should bar the failure to warn claim.  We have already held that the CDA does not declare a general immunity from liability deriving from third-party content. [T]he Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.

*Id.* at 852-853, citations and quotation marks omitted.

Next, the court noted that Internet Brands was not alleged to have learned of the predators' activity from any monitoring of postings on the website, nor was its failure to monitor postings at issue.  *Id* at 851.  The same is true here, where Amazon is alleged to have learned of the

Document received by the CA 1st District Court of Appeal.

adulterated Products from the RAPEX alerts and from Mr. Lee's notice, and, as noted above, not from monitoring any postings.

Finally, the court found that: "The duty to warn allegedly imposed by California law would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." (*Id.* at 851.)  The same is true here.  Proposition 65 did not require Amazon to alter any content; Amazon could have complied with Proposition 65 in the same way that Internet Brands would need to comply, by posting a warning or by blocking sales of the adulterated Products.

Amazon's reliance on *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4[th] 816, is misplaced for similar reasons. In *Gentry*, a plaintiff sued eBay for failing to provide a warranty or certificate of authenticity for autographed collectibles that third-party sellers represented to be to be authentic, as required by Civil Code section 1739.7(b). The court ruled for eBay, concluding that holding the company responsible for providing a warranty when "it merely made the individual defendant's false product descriptions available to other users on its Web site. . . puts eBay in the shoes of the [third party sellers], making it responsible for their publications or statements." *Id* at 832-33. The court found that imposing such a requirement on eBay was preempted by the CDA. *Id.* The situation here, however, is different, because Proposition 65 does not make Amazon liable for the statements of the suppliers of the Products; it requires Amazon independently to provide a warning or to cease sales of the Products.

The Court of Appeal in *Bolger*, *supra*, carefully explained the limits of the *Gentry* holding:

> Bolger's claims are based on Amazon's role in the chain of production and distribution of an allegedly defective product. The fact that some content provided by Lenoge was posted on the Amazon website does not automatically immunize Amazon for its own choices and activities unrelated to that content. (See

Document received by the CA 1st District Court of Appeal.

*HomeAway.com, supra,* 918 F.3d at pp. 682–683.)

*Bolger, supra,* 53 Cal.App.5th at p. 465.  The same is true here, where Mr. Lee's claims are based on Amazon's role in "the chain of production and distribution of a [] defective product" that contains dangerous levels of mercury. *Id*.  Amazon's liability in *Bolger* was based on products provided by Lenoge, who was the third-party seller.  In the present case, Amazon's liability is similarly based on products provided by third-party sellers.  As the *Bolger* court held, the fact that this case arises from third-party products does not immunize Amazon from its own choices and activities.  Amazon's choice here, to continue to sell the Products without providing a warning, after it knew that they contained dangerously high levels of mercury, is therefore not immunized by the CDA.

### C.   Congress did not Intend to Preempt Claims like the ones at Issue in this Case.

Amazon cannot broaden the scope of the CDA beyond its purpose, to evade California's police power. The CDA contains a savings clause that states, "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section . . ." 47 U.S.C. §230(e)(3).  This savings clause recognizes that California must be able to enact laws to ensure its citizens' health and safety by requiring sellers like Amazon to stop selling, or to provide warnings for, dangerous products, and by permitting enforcement actions, like the one Mr. Lee filed in the public interest in this case, when a seller knowingly fails to do so.

As the court observed in *Bolger*, "Amazon was 'involved in the vertical distribution of consumer goods' and 'responsible for passing the product down the line to the consumer.'" *Bolger, supra,* at 453, citations omitted.  Just as the court in *Bolger* found that Amazon could be held strictly liable and cannot be immunized under the CDA because its involvement in the stream of commerce far surpasses that of a mere

Document received by the CA 1st District Court of Appeal.

"publisher or speaker," this court should find that Amazon should be held liable under Proposition 65.  *Id*. at 463-464.

      In this case, once Amazon learned that the Products contained high levels of mercury, it could have complied with Proposition 65 by ceasing sales or by providing a warning.  Since Amazon could do either of those things without review of, or taking responsibility for, third-party content, and without implicating any of the concerns regarding defamation, slander, or liability for statements of others that led to the passage of the CDA, the section 230(e)(3) savings clause applies here, and there is no basis for CDA preemption.

///

///

///

Document received by the CA 1st District Court of Appeal.

## CONCLUSION

Proposition 65 protects Californians from dangerous and hazardous chemicals in consumer products. The Attorney General has successfully utilized this law to safeguard Californians, and to encourage businesses to produce, manufacture and sell safer products in the state. But the erroneous legal standards that the trial court relied on would eviscerate Proposition 65's effectiveness.

The judgment of the trial court should be reversed.

Respectfully submitted,

ROB BONTA
*Attorney General of California*

*/s/ Dennis A. Ragen*
*DENNIS A. RAGEN
ROXANNE J. CARTER
*Deputy Attorneys General*
*Attorneys for the People of the State of California*

Document received by the CA 1st District Court of Appeal.

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Rule 8.204(c)(1) of the California Rules of Court that the foregoing document is proportionally spaced, has a typeface of 13 points, and contains 8,127 words, excluding the cover, the tables, the signature block, and this certificate. Counsel relies on the word count of the Word word-processing program used to prepare this brief.

ROB BONTA
*Attorney General of California*


*/s/ Dennis A. Ragen*
*DENNIS A. RAGEN
ROXANNE J. CARTER
*Deputy Attorney General*
*Attorneys for the People*

Document received by the CA 1st District Court of Appeal.