NICHOLAS J. HOFFMAN (SBN 284472)
  nhoffman@mcguirewoods.com
ARIA HANGVAL (SBN 336933)
  ahangval@mcguirewoods.com
McGUIREWOODS LLP
Wells Fargo Center – South Tower
355 S. Grand Avenue, Suite 4200
Los Angeles, California 90071-3103
Telephone: (213) 457-9840
Facsimile: (213) 457-9877

SAMUEL L. TARRY, JR. (*pro hac vice application forthcoming*)
  starry@mcguirewoods.com
McGUIREWOODS LLP
1750 Tysons Boulevard Suite 1800
Tysons, Virginia 22102-4215
Telephone: (703) 712-5425
Facsimile: (703) 712-5185

Attorneys for Defendant
ETSY, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AS YOU SOW, a 501(c)(3) non-profit corporation,<br><br>        Plaintiff,<br><br>     v.<br><br>ETSY, INC. and DOES 1-20, inclusive,<br><br>       Defendants. | Case No.: 24-cv-04203-MMC<br><br>**DEFENDANT ETSY, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>**Judge:** Hon. Maxine M. Chesney<br>**Date:** October 11, 2024<br>**Time:** 9:00 a.m.<br>**Location:** Courtroom 7, 19th Floor |

1

## REQUEST FOR JUDICIAL NOTICE

2      Pursuant to Federal Rule of Evidence 201, Defendant Etsy, Inc. ("Etsy"), by and through its

3 undersigned counsel, respectfully requests that the Court take judicial notice of Exhibits 1-6, true

4 and correct copies of which are attached hereto.  Etsy submits this Request for Judicial Notice in

5 support of its concurrently filed Opposition to Plaintiff's Motion to Remand.

6      A court may take judicial notice of facts "not subject to reasonable dispute" because they

7 are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of

8 accurate and ready determination by resort to sources whose accuracy cannot reasonably be

9 questioned." Fed. R. Evid. 201.  When considering a motion to remand, a "court may take judicial

10 notice of matters of public record . . . as long as the facts noticed are not subject to reasonable

11 dispute."   *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012).

12 Additionally, a court considering a motion may take judicial notice of undisputed matters of public

13 record, including documents on file in federal or state courts.  Fed. R. Evid. 201(b); *Harris v. County*

14 *of Orange,* 682 F.3d 1126, 1132 (9th Cir. 2012).   Etsy requests that the Court take judicial notice

15 of the following documents:

16      1.      Plaintiff's first Complaint filed on March 18, 2024 in California Superior Court,

17 Alameda County, Case No. 24CV068179.  *See United States ex rel. Robinson Rancheria Citizens*

18 *Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (The court "may take notice of

19 proceedings in other courts, both within and without the federal judicial system, if those proceedings

20 have a direct relation to matters at issue") (citation omitted); *Glendale-Pasadena Airport Auth. v.*

21 *Ciry of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (a district court may take judicial notice of

22 documents filed in state courts); *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012)

23 (courts "may take judicial notice of ... undisputed matters of public record, including documents on

24 file in federal or state courts").  A true and correct copy of this document is attached hereto as

25 **Exhibit 1.**

26      2.      Plaintiff's Request for Dismissal of its first Complaint against Etsy filed in

27 California Superior Court, Alameda County, Case No. 24CV068179 on April 26, 2024.  *See United*

28 *States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.

1992) (The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted); *Glendale-Pasadena Airport Auth. v. Ciry of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (holding a district court may take judicial notice of documents filed in state courts); *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (courts "may take judicial notice of ... undisputed matters of public record, including documents on file in federal or state courts"). A true and correct copy of this document is attached hereto as **Exhibit 2.**

3. The California Attorney General's Summary on Proposition 65 Settlements in 2018. This summary is publicly available on the California Attorney General's website at https://oag.ca.gov/sites/all/files/agweb/pdfs/prop65/2018-summary-settlements.pdf (last accessed August 20, 2024). *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (holding a court may take "judicial notice of the undisputed and publicly available information displayed on government websites"); *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) ("The opinions of State Attorney Generals are judicially noticeable."); *Nichols v. Brown*, 945 F. Supp. 2d 1079, 1091 n.4 (C.D. Cal. 2013) (same); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a government website). A true and correct copy document is attached hereto as **Exhibit 3.**

4. The California Attorney General's Summary on Proposition 65 Settlements in 2019. This summary is publicly available on the California Attorney General's website at https://oag.ca.gov/sites/default/files/2019-total-report.pdf (last accessed August 20, 2024). *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (holding a court may take "judicial notice of the undisputed and publicly available information displayed on government websites"); *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) ("The opinions of State Attorney Generals are judicially noticeable."); *Nichols v. Brown*, 945 F. Supp. 2d 1079, 1091 n.4 (C.D. Cal. 2013) (same); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a government website). A true and correct copy document is attached hereto as **Exhibit 4.**

5. Proposition 65 settlement indicating $900,000.00 in attorney' fees and expenses

recovered by Plaintiff, AG Number: 2018-1640. This settlement is publicly available on the California Attorney General's website at https://oag.ca.gov/system/files/prop65/settlements/2018-01640S3249.pdf (last accessed August 20, 2024). *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (holding a court may take "judicial notice of the undisputed and publicly available information displayed on government websites"); *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) ("The opinions of State Attorney Generals are judicially noticeable."); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a government website); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted); *Glendale-Pasadena Airport Auth. v. Ciry of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (holding a district court may take judicial notice of documents filed in state courts); *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (courts "may take judicial notice of ... undisputed matters of public record, including documents on file in federal or state courts"). A true and correct copy document is attached hereto as **Exhibit 5.**

6.   Proposition 65 settlement indicating $325,000.00 in attorney' fees and expenses recovered by Plaintiff, AG Number: 2015-00988. This settlement is publicly available on the California Attorney General's website at https://oag.ca.gov/system/files/prop65/settlements/2015-00988S7282.pdf (last accessed August 20, 2024). *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (holding a court may take "judicial notice of the undisputed and publicly available information displayed on government websites"); *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) ("The opinions of State Attorney Generals are judicially noticeable."); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a government website); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted); *Glendale-*

1  *Pasadena Airport Auth. v. Ciry of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (holding a district

2  court may take judicial notice of documents filed in state courts); *Harris v. Cty. of Orange*, 682 F.3d

3  1126, 1131-32 (9th Cir. 2012) (courts "may take judicial notice of ... undisputed matters of public

4  record, including documents on file in federal or state courts").  A true and correct copy document

5  is attached hereto as **Exhibit 6**.

6

7   DATED: August 20, 2024                    Respectfully submitted,

8

9                                              McGUIREWOODS LLP

10

11                                             By:  */s/ Nicholas J. Hoffman*
                                                    Samuel L. Tarry, Jr. (*PHV Forthcoming*)
12                                                  Nicholas J. Hoffman
                                                    Aria Hangval
13                                                  Attorneys for Defendant
                                                    ETSY, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
03/18/2024 at 02:49:12 PM
By: Damaree Franklin,
Deputy Clerk

Rachel S. Doughty (State Bar No. 255904)
Jennifer Rae Lovko (State Bar No. 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
Fax: (510) 900-9502
rdoughty@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiff*

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ALAMEDA

AS YOU SOW, a 501(c)(3) non-profit corporation,

        Plaintiff,

    v.

ETSY, INC.,

        Defendant.

Case No. ___24CV068179___

**COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)**

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

1.     Plaintiff AS YOU SOW brings this action as a representative in the public interest to protect the citizens of the State of California from unknowingly exposing themselves to toxic mercury or mercury compounds added as active ingredients in skin lightening creams marketed, distributed, and sold to Californians through the website www.etsy.com. By this Complaint, plaintiff AS YOU SOW seeks an order enjoining Defendant ETSY, INC. to either (1) prevent third parties from selling skin lightening products that contain mercury or mercury compounds to California consumers on Defendant's website, www.etsy.com or (2) comply with Proposition 65's warning requirement by providing a clear and reasonable warning to California customers prior to their purchase of skin lightening products that contain mercury or mercury compounds on www.etsy.com. Plaintiff also seeks civil penalties as provided for under Proposition 65 and other appropriate relief.

## **Venue And Jurisdiction**

2.     This Court has jurisdiction over this action pursuant to Health and Safety Code section 25249.7, which allows enforcement of Proposition 65 in any court of competent jurisdiction, and pursuant to California Constitution, article VI, section 10, because this case does not present a cause given by statute to other trial courts.

3.     This court has jurisdiction over Defendant because it has sufficient minimum contacts in the State of California, and/or otherwise purposefully avails itself of the California market.

4.     Plaintiff has met the statutory requirements for notice to bring this citizen suit enforcement action under Health and Safety Code section 25249.7 and its implementing regulations.

5.     Venue is proper in the Superior Court of California, Alameda County, pursuant to Code of Civil Procedure sections 393 and 395, because this court is a court of competent jurisdiction, because plaintiff seeks civil penalties against Defendant, because one or more instances of wrongful conduct occurred and continue to occur in Alameda County, and/or because Defendant conducted and continues to conduct business in this county with respect to the consumer products at issue in this case.

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

**Parties**

6.      Plaintiff AS YOU SOW is a 501(c)(3) non-profit corporation dedicated to, among other causes, the protection of the environment, toxics reduction, the promotion and improvement of human health, and the improvement of worker and consumer rights. AS YOU SOW has, since 1992, been one of the leading enforcers of Proposition 65, bringing hundreds of manufacturers and whole industries into compliance as part of its work to promote corporate accountability, ensure safer consumer products, and create a sustainable marketplace that does not degrade the planet. AS YOU SOW brings this action as a private attorney general in the public interest pursuant to Health & Safety Code section 25249.7, subdivision (d).

7.      Defendant ETSY, INC. is a business entity with ten or more employees doing business within the scope of Proposition 65. (Health & Saf. Code, § 25249.11.)

**Statutory And Regulatory Background**

8.      Overwhelmingly enacted by the voters of California in 1986 as "Proposition 65," the Safe Drinking Water and Toxic Enforcement Act "is a remedial statute intended to protect the public." (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal. 4th 294, 314.)

9.      Proposition 65 declared the People's right to be "informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm." (Health & Saf. Code Div. 20, Ch. 6.6 Note, § 1, subd. (b).)

10.      Under Proposition 65:

> No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in section 25249.10.

(Health & Saf. Code, § 25249.6.)

11.      A "person in the course of doing business" does not include any person employing fewer than 10 employees in his or her business; any city, county, or district or any department or agency thereof or the state or any department or agency thereof or the federal government or any

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

1  department or agency thereof; or any entity in its operation of a public water system as defined in

2  Section 116275. (Health & Saf. Code, § 25249.11, subd. (b).)

3      12.    An exposure to a listed chemical contained in a consumer product "results from a

4  person's acquisition, purchase, storage, consumption, or other reasonably foreseeable use of a

5  consumer good, or any exposure that results from receiving a consumer service." (27 Cal. Code Regs.,

6  § 25602 subd. (b).)

7      13.    A "knowingly" exposure occurs where the party responsible for such exposure has:

8          knowledge of the fact that a discharge of, release of, or exposure to a chemical listed
           pursuant to Section 25249.8(a) of the Act is occurring. No knowledge that the
9          discharge, release or exposure is unlawful is required.

10  (27 Cal. Code Regs., § 25102, subd. (n).)

11      14.    Neither Proposition 65 nor the regulations use the phrase "constructive knowledge" or

12  language commonly associated with the concept, such as "should know" or "reason to know."

13  Similarly, Proposition 65 nor the regulations applicable to this case use the phrase "actual knowledge"

14  as well. *See Lee v. Amazon, Inc*., 76 Cal.App.5th 200 (2002). Further, it has been found that there are

15  circumstances in which constructive knowledge is sufficient to require provision of a warning. (*Id*).

16      15.    According to the Office of Environmental Health Hazard Assessment (OEHHA), a

17  warning meets the "clear and reasonable" requirements of Proposition 65 only if it includes: (1) a

18  symbol consisting of a black exclamation point in a yellow equilateral triangle with a bold black

19  outline[1]; (2) the symbol shall be placed to the left of the text of the warning, in a size no smaller than

20  the height of the word "WARNING"; (3) the word "WARNING:" in all capital letters and bold print;

21  and (4) the words, "This product can expose you to chemicals including [name of one or more

22  chemicals], which is [are] known to the State of California to cause [cancer, birth defects or other

23  reproductive harm or cancer and birth defects or other reproductive harm]." (27 Cal. Code Regs., §

24  _____

25  [1] Where the sign, label or shelf tag for the product is not printed using the color yellow, the symbol may be printed in black
    and white.

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

25603, subd. (a).) Where a warning is being provided for an exposure to a single chemical the words "chemicals including" may be deleted from the warning content. (*Id*).

16.     For internet purchases, the warning may be provided by including a clearly marked hyperlink using the word "**WARNING**" on the product display page, or by "otherwise prominently displaying the warning to the purchaser prior to completing the purchase." (27 Cal. Code Regs., § 25602, subd. (b).) "For purposes of this subarticle, a warning is not prominently displayed if the purchaser must search for it in the general content of the website." (*Id*.)

17.     Where a sign or label used to provide consumer information about a product is in a language other than English, "the warning must also be provided in that language in addition to English." (27 Cal. Code Regs., § 25602, subd. (d).)

18.     Through its strong notice provisions, Proposition 65 helps to protect California's drinking water sources from contamination; allows consumers to make informed choices about the products they buy; and gives Californians the tools they need to protect themselves from exposure to toxic chemicals.

19.     Proposition 65 provides that any person who "violates or threatens to violate" the statute may be enjoined in any court of competent jurisdiction. (Health & Saf. Code, § 25249.7.) "Threaten to violate" is defined to mean "to create a condition in which there is a substantial probability that a violation will occur." (*Id.* at § 25249.11, subd. (e).)

20.     In addition, any person who violates Proposition 65 is liable for civil penalties not to exceed $2,500 per day for each violation, recoverable in a civil action. (Health & Saf. Code, § 25249.7, subd. (b).)

21.     Private parties are entitled to bring an action in the public interest to enforce Proposition 65 under Health and Safety Code, section 25249.7, subdivision (d).

**General Allegations of Fact**

**A.  Defendant operates www.etsy.com in the course of doing business.**

22.     Defendant is a "person in the course of doing business" as that term is defined at Health and Safety Code section 25249.11, subdivision (a). (*Lee v. Amazon, Inc.*, 76 Cal.App.5th 200, 249 (2022).)

23.     Defendant owns and operates a global marketplace located at the website www.etsy.com

24.     Defendant's online platform facilitates the sale of products by third parties to end-users or online customers. In 2023, this platform was used by over 6 million sellers and 91 million buyers.

25.     Defendant posted a consolidated gross merchandise sales of $32 billion in fiscal year 2023 with market presence on multiple continents, including Asia, Europe, and the Americas.

26.     Defendant provides some level of business service for each product sold through its website, including the skin lightening products at issue in this case.

27.     In exchange for the following services, Defendant earns fixed fees, a percentage of sales, per-unit activity fees, interest, or some combination thereof from each of the approximately 6 million third party sellers utilizing www.etsy.com:

    a)  Defendant attracts customers to the web site and advertises items across the web through offsite advertisements.

    b)  Defendant assists third parties with the creation and management of their shops and products.

    c)  Defendant offers Etsy Purchase Protection for buyers, providing reimbursement to buyers for products not received or not received timely, product received as damaged, and products not matching the listing description and photos.

    d)  Defendant has the authority to moderate seller content, which includes listings, messages, reviews, images, videos, and all other posted content posted. ETSY, INC. retains the right to employ enforcement mechanisms on an account when its policies are not followed.

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

1    e)  Defendant has the ability to hold seller funds, deactivate a listing, restrict a listing from

2        some or all members, or suspend an account.

3    28.    Third party sellers would not have the ability to reach Defendant's billions of

4    customers, including those in California, without access to the Defendant's marketplace at

5    www.etsy.com, and Defendant would not have as many business opportunities or as high profit

6    margins absent its partnership with third party sellers.

7    29.    Defendant does not give customers, or private enforcers, access to the legal name,

8    physical address, or contact information for third party sellers through online platform.

9    **B.  Exposure to mercury or mercury compounds is reasonably foreseeable.**

10   30.    On July 1, 1990, OEHHA identified and listed "mercury and mercury compounds" as

11   chemicals known to the State of California to cause developmental toxicity, pursuant to Proposition

12   65. Mercury and mercury compounds became subject to Proposition 65's "clear and reasonable

13   warning" requirement one year later on July 1, 1991. (Health & Saf. Code, §§ 25249.8, 25249.10,

14   subd. (b); 27 Cal. Code Regs., § 27001, subd. (c).)

15   31.    Mercury is broadly known to be an intentionally added ingredient in products claiming

16   skin lightening qualities.

17   32.    Mercury is an effective skin lightener because it penetrates deep into the skin where it

18   interacts with cells known as melanocytes, which produce the pigment known as melanin, a chemical

19   that darkens the skin. Mercury replaces a critical enzyme in melanocyte cells, which shuts off the

20   production of melanin and causes the skin to lighten. Mercury is also a well-known, effective anti-

21   bacterial for the treatment of acne.

22   33.    Generally, mercury exists in three forms:  elemental mercury, inorganic mercury

23   compounds, and organic mercury. Mercury is toxic to humans in all forms. The most commonly used

24   active ingredient in skin lightening creams is inorganic mercury because it can be absorbed into the

25   cream readily and easily.

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

34.     Californians acquire, purchase, store, consume, use, and/or dispose of skin lightening creams containing mercury from third party sellers who operate product pages at www.etsy.com.

35.     Reasonably foreseeable use of skin lightening creams containing mercury causes those Californians and their household members to be exposed to mercury and mercury compounds in three main routes: ingestion, inhalation, or dermal absorption.

36.     Ingestion occurs post-application as a result of normal hand-to-mouth behavior, such as eating or preparing food.

37.     Inhalation occurs when mercury vapor off-gasses from the creams.

38.     Dermal absorption occurs with each reasonably foreseeable application of a skin lightening cream to the user's skin. Skin lightening creams that contain mercury are designed and specifically marketed for direct contact with skin.

39.     Exposure to a cream user's household members is foreseeable because use of the product results in contamination of household air and surfaces, and household members come into direct contact with the skin of the primary user of the cream.

40.     Because Californians purchase skin lightening creams containing mercury through the Etsy web site throughout California, exposures to mercury occur and continue to occur in residences where the products are used and in locations in which the products are disposed, including on property not owned or controlled by Defendant.

41.     Each reasonably foreseeable use of skin lightening creams containing mercury—whether by ingestion, inhalation, or dermal absorption—results in continuing and ongoing exposure to mercury or mercury compounds because mercury has a half-life in the body of two months, and of decades in the brain.

42.     Since 1973, the Food and Drug Administration has warned against the use of mercury in cosmetics, due to ease of exposure and bioaccumulation:

> It is well known that mercury compounds are readily absorbed through the unbroken skin as well as through the lungs by inhalation and by intestinal absorption after ingestion. Mercury is absorbed from topical application and is accumulated in the body, giving rise to numerous adverse effects. … Cosmetic preparations containing

mercury compounds are often applied with regularity and frequency for prolonged periods. Such chronic use of mercury-containing skin-bleaching preparations has resulted in the accumulation of mercury in the body and the occurrence of severe reactions.

(21 C.F.R. § 700.13(b).)

43.    The California Department of Public Health recommends that when someone has a skin lightening cream they believe contains mercury, that person should immediately dispose of the cream at a household hazardous waste facility.

**C. Defendant knowingly and intentionally exposed and continues to expose Californians to skin lightening creams that contain mercury or mercury compounds.**

44.    Beginning at least in 2014 and continuing to present, Defendant ETSY, INC. has permitted third parties access to its online marketplace in order to sell skin lightening, whitening, and "smoothing" creams containing mercury or mercury compounds ("PRODUCTS"), and specifically including those listed below in Table 1.

45.    Defendant knows that the PRODUCTS were sold to consumers in California.

46.    Customers who purchase skin lightening creams from www.etsy.com are presumed to have used them. (*Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 250.)

47.    Each of the PRODUCTS listed in Table 1 is a multi-use product.

48.    Defendant has never provided a Proposition 65 warning to any consumer who bought a PRODUCT, despite the fact that many consumers are still using, and being exposed to mercury through the use of the PRODUCTS, and Defendant's knowledge of that fact.

| Table 1: Noticed Consumer Products | |
|---|---|
| PRODUCTS[2] | Etsy Storefront[3] |
| Deluxe Nadinola Bleaching Cream | TheDetoxClub; PureJamaicanStore |
| Due Beauty Cream | MystiqueArtShop; WholesaleByHuma |

---

[2] The product names listed in Table 1 are provided to assist in identification only and are not exhaustive of possible name variations under which the PRODUCTS are or may be listed at www.etsy.com.

[3] The Etsy storefront names listed in Table 1 are provided to assist in identification only and are not exhaustive of possible storefronts under which the PRODUCTS are or may be listed at www.etsy.com.

| Faiza | MystiqueArtShop; KUCHIDRESS |
|---|---|
| La Tia Mana Crema Limpiadora y Curativa | CapirotadaStore; NaturalByLLC; TruVaShopTreasures |
| Miss Key Crema Blanqueadora | OceansBeautyWellness |

49.    The PRODUCTS contain mercury or mercury compounds.

50.    Since 2014 and continuing to present, multiple health and safety agencies across the globe issued health alerts, announced investigations into, and advised consumers to beware of skin lightening products, including for the PRODUCTS, because they contain dangerously high levels of mercury or mercury compounds, including:

a)  **Deluxe Nadinola Bleaching Cream**: New York City Public Health Warning

b)  **Due Beauty Cream**: New York City Public Health Warning

c)  **Faiza**: New York City Public Health Warning; European Union Rapex Warning

d)  **La Tia Mana Crema Limpiadora y Curativa**: FDA Warning

e)  **Miss Key Crema Blanqueadora**: New York City Public Health Warning

51.    Defendant ETSY, INC. uses a combination of automated systems and human review by enforcement specialists to review seller items that are in violation of Defendant's policies. This review includes consideration of regulatory reports from government agencies.

52.    According to public health experts, skin whitening cosmetic products likely contain mercury if (1) the product packaging is in a foreign language and does not contain an ingredient label; (2) the product is manufactured in Pakistan; (3) the product claims to whiten or bleach the skin. If these three factors are present, Defendant should either prohibit the sale of the product, require a Proposition 65 warning regarding the mercury content of the product, or test the product to confirm the presence or absence of mercury in the product line.

53.    On December 22, 2023, Plaintiff sent a letter to ETSY, INC. to inform the company that several mercury-containing skin lightening products were being posted and sold on its website and such products are toxic to consumers and should not be sold in California or in the United States.

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

54.     On January 18, 2024, Plaintiff sent sixty-day Notices of Violation ("NOTICE") to ETSY, INC. listing the PRODUCTS.

55.     Despite its knowledge that skin whitening creams may contain mercury or mercury compounds, ETSY, INC. has permitted, and continues to permit, third party sellers access to www.etsy.com to sell skin lightening creams that it knows contain toxic amounts of mercury to California consumers.

**D.  Defendant has exposed Californians to mercury and mercury compounds without providing a clear and reasonable warning to consumers.**

56.     Defendant has not posted any Proposition 65 warnings for mercury in skin lightening creams at issue in this case.

**E.  Notice of Violation**

57.     A true and correct copy of NOTICE, dated January 18, 2024, is attached as **Exhibit 1** to this Complaint.

58.     In the NOTICE, Plaintiff warned ETSY, INC. that, as a result of its sales of the PRODUCTS, purchasers and users in the State of California were being exposed to mercury resulting from consumer's reasonably foreseeable use, without the individual purchasers and users first having been provided with a "clear and reasonable warning" regarding such toxic exposures, as required by Proposition 65.

59.     The NOTICE included, *inter alia*, the following information: the name, address, and telephone number of the noticing individual; the name of the alleged violator; the statute violated; the approximate time-period during which violations occurred; and descriptions of the violations, including the chemical involved, the routes of toxic exposure, the type of products causing the violations ("skin lightening, whitening, and 'smoothing' creams containing mercury or mercury compounds"), and exemplars of the PRODUCTS (identified in Table 1 herein). Defendant ETSY, INC. and the California Attorney General were provided copies of the NOTICE by mail. Additionally, Defendant was provided with a copy of a document entitled "The Safe Drinking Water and Toxic

11

11

1  Enforcement Act of 1986 (Proposition 65): A Summary," which is also known as Appendix A to title
2  27 of California Code of Regulations section 25093.

3     60.    The NOTICE included a certificate of merit, executed by Plaintiff's attorney stating
4  that the person executing the certificate had consulted with one or more persons with relevant and
5  appropriate experience or expertise who has reviewed the facts, studies, or other data regarding
6  exposure to the listed chemical that is the subject of the NOTICE, and that, based on that information,
7  the person executing the certificate believes there is a reasonable and meritorious case for this private
8  action. Factual information sufficient to establish the bases of the certificate of merit was attached to
9  the certificate of merit served on the California Attorney General for the NOTICE.

10    61.    No public prosecutor has commenced and is diligently prosecuting an action against
11 the violations at issue herein, although the notice period provided in Health and Safety Code section
12 25249.7 has elapsed.

13                    **First Cause Of Action**
14              **(Violation of Health & Saf. Code, § 25249.6)**

15    62.    Plaintiff realleges and incorporates each and every allegation contained in the
16 preceding paragraphs as though fully set forth herein.

17    63.    Under Proposition 65:

18     No person in the course of doing business shall knowingly and intentionally expose
19     any individual to a chemical known to the state to cause cancer or reproductive
       toxicity without first giving clear and reasonable warning to such individual, except
20     as provided in section 25249.10.

21 (Health & Saf. Code, § 25249.6.)

22    64.    Mercury and mercury compounds are present in the PRODUCTS in such a way as to
23 expose individuals in California to mercury and mercury compounds.

24    65.    The PRODUCTS were distributed, sold, or offered for sale in California and so require
25 a "clear and reasonable warning" under Proposition 65.

26
27
28

                    12

66.     Defendant has had constructive and actual knowledge that the PRODUCTS contain mercury or mercury compounds.

67.     Consumers are not provided with a clear and reasonable warning prior to purchase of the PRODUCTS.

68.     Consumers are not provided with a clear and reasonable warning prior to use of the PRODUCTS.

69.     In the course of its business, Defendant makes possible and intends for third parties to sell the PRODUCTS to California consumers.

70.     Defendant, in the course of doing business in California, has violated Health and Safety Code section 25249.6 by knowingly and intentionally exposing California consumers to mercury or mercury compounds without first giving clear and reasonable warning to such individuals who were or who would become exposed to mercury or mercury compounds through dermal contact, ingestion, and/or inhalation during the reasonably foreseeable uses of the PRODUCTS.

71.     Defendant has caused Californians to be exposed to a listed chemical in violation of Proposition 65, whether such exposure is classified as a consumer exposure, environmental exposure, none of the above, all of the above, some of the above, or otherwise.

72.     Under Health and Safety Code section 25249.7, subdivision (b), this Court has authority to assess against Defendant a maximum civil penalty not to exceed $2,500 per day for each violation of Proposition 65 that has occurred and continues to occur.

73.     Under Health and Safety Code section 25249.7, subdivision (a) this Court is authorized to enjoin Defendant to comply with Proposition 65 now and at all times in the future.

<u>**Second Cause of Action**</u>

**(Violation of 27 Cal. Code Regs., §§ 25602 and 25603)**

74.     Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs as though fully set forth herein.

13

75.     Defendant has violated and continue to violate California Code Regulations, Title 27, section 25603, subdivision (a) because no warning is not prominently displayed on the product description page on www.etsy.com and may not be displayed at all to a purchaser prior to completing the purchase.

76.     Defendant has violated and continue to violate California Code Regulations, Title 27, section 25602, subd. (b) because Defendant has never provided a Proposition 65 warning in any non-English language used on the labels for the PRODUCTS on www.etsy.com.

77.     To date, although at least some of the PRODUCTS remain in use, Defendant has failed and continue to fail to provide a clear and reasonable warning as required by Health and Safety Code section 25249.6 to users of the PRODUCTS.

78.     As a direct result of Defendant's acts and omissions, the general public in California has been regularly, unlawfully, and involuntarily exposed to mercury and mercury compounds, which are known to the State of California to be developmental toxins.

79.     Under Health and Safety Code section 25249.7, subdivision (b), this Court has authority to assess against Defendant a maximum civil penalty not to exceed $2,500 per day for each violation of Proposition 65 that has occurred and continues to occur.

80.     Under Health and Safety Code section 25249.7, subdivision (a) this Court is authorized to enjoin Defendant to comply with Proposition 65 now and at all times in the future.

**Prayer For Relief**

81.     WHEREFORE, Plaintiff prays the Court:

A.     Grant civil penalties pursuant to Health and Safety Code section 25249.7, subdivision (b)(1) against ETSY, INC. in the amount of up to $2,500 per day for each violation;

B.     Enter such injunctions or other orders as are necessary pursuant to Health and Safety Code section 25249.7, subdivision (a) to prevent ETSY, INC. from exposing persons within the state of California to the developmental toxins mercury and mercury compounds caused by the reasonably foreseeable use of the PRODUCTS without providing clear and reasonable warnings;

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

1

C.      Award Plaintiff reasonable attorneys' fees and costs pursuant to Code of Civil

2    Procedure, section 1021.5 and as otherwise appropriate; and

3

D.      Grant such other and further relief as may be just and proper.

4

5                                                Respectfully Submitted,

6    Dated: March 18, 2024                        GREENFIRE LAW, PC

7

8    By: _____
                                                  Rachel Doughty
9                                                 Attorney for Plaintiff
                                                  AS YOU SOW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES AND OTHER EQUITABLE RELIEF FOR
VIOLATIONS OF PROPOSITION 65 (HEALTH & SAF. CODE, § 25249.6 et seq.)

Exhibit 2

CIV-110

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY**<br>NAME: Jennifer Rae Lovko<br>FIRM NAME: Greenfire Law, APC<br>STREET ADDRESS: 2748 Adeline Street, Suite A<br>CITY: Berkeley     STATE: CA     ZIP CODE: 94703<br>TELEPHONE NO.: (510)900-9502     FAX NO.:<br>E-MAIL ADDRESS: rlovko@greenfirelaw.com<br>ATTORNEY FOR *(name)*: Plaintiff     STATE BAR NUMBER: 208855 | **FOR COURT USE ONLY** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, California 94612
BRANCH NAME: Rene C. Davidson Courthouse

PLAINTIFF/PETITIONER: As You Sow, a 501(c)(3) non-profit corporation
DEFENDANT/RESPONDENT: Etsy, Inc., et al

| | |
|---|---|
| **REQUEST FOR DISMISSAL** | CASE NUMBER:<br>24CV068179 |

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1.  TO THE CLERK: Please **dismiss** this action as follows:
    a.  (1) [ ] With prejudice   (2) [x] Without prejudice
    b.  (1) [x] Complaint   (2) [ ] Petition
        (3) [ ] Cross-complaint filed by *(name):*                    on *(date):*
        (4) [ ] Cross-complaint filed by *(name):*                    on *(date):*
        (5) [ ] Entire action of all parties and all causes of action
        (6) [ ] Other *(specify):**

2.  *(Complete in all cases except family law cases.)*
    The court [ ] did   [x] did not   waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: 04/26/2024

Jennifer Rae Lovko
_____
(TYPE OR PRINT NAME OF  [x] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed

▶ _____
(SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-Complainant

3.  **TO THE CLERK:** Consent to the above dismissal is hereby given.**
Date:

_____
(TYPE OR PRINT NAME OF  [ ] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint - or Response (Family Law) seeking affirmative relief - is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

▶ _____
(SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-Complainant

---

4.  [ ] Dismissal entered as requested on *(date):*
5.  [ ] Dismissal entered on *(date):*                    as to only *(name):*
6.  [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7.  a. [ ] Attorney or party without attorney notified on *(date):*
    b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
        [ ] a copy to be conformed       [ ] means to return conformed copy

Date: _____     Clerk, by _____, Deputy

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-110 [Rev. January 1, 2013] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.;<br>Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390<br>*www.courts.ca.gov* |

CIV-110

| PLAINTIFF/PETITIONER: | As You Sow, a 501(c)(3) non-profit corporation | CASE NUMBER: |
|---|---|---|
| DEFENDANT/RESPONDENT: | Etsy, Inc., et al | 24CV068179 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is *(check one below):*

   a. ☐ not recovering anything of value by this action.

   b. ☐ recovering less than $10,000 in value by this action.

   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. All court fees and court costs that were waived in this action have been paid to the court *(check one):*   ☐ Yes   ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____                    ▶ _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | | Clear this form |
|---|---|---|---|

**PROOF OF SERVICE**

I am employed in the County of Alameda. My business address is 2748 Adeline Street, Suite A, Berkeley, California 94703. I am over the age of 18 years and not a party to the above-entitled action. Document(s) served:

- **REQUEST FOR DISMISSAL (CIV-110)**

On April 26, 2024, I served the foregoing document(s) on the parties in this action, located on the attached service list as designated below:

( )   <u>By First Class Mail:</u>      Deposited the above documents in a sealed envelope with the United States Postal Service, with the postage fully paid.

( )   <u>By Personal Service:</u>      I personally delivered each in a sealed envelope to the office of the address on the date last written below.

( )   <u>By Overnight Mail:</u>      I caused each to be placed in a sealed envelope and placed the same in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for.

(x)   <u>By Electronic Transmission:</u>      Based on an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 26, 2024, in Berkeley, California.

_____
Jessica San Luis

1

## SERVICE LIST

| Nicholas J. Hoffman | By Electronic Transmission |
|---|---|
| Joseph T. Rezabek | |
| McGuireWoods LLP | |
| Wells Fargo Center | |
| South Tower | |
| 355 S. Grand Ave, Ste 4200 | |
| Los Angeles, CA 90071-3103 | |
| NHoffman@mcguirewoods.com | |
| JRezabek@mcguirewoods.com | |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 3

Proposition 65 Settlement Executive Summary 2018

| Plaintiff | No. of Settlements | Total Settlement Payments | Non-Contingent Civil Penalty* | % of Total | Attorneys' Fees and Costs | % of Total | Payment In-Lieu of Penalty (PILP) | % of Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| APS&EE, LLC | 18 | $401,000 | $56,000 | 14% | $345,000 | 86% | $0 | 0% |
| As You Sow | 3 | $1,073,375 | $52,000 | 5% | $999,500 | 93% | $21,875 | 2% |
| | | | | | | | | |
| Brodsky & Smith Plaintiffs (combined) | | | | | | | | |
| Balaboo, Precila | 11 | $189,000 | $15,500 | 8% | $173,500 | 92% | $0 | 0% |
| Bell, Ema | 33 | $719,000 | $60,500 | 8% | $658,500 | 92% | $0 | 0% |
| Bell, Ema/Balaboo, Precila | 1 | $20,000.00 | $2,000.00 | 10% | $18,000.00 | 90% | $0 | 0% |
| Espinosa, Gabriel | 21 | $417,500.00 | $31,750.00 | 8% | $385,750.00 | 92% | $0 | 0% |
| Calacin, Karen | 2 | $56,000.00 | $7,000.00 | 13% | $49,000.00 | 88% | $0 | 0% |
| Velarde, Hector | 10 | $205,000 | $16,400 | 8% | $188,600 | 92% | $0 | 0% |
| Ferriero, Anthony | 67 | $1,239,750 | $103,250 | 8% | $1,136,500 | 92% | $0 | 0% |
| Ferriero, Anthony/Espinosa, Gabriel | 2 | $55,000 | $4,000 | 7% | $51,000 | 93% | $0 | 0% |
| Subtotal | 147 | $2,901,250 | $240,400 | 8% | $2,660,850 | 92% | $0 | 0% |
| | | | | | | | | |
| California Citizen Protection Group, LLC | 1 | $43,750.00 | $7,500.00 | 17% | $36,250.00 | 83% | $0 | 0% |
| Center for Environmental Health (CEH) | 56 | $7,307,766 | $1,457,596 | 20% | $5,108,824 | 70% | $741,346 | 10% |
| | | | | | | | | |
| Chanler Group, The (combined) | | | | | | | | |
| Brimer, Russell | 5 | $127,500 | $13,000 | 10% | $114,500 | 90% | $0 | 0% |
| Englander, Peter | 33 | $942,350 | $110,400 | 12% | $831,950 | 88% | $0 | 0% |
| Held, Anthony, Ph.D., P.E. | 26 | $678,615 | $114,865 | 17% | $563,750 | 83% | $0 | 0% |
| Leeman, Whitney R., Ph.D. | 2 | $102,000 | $7,000 | 7% | $95,000 | 93% | $0 | 0% |
| Moore, John | 34 | $783,075 | $87,550 | 11% | $695,525 | 89% | $0 | 0% |
| Vinocur, Laurence | 27 | $655,750 | $73,750 | 11% | $582,000 | 89% | $0 | 0% |
| Vinocur, Laurence/Moore, John | 1 | $38,000 | $8,000 | 21% | $30,000 | 79% | $0 | 0% |
| Wozniak, Paul | 8 | $209,000 | $25,000 | 12% | $184,000 | 88% | $0 | 0% |
| Subtotal | 136 | $3,536,290 | $439,565 | | $3,096,725 | | $0 | |
| | | | | | | | | |
| Center for Advanced Public Awareness, Inc. | 33 | $1,206,250 | $280,761 | 23% | $777,901 | 64% | $147,588 | 12% |
| Chemical Toxin Working Group, Inc. | 7 | $804,500 | $130,250 | 16% | $674,250 | 84% | $0 | 0% |
| Cheng, Kingpun | 20 | $339,195 | $27,060 | 8% | $312,135 | 92% | $0 | 0% |
| Chin, Alicia | 3 | $23,300 | $4,800 | 21% | $18,500 | 79% | $0 | 0% |
| Consumer Advocacy Group | 31 | $4,440,500 | $522,165 | 12% | $3,711,000 | 84% | $207,335 | 5% |
| Davia, Susan | 19 | $760,900 | $124,000 | 16% | $636,900 | 84% | $0 | 0% |
| DiPirro, Michael | 8 | 233500 | $28,500 | 12% | $205,000 | 88% | 0 | 0% |
| Ecological Alliance, LLC | 125 | $1,693,550 | $123,500 | 7% | $1,570,050 | 93% | $0 | 0% |
| Ecological Rights Foundation | 13 | $340,000 | $72,000 | 21% | $268,000 | 79% | $0 | 0% |
| Embry, Kimberley | 13 | $399,000 | $79,400 | 20% | $319,600 | 80% | $0 | 0% |
| Environmental Law Foundation | 1 | $48,409.00 | $24,225.00 | 50% | $24,184 | 50% | $0 | 0% |
| Environmental Research Center | 47 | $4,369,849.00 | $1,201,960.00 | 28% | $2,382,575 | 55% | $785,314 | 18% |
| | | | | | | | | |
| ERC/Office of the Attorney General/Erika McCartney | 1 | $359,000 | $175,000 | 49% | $184,000 | 51% | $0 | 0% |
| | | | | Enviornmental Research Center: | $87,500 | 24% | | |
| | | | | Office of the Attorney General: | $87,500 | 24% | | |
| | | | | Erika McCartney: | $9,000 | 3% | | |
| | | | | | | | | |
| Environprotect, LLC | 4 | $54,500 | $3,500 | 6% | $51,000 | 94% | $0 | 0% |
| Hammond, Sara | 16 | $342,500 | $16,000 | 5% | $326,500 | 95% | $0 | 0% |
| Kaloustian, Tamar | 1 | $45,000 | $6,000 | 13% | $39,000 | 87% | $0 | 0% |
| Johnson, Dennis | 3 | $84,000.00 | $13,500.00 | 16% | $70,500.00 | 84% | $0 | 0% |
| Macias, Donny | 2 | $11,000.00 | $500.00 | 5% | $10,500.00 | 95% | $0 | 0% |
| | | | | | | | | |
| Pacific Justice Center (combined) | | | | | | | | |
| Chamberlin, Amy | 8 | $463,750 | $127,000 | 27% | $336,750 | 73% | $0 | 0% |
| McCartney, Erika | 12 | $764,500 | $214,000 | 28% | $550,500 | 72% | $0 | 0% |
| Subtotal | 20 | $1,228,250 | $341,000 | 28% | $887,250 | 72% | $0 | 0% |
| | | | | | | | | |
| Parker, Maureen | 5 | $93,500 | $3,000 | 3% | $90,500 | 97% | $0 | 0% |
| Safe Products for Californians, LLC | 9 | $212,540 | $32,000 | 15% | $180,540 | 85% | $0 | 0% |
| Shefa LMV, LLC | 79 | $1,368,000 | $206,250 | 15% | $1,161,750 | 85% | $0 | 0% |
| Wimberley, Evelyn | 8 | $221,000 | $6,500 | 3% | $214,500 | 97% | $0 | 0% |
| | | | | | | | | |
| TOTAL | 829 | $35,169,924.00 | $6,015,932.00 | 17.1% | $27,250,534.00 | 77.5% | $1,903,458.00 | 5.4% |

\* A non-contingent penalty is the civil penalty that must be paid pursuant to the settlement, regardless of future events or actions of the defendant.
   If a settlement includes a contingent penalty, the plaintiff should report the additional penalty amount when it becomes due.

Settlements often contain injunctive relief and monetary payments that cannot be presented in summary form and that require reference to the actual settlement
documents to accurately assess.  Copies of Proposition 65 settlements are available on the Attorney General's website, at http://oag.ca.gov/prop65.  This report should
not be used by itself to evaluate Proposition 65 settlements.

Exhibit 4

| Plaintiff | No. of Settlements | Total Settlement Payments | Non-Contingent Civil Penalty* | % of Total | Attorney's Fee and Costs | % of Total | Payment In-Lieu of Penalty (PILP) | % of Total | % of PILP to (Civil Penalty + PILP) |
|---|---|---|---|---|---|---|---|---|---|
| APS&E.E., LLC | 22 | $1,422,482 | $973,000 | 68% | $449,482 | 32% | $0 | 0% | 0% |
| As You Sow | 1 | $350,000 | $15,000 | 4% | $325,000 | 93% | $10,000 | 3% | 40% |
| | | | | | | | | | |
| Brodsky & Smith Plaintiffs (combined) | | | | | | | | | |
| Balabao, Procila | 22 | $369,500 | $33,150 | 9% | $336,350 | 91% | $0 | 0% | 0% |
| Boll, Erna | 43 | $793,000 | $68,750 | 9% | $724,250 | 91% | $0 | 0% | 0% |
| Espinosa, Gabriel | 19 | $304,750 | $28,750 | 9% | $276,000 | 91% | $0 | 0% | 0% |
| Boll, Erna/Espinsa, Gabriel | 1 | $20,000.00 | $2,000.00 | 10% | $18,000.00 | 90% | $0.00 | 0% | 0% |
| Boll, Erna/Balabao, Procilla | 3 | $94,500.00 | $10,500.00 | 11% | $84,000.00 | 89% | $0.00 | 0% | 0% |
| Boll, Erna/Balabao, Procila/Espinosa, Gabriel | 2 | $60,000.00 | $6,000.00 | 10% | $54,000.00 | 90% | $0.00 | 0% | 0% |
| Velardo, Hector | 1 | $5,000 | $500 | 10% | $4,500 | 90% | $0 | 0% | 0% |
| Forriero, Anthony | 91 | $1,387,750 | $127,400 | 9% | $1,260,350 | 91% | $0 | 0% | 0% |
| Anthony Forriero/Boll, Erna | 1 | $30,000 | $3,000 | 10% | $27,000 | 90% | $0 | 0% | 0% |
| Volarod, Hector/Boll,Erna/Forrerio, Anthony | 1 | $35,000 | $3,000 | 9% | $32,000 | 91% | $0 | 0% | 0% |
| Macias, Danny | 1 | $15,000.00 | $1,000.00 | 7% | $14,000 | 93% | $0 | 0% | 0% |
| | | | | | | | | | |
| CA Citizen Protection Group, LLC | 17 | $337,000.00 | $15,000.00 | 4% | $322,000.00 | 96% | $0.00 | 0% | |
| | | | | | | | | | |
| Center for Environmental Health (CEH) | 46 | $4,122,000 | $635,311 | 15% | $2,999,311 | 73% | $487,378 | 12% | 43% |
| | | | | | | | | | |
| Chanler Group, The (combined) | | | | | | | | | |
| Brimer, Russell | 2 | $49,000 | $6,000 | 12% | $43,000 | 88% | $0 | 0% | 0% |
| Englander, Peter | 7 | $130,400 | $19,400 | 15% | $111,000 | 85% | $0 | 0% | 0% |
| Held, Anthony, Ph.D., P.E. | 10 | $328,300 | $61,200 | 19% | $267,100 | 81% | $0 | 0% | 0% |
| Moore, John | 12 | $298,100 | $40,100 | 13% | $258,000 | 87% | $0 | 0% | 0% |
| Vinocur, Laurence | 57 | $1,127,724 | $144,583 | 13% | $983,141 | 87% | $0 | 0% | 0% |
| Wozniak, Paul | 27 | $475,150 | $56,550 | 12% | $418,600 | 88% | $0 | 0% | 0% |
| | | | | | | | | | |
| Center for Advanced Public Awareness, Inc. | 42 | $987,625 | $101,550 | 10% | $866,103 | 88% | $19,972 | 2% | 16% |
| Chemical Toxin Working Group, Inc. | 7 | $420,500 | $42,500 | 10% | $378,000 | 90% | $0 | 0% | 0% |
| Cheng, Kingpun | 16 | $227,175 | $15,500 | 7% | $211,675 | 93% | $0 | 0% | 0% |
| Chin, Alicia | 2 | $28,250 | $6,500 | 23% | $21,750 | 77% | $0 | 0% | 0% |
| Community Science Institute | 2 | $162,520.00 | $64,850.00 | 40% | $60,900.00 | 37% | $36,770.00 | 23% | 36% |
| Consumer Advocacy Group | 49 | $4,251,000 | $699,965 | 16% | $3,303,000 | 78% | $248,035 | 6% | 26% |
| Consumer Protection Group, LLC | 8 | $299,750.00 | $46,365.00 | 15% | $247,535.00 | 83% | $5,850.00 | 2% | |
| Davia, Susan | 14 | $505,337 | $75,200 | 15% | $430,137 | 85% | $0 | 0% | 0% |
| DiPirro, Michael | 4 | $153,175 | $13,850 | 9% | $139,325 | 91% | $0 | 0% | 0% |
| Donaldson, Audrey | 13 | $254,750.00 | $36,800.00 | 14% | $217,950.00 | 86% | $0.00 | 0% | 0% |
| Ecological Alliance, LLC | 136 | $2,127,150 | $123,050 | 6% | $2,004,100 | 94% | $0 | 0% | 0% |
| Ecological Rights Foundation | 8 | $163,500 | $18,000 | 11% | $145,500 | 89% | $0 | 0% | 0% |
| Environmental Law Foundation | 1 | $5,000 | $2,500 | 50% | $2,500 | 50% | $0 | 0% | 0% |
| Embry, Kimberley | 22 | $870,500.00 | $85,000.00 | 10% | $785,500.00 | 90% | $0.00 | 0% | 0% |
| Environmental Research Center | 57 | $4,772,765 | $1,438,884 | 30% | $2,452,136 | 51% | $881,745 | 18% | 38% |
| Environprotect, LLC | 1 | $13,250 | $500 | 4% | $12,750 | 96% | $0 | 0% | 0% |
| Fishman, Jennifer | 1 | $100,000.00 | $50,000.00 | 50% | $50,000 | 50% | $0 | 0% | 0% |
| Hammond, Sara | 18 | $412,000 | $19,000 | 5% | $393,000 | 95% | $0 | 0% | 0% |
| Johnson, Dennis | 16 | $264,250.00 | $33,450.00 | 13% | $230,800.00 | 87% | $0.00 | 0% | 0% |
| Kaloustian, Tamar | 4 | $53,500.00 | $5,350.00 | 10% | $48,150.00 | 90% | $0 | 0% | 0% |
| Mateel Environmental Justice Foundation | 2 | $75,000 | $3,000 | 4% | $72,000 | 96% | $0 | 0% | 0% |
| | | | | | | | | | |
| Pacific Justice Center (combined) | | | | | | | | | |
| Chamberlin, Amy | 1 | $57,500 | $12,500 | 22% | $45,000 | 78% | $0 | 0% | 0% |
| McCartney, Erika | 8 | $414,250 | $121,500 | 29% | $292,750 | 71% | $0 | 0% | 0% |
| | | | | | | | | | |
| Parker, Maureen | 2 | $37,750 | $1,000 | 3% | $36,750 | 97% | $0 | 0% | 0% |
| Safe Products for Californians | 8 | $144,598.00 | $14,000.00 | 10% | $130,598.00 | 90% | $0.00 | 0% | 0% |
| Shvo LMV, LLC | 63 | $1,020,600 | $142,500 | 14% | $875,100 | 86% | $3,000 | 0% | 2% |
| Van Patten, Brad | 2 | $116,500 | $15,500 | 13% | $101,000 | 87% | $0 | 0% | 0% |
| Wimberley, Evelyn | 5 | $117,500 | $2,500 | 2% | $115,000 | 98% | $0 | 0% | 0% |
| | | | | | | | | | |
| **GRAND TOTAL** | 898 | $29,810,351 | $5,441,508 | 18% | $22,676,093 | 76% | $1,692,750 | 6% | 24% |

* A non-contingent penalty is the civil penalty that must be paid pursuant to the settlement, regardless of future events or actions of the defendant.
If a settlement includes a contingent penalty, the plaintiff should report the additional penalty amount when it becomes due.

Settlements often contain injunctive relief and monetary payments that cannot be presented in summary form and that require reference to the actual settlement documents to accurately assess. Copies of Proposition 65 settlements are avaialble on the Attorney General's website, at http://oag.ca.gov/prop65. This report should not be used by itself to evaluate Proposition 65 settlements.

Exhibit 5

DANIELLE FUGERE (State Bar No. 160873)
AS YOU SOW
Main Post Office
P.O. Box 751
Berkeley, California 94701
Telephone: (415) 577-5594
Dfugere@asyousow.org

Attorneys for Plaintiff
AS YOU SOW

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| AS YOU SOW, a California Non-Profit Public Benefit Corporation, | Case No. CGC-15-548791 |
| Plaintiff, | **CONSENT JUDGMENT AS MODIFIED BY COURT ON NOVEMBER 17, 2023** |
| v. | |
| TRADER JOE'S COMPANY, and DOES 1 through 10, inclusive, | Complaint Filed:   November 3, 2015 |
| | Trial Date:           N.A. |
| Defendants. | |

**1. INTRODUCTION**

1.1     As You Sow ("AYS") is a non-profit corporation dedicated to, among other causes, the protection of the environment, the promotion of human health, the improvement of worker and consumer rights, environmental education, and corporate accountability.  AYS is based in Oakland, California and is incorporated under the laws of the State of California.

1.2     Between July 18, 2014 and November 10, 2017, AYS sent Proposition 65 (California Health & Safety Code Sections 25249.5, et seq.) 60-day Notices of Violation ("Notices") to various companies, including all of those companies identified as "Initial Settling Defendants" (as defined in Section 2) that are listed in **Exhibit A**.  The Notices were also sent by AYS to all relevant public enforcers, as required by Health & Safety Code Section 25249.7(d).

1.3     In the Notices, AYS states that that the Chocolate Products manufactured, distributed, and/or sold by the noticed companies, which are offered for sale to California consumers, and/or which are used in products offered for sale to consumers in California, cause exposures to lead and/or cadmium and that such Chocolate Products require warnings under Health and Safety Code Section 25249.6.

1.4     After AYS's October 24, 2017 Notice has run its course, and assuming no authorized public prosecutor has filed a superseding claim, AYS individually and on behalf of the public interest, will amend a Proposition 65 enforcement action concerning lead and cadmium in the Chocolate Products that it had previously filed in the Superior Court of the State of California for the County of San Francisco, Case No. CGC-15-548791 (the "Action") in contemplation of a motion for approval and entry of this Consent Judgment.  The amended complaint filed in the Action asserted a cause of action against each of the Initial Settling Defendants for the alleged failure to warn under Proposition 65 on the basis of the allegations contained in the Notices.

1.5     Each Initial Settling Defendant (as defined in Section 2 and listed on **Exhibit A**) employs ten or more employees and manufactures, imports, distributes, sells, and/or directly or indirectly offers for sale in California Chocolate Products or has done so in the past.  Each Initial

2

Settling Defendant represents that, as of the date it executes this Consent Judgment, no public enforcer is diligently prosecuting a Proposition 65 action against it related to lead or cadmium in its Chocolate Products.

1.6     For the purpose of avoiding prolonged and costly litigation concerning the claims and defenses in this Action, the Parties (as defined in Section 2) enter into this Consent Judgment as a full settlement of all Proposition 65 claims that were raised in the Action, or which could have been raised in the Action, based on the facts alleged therein. By execution of this Consent Judgment, Settling Defendants do not admit any violation of Proposition 65 or any other law. Nothing in this Consent Judgment shall be construed as an admission by the Parties of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or affect the responsibilities and duties of the Parties under this Consent Judgment.

## 2. DEFINITIONS

2.1     "Chocolate Product" means chocolate candy; chocolate bars, pieces, chips, beverages, and chocolate-based confections with or without inclusions; cocoa nibs and cocoa powder; chocolate and cacao-based compounds in any form; and other products derived primarily (i.e., in excess of 50%) from cacao. Chocolate Products include the preceding as sold on a standalone basis and/or as sold to be used as ingredients in other foods into which they are incorporated.

2.2     "Compliance Date" means one year following the Effective Date.

2.3     "Consensus Basis" means a creative and dynamic way of reaching agreement between all members of a group. Instead of simply voting for an item and having the majority of the group dictate the outcome, a group using consensus is committed to finding solutions that each member of the group actively supports, or at least can live with and that all opinions, ideas and concerns are taken into account. A Consensus Basis does not reflect compromise or unanimity – it aims to go further by weaving together everyone's best ideas and key concerns. It is an acceptable resolution, one that can be supported, even if not the "favorite" of each individual. Multiple concerns and information shall be shared until the sense of the group is clear. Ideas and solutions belong to the group; no names are recorded. The group as a whole is

1    responsible for the decision and the decision belongs to the group.  The goal is unity, not

2    unanimity.

3         2.4    "Covered Product" means a Chocolate Product that is manufactured, imported,

4    distributed, or sold by a Settling Defendant, including, but not limited to, the exemplar

5    Chocolate Product identified in a 60-Day Notice of Violation served on the Settling Defendant

6    by AYS.

7         2.5    "Effective Date" means the date on which this Consent Judgment is entered by the

8    Court.

9         2.6    "Feasible" means capable of being accomplished in a successful manner within a

10   reasonable period of time, taking into account public health,  and economic, environmental,

11   social, and technological factors.  In considering whether an action or performance level is

12   Feasible, consideration shall be given, among other things, to scaling as to the size and resources

13   of the potential implementing enterprise involved, the implementing enterprise's place and role

14   within the chain of commerce, the prior demonstration of the viability of the concept or

15   technology at issue at both the research and actual commercial application scale, and the nature

16   of the issue being addressed.

17        2.7    "Lot" means all units of a given Chocolate Product bearing the same lot number,

18   best-by, or sell-by date.

19        2.8    "Opt-In Settling Defendants" refers to Settling Defendants that join into this

20   Consent Judgment pursuant to the procedure established in Section 7.

21        2.9    "Opt-In Stipulation" means a Stipulation for Entry of Judgment in the form

22   attached hereto as **Exhibit B**, for execution by a prospective Opt-In Settling Defendant pursuant

23   to the procedure established in Section 7.

24        2.10   "Parties" means AYS and Settling Defendants taken together; a "Party" means As

25   You Sow or any particular Settling Defendant taken individually.

26        2.11   "Settling Defendant" means a defendant who is a Party to this Consent Judgment

27   at the time it is entered, or who opts in to this Consent Judgment any time after its entry

28   pursuant to the procedure established in Section 7.  The former are also specifically referred to

4

herein as "Initial Settling Defendants" (i.e., the companies specifically listed on **Exhibit A**) and the latter are also specifically referred to herein as "Opt-In Settling Defendants."

## 3. INVESTIGATION REGARDING SOURCES AND POTENTIAL FOR REDUCTION OF LEAD AND CADMIUM IN CHOCOLATE PRODUCTS

3.1 **Overview.** An expert committee ("Committee") shall be formed to investigate and report on the predominant sources of lead and cadmium in Chocolate Products, and to make findings and recommendations on Feasible measures that may be taken, if any, to meaningfully reduce levels of lead and cadmium found in Chocolate Products. The Committee's charges include:

3.1.1. Researching and identifying the sources of lead and cadmium levels in chocolate products, including both natural and anthropogenic sources ("Root Cause Phase");

3.1.2. Identifying and making recommendations regarding Feasible means to reduce lead and cadmium levels over the nearer and longer term, such as through agricultural practices, manufacturing practices, and handling practices ("Reduction Recommendations Phase");

3.1.3. Evaluating and making recommendations as to whether, and, if so, when, the lead and cadmium concentration levels in Chocolate Products that trigger Proposition 65 warnings shall be modified from the "drop down" levels described in Sections 6.2.1 and 6.2.2 of this Consent Judgment based on Feasible means to reduce lead and cadmium levels over time ("Warning Trigger Phase");

3.1.4. Preparing and submitting a final report with all Consensus Based Committee findings and recommendations, including an appendix setting forth significant areas where consensus could not be achieved, an appendix setting forth any significant conflicting opinions on aspects of a Consensus Based finding where they exist, and an appendix containing complete citations for all source materials used ("Final Report Phase"); and

3.1.5. Providing an oral presentation to the Parties to address follow up questions or inquiries regarding the final report at a Committee member's discretion.

5

3.2     **Formation and Direction of the Committee.** The Committee shall consist of four subject matter experts ("SMEs") and be supported by a retained project manager ("Project Manager"). Within one hundred and twenty (120) days of the Effective Date, AYS, on the one hand, and the Initial Settling Defendants, on the other hand, shall each appoint a qualified SME to the Committee and shall jointly agree upon and appoint a third and fourth SME to the Committee. These four individuals shall form the Committee.

      3.2.1.  SMEs shall be selected based on the following criteria:

           (a)     One SME selected by the Chocolate Industry with a relevant background and expertise.

           (b)     One SME selected by As You Sow with a relevant background and expertise.

           (c)     One additional SME with potential cadmium and cocoa expertise as mutually identified with relevant backgrounds and expertise.

           (d)     One additional SME with potential lead and cocoa expertise as mutually identified with relevant background and expertise.

      3.2.2.  In addition to the SMEs, one Project Manager shall be mutually identified with relevant project management experience, who will provide administrative and logistical support to the Committee, facilitate discussion among the Committee members, and help manage its budget and keep it organized and on schedule in addressing the requirements and timelines set forth in this Consent Judgment.

      3.2.3.  In the event a member of the Committee can no longer perform their duties, a replacement member shall be appointed by the original nominating Party or Parties. AYS and the Initial Settling Defendants shall jointly agree on the replacement for a member who was originally jointly appointed. The Party or Parties appointing a replacement member shall first confer with the remaining members of the Committee concerning potential replacement nominees and solicit their input on appropriate candidates and qualifications. In the event of a resignation of the retained project manager, AYS and the Initial Settling Defendants shall jointly agree upon and arrange for the prompt retention of a replacement.

6

3.2.4.  Within one hundred fifty (150) days of the Effective Date, AYS and the Initial Settling Defendants, or a representative acting on the Initial Settling Defendants' collective behalves, shall hold a kickoff meeting with the Committee and the retained project manager to review the Scope of Work attached hereto as **Exhibit C**, which shall be provided to the Committee members and the Project Manager along with a copy of this Consent Judgment upon the Committee's formation.  The Scope of Work shall, following clarifications or modifications agreed upon by AYS and the Initial Settling Defendants made at or after the kickoff meeting, guide the Committee's investigation and be binding on the Parties.

3.3    **Operation of Committee.**

3.3.1.  The Committee shall operate on a Consensus Basis and within the budget agreed upon by the Parties.  It shall accept reasonable and relevant input from any willing source available and evaluate its content based on professional standards and judgment consistent with the Committee members' prior experience.  The preliminary allocation of this budget to different aspects of the Committee's work is set forth below, but it and the overall level of expenditure will be subject to adjustment by mutual agreement of AYS and the Initial Settling Defendants based on a request received from the Project Manager at or following the kickoff meeting referred to in Section 3.2.4.  In no event shall the budget, inclusive of the cost of the Project Manager, exceed the aggregate cap agreed upon by the Parties under Section 8.5 of this Consent Judgment.

3.3.2.  Approximately three quarters (3/4ths) of the Committee's overall budget shall be devoted to its investigative and assessment activities (including as supported by the Project Manager), and one quarter (1/4th) of the Committee's overall budget shall be devoted to formulating its findings and preparing the final report, unless the Committee determines that another allocation of funds is more appropriate, and the Project Manager informs and obtains the approval of AYS and the Initial Settling Defendants of such a revised allocation.  The Committee shall complete the Root Cause Phase within nine (9) months from the date of the kickoff meeting established pursuant to Section 3.2.4; the Committee shall complete the Reduction Recommendations Phase within eighteen (18) months from the date of the kickoff

1  meeting established pursuant to Section 3.2.4. Through the Project Manager, the Committee

2  shall provide AYS and the Initial Settling Defendants with brief quarterly progress reports

3  concerning the status of the relevant investigation and the overall budget and identify any

4  significant obstacles that may have arisen relative to timely completion of the Committee's

5  work. The deadlines set forth in this Section 3.3.2 may be modified with the agreement of both

6  AYS and the Initial Settling Defendants based on a significant obstacle to timely completion that

7  has been identified in a progress report or otherwise presented by Project Manager due to

8  unforeseeable circumstances or other reasonable and justifiable need.

9        3.3.3.  Members of the Committee and the Project Manager shall sign a

10  confidentiality agreement concerning their work undertaken pursuant to this Consent Judgment

11  and shall not be subject to deposition concerning such work. Nor shall internal working

12  documents created by members of the Committee or the Project Manager during the course of

13  their work pursuant to this Consent Judgment, such as notes and drafts reflecting their mental

14  impressions, be discoverable or otherwise disclosed. Documents the Committee or its members

15  have obtained from public sources that members of the Committee have relied on to reach the

16  recommendations they provide pursuant to Section 3.3.4 are not subject to the discovery

17  restrictions of this Section. The final report the Committee issues pursuant to Section 3.3.4 shall

18  likewise be subject to disclosure and may be made publically available by any Party, as long as

19  any information that is subject to the requirements of Section 3.4.4 have been redacted from it.

20        3.3.4.  No later than one hundred eighty (180) days after the conclusion of the

21  Root Cause Phase and the Reduction Recommendation Phase, the Committee shall complete the

22  Warning Trigger Phase and Final Report Phase and issue its final report to the Parties regarding

23  the findings and recommendations the Committee. Subject to Sections 3.3.3 and 3.4.4, AYS

24  and the Initial Settling Defendants shall have access to review the materials upon which the

25  Committee has relied in performing its work, which the Project Manager shall arrange to

26  preserve for a period of five (5) years.

27

28

1      3.4     **Means of Investigation by the Committee.**

2              3.4.1.  As described in the Scope of Work, the Committee's investigation should

3      be based on a number of sources (whether existing or produced at the Committee's request),

4      including an initial literature review (including peer-reviewed published articles to the extent

5      possible); reviewing test data regarding cocoa beans and Chocolate Products; testing of

6      production equipment, packaging and equipment and materials used in the drying and storage of

7      cocoa beans and testing of cocoa beans and Chocolate Products (including in relation to testing

8      of production equipment, product packaging, and drying and storage methods); travel to cocoa

9      growing areas and processing plants; and interviews with academics, government agencies,

10     chocolate growers, chocolate suppliers, and chocolate manufacturers or others who have

11     relevant expertise on the subject.  The Committee may also consult with outside subject matter

12     experts that are necessary to assist in the Committee's work.

13             3.4.2.  To inform the investigation, each Initial Settling Defendant shall make

14     available to the Committee, on a rolling basis and, at most, within one hundred twenty (120)

15     days of the Effective Date, relevant information in its possession regarding lead and cadmium in

16     chocolate, including relevant test data regarding cocoa beans, cocoa butter, and/or Chocolate

17     Products and the results of any prior non-privileged substantive investigations into the sources

18     of lead and cadmium in cocoa beans and/or Chocolate Products.

19             3.4.3.  The Committee may, at any time, reasonably request further information

20     (including existing test data) and/or samples of cocoa beans and Chocolate Products from one or

21     more Settling Defendants relevant to the Scope(s) of Work and the relevant Settling Defendants

22     shall make a good-faith effort to provide such requested information to the Committee within

23     thirty (30) days of the Committee's reasonable request.

24             3.4.4.  Any information provided to the Committee may be provided anonymously

25     (i.e., on a blinded basis and through an intermediary entity such as a trade association or law

26     firm) in order to protect proprietary or commercially sensitive business information, and the

27     members of the Committee shall not disclose or disseminate to others any information they

28     receive from a Settling Defendant or, if it has been provided to the Committee through another

9

entity, the source from which the Committee obtained such Settling Defendant-originated

information.

**4. IMPLEMENTATION OF INVESTIGATION FINDINGS**

4.1     Within one hundred twenty (120) days of the issuance of the Committee's final report pursuant to Section 3.3.4, AYS and the Initial Settling Defendants (or a designated representative thereof) shall begin to meet and confer to determine whether the drop down warning triggers set forth under Sections 6.2.1 and 6.2.2 of the Consent Judgment should be modified based on the final report of the Committee.  Such meet and confer period should extend for a period of at least ninety (90) days, unless AYS and the Initial Settling Defendants mutually agree to extend it, including to allow for the involvement of a mediator.  Following the conclusion of this meet and confer process, and no earlier than one hundred and twenty (120) days after the commencement of the meet and confer process, AYS and/or the Initial Settling Defendants may, as informed by the Committee's final report, jointly stipulate to or individually move for a modification of this Consent Judgment pursuant to Section 10, including with respect to any upward or downward adjustments of the drop down lead and cadmium warning triggers set forth under Sections 6.2.1 and 6.2.2.   Any Party may oppose such a modification before the Court.  If entered by the Court, such a modification shall be binding on and effective as to all Settling Defendants, including Opt-In Settling Defendants, one year following written notice to them of the Court's action approving of the modification.

4.2     If no modification is entered by the Court pursuant to Section 4.1, the "drop down" warning triggers set forth in Sections 6.2.1 and 6.2.2 shall automatically go into effect as scheduled.

4.2     Based on the outcome of the meet and confer process described in Section 4.1 above, the Initial Settling Defendants shall fund, implement, and share information with AYS as specified in the Project Plan attached to AYS's motion to modify this Consent Judgment (and now deemed appended hereto as Exhibit F).

4.3     Within sixty (60) days of the ninth anniversary of the Compliance Date, As You Sow and the Initial Settling Defendants shall begin meeting and conferring to discuss the

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

implications of the results of the implementation of the Project Plan with respect to Covered Products and the potential for further modifications to this Consent Judgment, including further reductions in the warning thresholds, based on the reports provided pursuant to the Project Plan and information then available to the Parties.  Such meet and confer period should extend for a period of at least ninety (90) days, unless AYS and the Initial Settling Defendants mutually agree to extend it, including to allow for the involvement of a mediator.  Following the conclusion of this meet and confer process, and no earlier than one hundred and twenty (120) days after the commencement of the meet and confer process, AYS and/or the Initial Settling Defendants may, as informed by the results of the Project Plan and information then available to the Parties, jointly stipulate to or individually move for a modification of this Consent Judgment pursuant to Section 10, including with respect to any further adjustments to Section 6 of the Consent Judgment.

## 5. BEST PRACTICES AND COMPLIANCE VERIFICATION TESTING

    5.1    **Required Provisional Efforts to Ensure Lowest Level Currently Feasible.** During the Committee's investigation and while the resulting meet and confer and any modification process is underway, all Settling Defendants who are cocoa, chocolate, or candy manufacturers (as opposed to retailers or distributors) must certify to AYS annually for five (5) years following the Compliance Date that they have complied with FDA's applicable Good Manufacturing Practice and Preventive Controls for Human Food  requirements (21 C.F.R. Part 117) for their Covered Products distributed and sold in the United States as reviewed by a qualified internal or third party food safety auditor.

    5.2    **Compliance Verification Testing and Enforcement Procedures.**  Utilizing the funding provided by the Settling Defendants under Section 8.6, AYS will conduct compliance verification testing after the requirements of Section 6 of this Consent Judgment become effective.  Any such testing and the provisions set forth in the remainder of this Section 5 shall govern AYS's enforcement of Section 6 of this Consent Judgment.  AYS's compliance verification testing conducted pursuant to this Section 5 shall only utilize Covered Product samples that (a) AYS obtains only from the California market or which are shipped to a

11

California address as the result of a purchase by AYS or its investigators via the internet, (b) have been manufactured following the Compliance Date as identified by the Covered Product's Lot identifier, and (c) do not bear the warning required by Section 6.3.

    5.3    In conducting compliance verification testing, AYS shall use a laboratory that employs inductively coupled plasma mass spectrometry ("ICP-MS") utilizing scientifically appropriate adherence to the protocols set forth in AOAC Method 2015.01 with a LOD/LOQ of 0.010 ppm or less.

    5.4    **Outlier Test Results.**

    5.4.1.  Any single test result obtained that exceeds 0.300 ppm of lead for a product with less than 95% cacao content or 0.450 ppm of lead for a product with 95% or greater cacao content; or 0.900 ppm of cadmium for a product with less than 95% cacao content or 1.92 ppm of cadmium for a product with 95% or greater cacao content shall be deemed a potential "Outlier."

    5.4.2.  At a Settling Defendant's option, any single Outlier test result must be subject to validation before it is deemed to be an effective result for purposes of this Consent Judgment.  The validation process shall consist of two steps:

        (a)    First, the laboratory from which the test result in question was obtained shall be required to check its equipment, test processes, validation procedures, laboratory contamination, operator error, and any other factors which could have produced an erroneous result.  If the result is determined erroneous due to testing error or failure to satisfy quality assurance or quality control procedures, the result shall be discarded and not used for any purpose under this Consent Judgment.  The Covered Product may then be re-tested as if such test were the first test.

        (b)    Second, if the steps in Section 5.4.2(a) have not invalidated the result, then the Settling Defendant may, in preparation for the meet and confer process set forth in Section 5.5.4 and no later than sixty (60) days after the notice of violation is sent, collect up to three (3) or more randomly selected samples of the Covered Product from the same Lot as the Covered Product subject to the Notice of Violation. AYS, at its option, can also test up to three

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

(3) more products from the same Lot and have those additional products tested.  The arithmetic mean of these test results and the original Outlier test result shall then be determined.  That mean result shall be deemed the final result concerning the sample in question and shall constitute the applicable test result for purposes of this Consent Judgment.  If, between a Settling Defendant and AYS, less than two (2) additional Covered Product samples from the same Lot remain in either the Settling Defendant's or AYS's control or can reasonably be acquired through purchase, the Settling Defendant and/or AYS may use such randomly selected samples of the Covered Product as produced in the same calendar quarter as is indicated by the Lot identifier of the potential Outlier sample.

5.5     **Stipulated Enforcement Process.**

5.5.1.  <u>Notice of Violation</u>.  In the event that AYS obtains qualified laboratory test results showing that the Covered Product exceeds the applicable limit or limits set forth in Section 6.2, it may issue a Notice of Violation pursuant to this Section 5.5.  For the purposes of this Consent Judgment, "Notice of Violation" shall mean violations of the Consent Judgment and is not a sixty day notice subject to the requirements of California Code of Regulations Title 27 § 25903.

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

5.5.2.  <u>Service of Notice of Violation and Supporting Documentation</u>.

(a)     The Notice of Violation shall be sent to the person(s) identified in Section 19 to receive notices for the Settling Defendant in question, and must be served within sixty (60) days of the later of the date the Covered Product at issue was tested or the test result in question was acquired by AYS, provided, however, that AYS may have up to an additional sixty (60) days to send the Notice of Violation if, notwithstanding AYS's good faith efforts, the test data required by Section 5.4.2(a) cannot be obtained by AYS from the laboratory before expiration of the initial sixty (60) day period.

(b)     The Notice of Violation shall, at a minimum, set forth: (a) the date the Covered Product was purchased; (b) the location at which the Covered Product was purchased; (c) the name of the Covered Product giving rise to the alleged violation, including the name and address of the retail entity from which the sample was obtained and pictures of the product packaging, which identifies the product's UPC number and lot number/best-by/sell-by date; and (d) all compliance verification test data obtained by AYS regarding the Covered Product, including any laboratory reports, quality assurance reports, and quality control reports associated with testing of the Covered Product.

5.5.3.  <u>Notice of Election of Response</u>.  No more than thirty (30) days after effectuation of service of a Notice of Violation, the Settling Defendant in question shall provide written notice to AYS whether such Settling Defendant elects to contest the allegations contained in a Notice of Violation ("Notice of Election").  Upon notice to AYS, Settling Defendant may have up to an additional thirty (30) days to elect if, notwithstanding Settling Defendant's good faith efforts, a Settling Defendant is unable to verify the test data provided by AYS before expiration of the initial thirty (30) day period.

(a)     If a Notice of Violation is contested, the Notice of Election shall include all documents upon which the Settling Defendant is relying to contest the alleged violation, including any test data that it wishes to rely on, including any laboratory reports, quality assurance reports, and quality control reports associated with testing of the Covered

14

1 Product. (Such test data may include, but not be limited to, the test results obtained under

2 Section 5.4.2(b), if applicable.)

3         5.5.4. <u>Meet and Confer</u>. If a Notice of Violation is contested, AYS and the

4 Settling Defendant shall meet and confer to attempt to resolve their dispute. Within thirty (30)

5 days of serving a Notice of Election, a Settling Defendant may withdraw the original Notice of

6 Election contesting the violation and serve a new Notice of Election to not contest the violation,

7 provided, however, that, in this circumstance, such Settling Defendant shall pay AYS's actual

8 documented fees and costs up to a cap of $5,000, in addition to the payments specified in

9 Sections 5.5 and 5.6. for violations of the Consent Judgment. At any time, AYS may withdraw

10 a Notice of Violation, in which case for purposes of Section 5.6, the result shall be as if AYS

11 never issued any such Notice of Violation. If no informal resolution of a Notice of Violation

12 results within thirty (30) days of a Notice of Election to contest, AYS may file an enforcement

13 motion or application pursuant to Section 16. In any such proceeding, AYS may seek whatever

14 fines, costs, penalties, attorneys' fees, or other remedies are provided by law for an alleged

15 failure to comply with Proposition 65 or this Consent Judgment.

16         5.5.5. <u>Non-Contested Notices</u>. If a Settling Defendant elects to not contest the

17 allegations in a Notice of Violation, it shall undertake corrective action and make payments as

18 set forth below.

19              (a) A Settling Defendant electing to not contest shall include in its

20 Notice of Election a detailed description with supporting documentation of the corrective

21 action(s) that it has undertaken or proposes to undertake to address the alleged violation. Any

22 such correction shall provide reasonable assurance that all Covered Products having the same

23 UPC number and Lot identifier as that of the Covered Product identified in AYS's Notice of

24 Violation (the "Noticed Covered Products") will not be thereafter sold in the State of California

25 or offered for sale to California customers by the Settling Defendant without the product

26 warning language specified in Section 6.3 having been provided prior to its sale, and that the

27 Settling Defendant has sent instructions to any retailers or customers that offer the Noticed

28 Covered Products for sale to cease offering the Noticed Covered Products for sale to California

15

consumers unless such product warning language is provided in conjunction with its sale. Settling Defendant shall also document the additional steps, including product testing and/or modification, that it will take to ensure that future Lots of the same Covered Product comply with the requirements of the Consent Judgment. A Settling Defendant shall keep for a period of one year and provide to AYS documentation confirming its implementation regarding the foregoing. If there is a dispute over the corrective action, the Settling Defendant and AYS shall meet and confer before seeking any remedy in court. In no case shall AYS issue to a Settling Defendant more than one Notice of Violation per Covered Product within a calendar quarter.

(b)     If the Notice of Violation is the first Notice of Violation received by the Settling Defendant for a type of Covered Product (as identified by its UPC code) under Section 5.5.1 that was not successfully contested or withdrawn, then a Settling Defendant as defined by Sections 8.1.1 or 8.1.4 shall pay $10,000,  a Settling Defendant as defined by Sections 8.1.2, 8.1.5, or 8.1.7 shall pay $7,500, and a Settling Defendant as defined by Sections 8.1.3, 8.1.6, or 8.1.8 shall pay $5,000, for each Notice of Violation.  If the Notice of Violation is the second Notice of Violation received by the Settling Defendant for a Covered Product under Section 5.5.1 that was not successfully contested or withdrawn, then a Settling Defendant as defined by Sections 8.1.1 or 8.1.4 shall pay $15,000, a Settling Defendant as defined by Sections 8.1.2, 8.1.5, or 8.1.7 shall pay $12,500, and a Settling Defendant as defined by Sections 8.1.3, 8.1.6, or 8.1.8 shall pay $10,000, for each Notice of Violation.  If the Notice of Violation is the third or fourth Notice of Violation received by the Settling Defendant for a Covered Product under Section 5.5.1 that was not successfully contested or withdrawn, then a Settling Defendant as defined by Sections 8.1.1 or 8.1.4 shall pay $25,000, a Settling Defendant as defined by Sections 8.1.2, 8.1.5, or 8.1.7 shall pay $20,000, and a Settling Defendant as defined by Sections 8.1.3, 8.1.6, or 8.1.8 shall pay $15,000, for each Notice of Violation.

(c)     If a Settling Defendant produces with its Notice of Election test data for the Covered Product (as identified by its UPC code and a best-by or sell-by date falling within the same calendar quarter) that: (i) was obtained prior to the date AYS gave Notice of Violation; (ii) was conducted on the same type of Covered Product (as identified by its UPC

16

code); and (iii) demonstrates levels below the applicable warning triggers set forth in Section 6.2.1 and 6.2.2, then any payment under this Section shall be reduced by one hundred percent (100%) for the first Notice of Violation, except that the Settling Defendant shall reimburse AYS for AYS's actual documented fees and costs associated with testing the Covered Product up to limit of $5,000.  Pursuant to Section 5.5.5(a), the Settling Defendant shall also document the measures, including product testing, warnings, and/or modification, that it will take to ensure that future Lots of the same Covered Product comply with the requirements of the Consent Judgment.

       5.5.6.  <u>Payments</u>.  Any payments under Section 5.5.5 shall be made by check payable to "As You Sow" and shall be paid within thirty (30) days of service of a Notice of Election triggering a payment and shall be used by AYS as reimbursement for costs for investigating, preparing, sending, and prosecuting Notices of Violation, and to reimburse attorneys' fees and costs incurred in connection with these activities.  To the extent such reimbursement exceeds AYS's associated costs, AYS will use these funds to replenish the Compliance Testing Fund established pursuant to Section 8.6 of this Consent Judgment.

    5.6    **Repeat Violations.**  If a Settling Defendant has received more than four (4) Notices of Violation concerning the same Covered Product that were not successfully contested or withdrawn in any two (2) year period then, at AYS's option, AYS may seek whatever fines, costs, penalties, attorneys' fees, or other remedies that are provided by law for failure to comply with Proposition 65.  Prior to seeking such relief, AYS shall meet and confer with the Settling Defendant for at least thirty (30) days to determine if the Settling Defendant and AYS can instead agree on measures that the Settling Defendant can undertake to prevent future alleged violations.

## 6. INJUNCTION GOVERNING COVERED PRODUCT FORMULATIONS AND WARNINGS

    6.1    **Applicability.**  Covered Products subject to this Consent Judgment are subject to the requirements for Proposition 65 warnings set forth in Sections 6.3, 6.4, and 6.5, as applicable, depending on their cacao content (by %) and lead and cadmium levels as further

17

specified in Section 6.2.  The requirements set forth in this Section 6 shall apply only to Covered Products:  (a) manufactured on or following the Compliance Date, and (b) which are (i) sold or may be offered for sale to California consumers ("consumer products") or (ii) sold or may be offered for sale as inputs to Covered Products ("non-consumer products") which are sold or may be offered for sale to California consumers.

      6.2   **Product Warning Triggers.**

        6.2.1.  **Product Warning Triggers Based on Lead Concentration Levels.**

           (a)     <u>For Covered Products with up to 65% cacao content</u>: Product Warnings are required if the Covered Product's associated lead concentration level exceeds 0.100 ppm, provided, however, that as of the sixth anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.065 ppm unless (i) the Committee has recommended that the 0.100 ppm lead concentration level be continued, a lead concentration level between 0.100 and 0.065 ppm be instituted, or that a lead concentration level less than 0.065 ppm replace the 0.065 ppm level, and (ii) a modification of this Consent Judgment has been entered which reflects the level that shall supersede the drop down to 0.065 ppm.  As of the seventh anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.060 ppm, and as of the eighth anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.055 ppm.

           (b)     <u>For Covered Products with greater than 65% and up to 95% cacao content</u>: Product Warnings are required if the Covered Product's associated lead concentration level exceeds 0.150 ppm, provided, however, that as of the sixth anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.100 ppm unless (i) the Committee has recommended that the 0.150 ppm lead concentration level be continued, a lead concentration level between 0.150 and 0.100 ppm be instituted, or that a lead concentration level less than 0.100 ppm replace the 0.100 ppm level, and (ii) a modification of this Consent Judgment has been entered which reflects the level that shall supersede the drop down to 0.100 ppm.  As of the seventh anniversary of the Compliance Date, the foregoing lead

18

1 concentration level shall be deemed to have been reduced to 0.095 ppm, and as of the eighth
2 anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to
3 have been reduced to 0.090 ppm.

4         (c)    For Covered Products with greater than 95% cacao content: Product
5 Warnings are required if the Covered Product's associated lead concentration level exceeds
6 0.225 ppm, provided, however, that as of the sixth anniversary of the Compliance Date, the
7 foregoing lead concentration level shall be deemed to have been reduced to 0.200 ppm unless (i)
8 the Committee has recommended that the 0.225 ppm lead concentration level be continued, a
9 lead concentration level between 0.225 and 0.200 ppm be instituted, or that a lead concentration
10 less than 0.200 ppm replace the 0.200 ppm level, and (ii) a modification of this Consent
11 Judgment has been entered which reflects the level that shall supersede the drop down to 0.200
12 ppm.  As of the seventh anniversary of the Compliance Date, the foregoing lead concentration
13 level shall be deemed to have been reduced to 0.195 ppm, and as of the eighth anniversary of the
14 Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced
15 to 0.190 ppm.

16      6.2.2.  **Product Warning Triggers Based on Cadmium Concentration Levels.**

17         (a)    For Covered Products with up to 65% cacao content: Product
18 Warnings are required if the Covered Product's associated cadmium concentration level exceeds
19 0.400 ppm, provided, however, that as of the sixth anniversary of the Compliance Date, the
20 foregoing cadmium concentration level shall be deemed to have been reduced to 0.320 ppm
21 unless (i) the Committee has recommended that the 0.400 ppm cadmium concentration level be
22 continued, a cadmium concentration level between 0.400 and 0.320 ppm be instituted, or that a
23 cadmium concentration level less than 0.320 ppm replace the 0.320 ppm level, and (ii) a
24 modification of this Consent Judgment has been entered which reflects the level that shall
25 supersede the drop down to 0.320 ppm.

26         (b)    For Covered Products with greater than 65% and up to 95% cacao
27 content:  Product Warnings are required if the Covered Product's associated cadmium
28 concentration level exceeds 0.450 ppm, provided, however, that as of the sixth anniversary of

19

1 the Compliance Date, the foregoing cadmium concentration level shall be deemed to have been

2 reduced to 0.400 ppm unless (i) the Committee has recommended that the 0.450 ppm lead

3 concentration level be continued, a cadmium concentration level between 0.450 and 0.400 ppm

4 be instituted, or that a cadmium concentration level less than 0.400 ppm replace the 0.400 ppm

5 level, and (ii) a modification of this Consent Judgment has been entered which reflects the level

6 that shall supersede the drop down to 0.400 ppm.

7         (c)    For Covered Products with greater than 95% cacao content: Product

8 Warnings are required if the Covered Product's associated cadmium concentration level exceeds

9 0.960 ppm, provided, however, that as of the sixth anniversary of the Compliance Date, the

10 foregoing cadmium concentration level shall be deemed to have been reduced to 0.800 ppm

11 unless (i) the Committee has recommended that the 0.960 ppm cadmium concentration level be

12 continued, a cadmium concentration level between 0.960 and 0.800 ppm be instituted, or that a

13 cadmium concentration level less than 0.800 ppm replace the 0.800 ppm level, and (ii) a

14 modification of this Consent Judgment has been entered which reflects the level that shall

15 supersede the drop down to 0.800 ppm.

16     6.3    **Product Warning Language.**  Following the Compliance Date, the following

17 Product Warning statement shall be used on any Covered Product authorized or offered for sale

18 in the State of California which exceeds an applicable trigger as set forth in Section 6.2:

19
20         **WARNING**: Consuming this product may expose you to chemicals including lead and
        cadmium, which are known to the State of California to cause [cancer and] birth defects
21         or other reproductive harm.  For further information go to www.p65warnings.ca.gov

22 The bracketed language in the preceding Product Warning statement may be deleted or included

23 at a Settling Defendant's option.

24     For Covered Products that are not able to obtain the levels set forth in Section 6.2.1 of the

25 Consent Judgment as of the seventh or eighth anniversary of the Compliance Date, but which do

26 not exceed the levels Section 6.2.1 of the Consent Judgment specifies as requiring a Proposition

27 65 warning as of the sixth anniversary of the Compliance Date, the following alternative

28 language is authorized:

20

CA WARNING:  Risk of reproductive harm from exposure to lead.  See

www.P65warnings.ca.gov/food

### 6.4    Method of Transmission for Product Warnings.

6.4.1.  **Labeling Requirement.** Where required pursuant to Sections 6.1 and 6.2, the Product Warning statement set forth in Section 6.3 shall be placed on a consumer Covered Product's labeling with such conspicuousness as compared with other words, statements, or designs on the labeling or packaging as to render it likely to be read and understood by an ordinary individual under customary conditions of use or purchase. The Product Warning statement shall be displayed in at least the same size as the largest of any other health or safety warnings or chemical or allergen disclosures on the Covered Product's label. The Product Warning statement shall be contained in the same section of the label that states other safety warnings or chemical/allergen disclosures about the Covered Product.

6.4.2.  **Warning for a Settling Defendant's Internet Sales.** In addition to complying with the labeling requirement in subsection 6.4.1, Settling Defendants who maintain their own websites that sell Covered Products to a California consumer, must also provide Product Warnings, where required for a Covered Product under Sections 6.1 and 6.2, by including either the Product Warning statement set forth in Section 6.3 or a clearly marked hyperlink using the word "WARNING" to such a Product Warning statement, either: (a) on the product display page for the Covered Product, (b) on the same page as serves as the order form for the Covered Product, (c) on the same page as where the price for the Covered Product is otherwise displayed; or (d) in a dialogue box that appears and is visible when a California address for delivery is provided by the consumer (but only if the dialogue box appears prior to the completion of the internet sale).

### 6.5    Non-Consumer Chocolate Products. The Product Warning requirements set forth in this Section 6 do not directly apply to commercial, non-consumer Chocolate Products that are intended to be used as ingredients in consumer products, as long as such products are not made available for sale directly to California consumers.  However, Settling Defendants that

21

manufacture, distribute or sell commercial, non-consumer Chocolate Products that do exceed the limits set forth in Section 6.2 shall advise their customers in writing at least annually that consumer products made with their commercial products may not be offered for sale in the State of California without the applicable warning as set forth in Section 6.3 and 6.4, unless the resulting consumer products do not exceed the limits as set forth in Sections 6.2.1 and 6.2.2.

6.6     Any changes to the language or format of the Product Warnings required under this Section 6 shall be made only after Court approval and following written notice to AYS and to the California Attorney General.

## 7. OPT-IN PROGRAM

7.1     This Consent Judgment is executed with the understanding that additional persons and entities who manufacture, distribute, sell, or offer for sale Chocolate Products in the State of California may wish to subscribe to the terms of this Consent Judgment. Each Opt-In Settling Defendant that has not already received a 60-Day Notice of Violation from AYS concerning the range of Chocolate Products it wishes to address through the Opt-In must be able to certify to the facts enumerated in Section 7.3.

7.2     At any time before one hundred eighty (180) days following the Effective Date, prospective Opt-In Settling Defendants who are willing to confirm the representations listed in Section 7.3 may become Settling Defendants under this Consent Judgment by executing an Opt-In Stipulation as provided in Section 7.3 and tendering the applicable payment amounts, as set forth in Section 8. Each Opt-In Defendant that has not received a 60-day Notice of Violation from AYS for the Chocolate Products to be covered by this Consent Judgment shall cooperate with AYS in providing an evidentiary basis upon which AYS can complete a certificate of merit for the 60-day Notice of Violation, as required by Health and Safety Code section 25249.7(d)(1).

7.3     Each Opt-In Settling Defendant shall execute and deliver to AYS an Opt-In Stipulation in the general form appearing as **Exhibit B** hereto identifying whether the Opt-In Settling Defendant has manufactured, imported, distributed, sold, or offered for use and sale in the State of California Chocolate Products, and certifying to the following facts: (1) it employs

ten or more persons; (2) it manufactured, imported, distributed, sold, or offered for use and sale in the State of California one or more specifically identified Chocolate Products without a "clear and reasonable" Proposition 65 warning during the preceding year; and (3) it knows or has reason to believe that one or more of the identified Chocolate Products has in the past contained or presently contains lead or cadmium in excess of at least one of the drop down levels set forth in Section 6.2.1 or 6.2.2.

       7.4    Not later than ninety (90) days after AYS receives a completed Opt-In Stipulation for a prospective Opt-In Settling Defendant for which a 60-day Notice of Violation has not been issued, any additional information and representations necessary to support a 60-day Notice of Violation, and payment of the applicable payments required in Section 8, AYS shall serve a Notice of Violation pursuant to California Health and Safety Code section 25249.7(d) on the Opt-In Settling Defendant, to the California Attorney General, to every California District Attorney and every California city attorney required to receive such a notice pursuant to California Health and Safety Code section 25249.7.

       7.5    No earlier than seventy (70) days from the date specified in the Notice of Violation sent to an Opt-In Settling Defendant, and provided that no authorized public prosecutor of Proposition 65 has filed an action against that Opt-In Settling Defendant for alleged exposures to lead or cadmium in the Covered Products and is diligently prosecuting it, AYS shall file in this Court an application for entry of the executed Opt-In Stipulation that AYS has received pursuant to this Section 7 and shall serve notice thereof on all other Settling Defendants.  If the Court approves the application for entry of the Opt-In Stipulation, the Complaint shall be deemed to have been amended to specifically name the Opt-In Settling Defendant that executed the Opt-In Stipulation as named defendants in this Action, and each such Opt-In Settling Defendant shall be deemed to be a full Settling Defendant under this Consent Judgment, with all applicable obligations and rights conferred by this Consent Judgment.

       7.6    In the event that a public prosecutor is diligently prosecuting an Opt-In Settling Defendant's alleged Proposition 65 violation prior to the expiration of the 60-day notice period,

AYS shall refund the full payment made by that Opt-In Settling Defendant and have no further obligation to that Opt-In Settling Defendant under this Section 7.

      7.7    At the time AYS files the final application for entry of the Opt-In Stipulations with the Court pursuant to Section 7.5, it shall prepare and file with the Court and serve on the California Attorney General, an application for approval of the Opt-In Stipulations pursuant to Section 8.2.  The application shall be supported by one or more declarations reporting the results of the opt-in program, including all expenses and attorneys' fees incurred by AYS's counsel with respect to the lead and cadmium enforcement process and opt-in process to date.  In the event that the application demonstrates that the total amount of the expenses and attorneys' fees incurred by AYS is less than the total amount of reimbursement provided pursuant to Section 8.2, AYS shall within thirty (30) days disgorge any attorneys' fees and costs reimbursements in excess of its costs actually incurred in AYS's chocolate-related Proposition 65 matters to the Initial Settling Defendants as set forth in Section 8.2 below.

      7.8    Opt-In Settling Defendants are subject to the timelines as set forth in Sections 5 and 6 of this Consent Judgment, without modification.

**8. MONETARY RELIEF**

8.1    For the purposes of this Section 8 regarding monetary relief, Settling Defendants shall fall into one of the following categories and provide certification of their qualifications therefore to AYS upon request:

    8.1.1.  <u>Large Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: Total annual U.S. sales of Covered Products of $500 Million or more

    8.1.2.  <u>Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: Total annual U.S. sales of Covered Products in excess of $50 Million but less than $500 Million

    8.1.3.  <u>Small Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: Total annual U.S. sales of Covered Products of less than $50 Million

    8.1.4.  <u>Not Otherwise Completely Released Large Candy Manufacturer</u>: Total annual U.S. sales of Covered Products of $500 Million or more

    8.1.5.  <u>Not Otherwise Completely Released Medium Candy Manufacturer</u>: Total annual U.S. sales of Covered Products of $50 Million but less than $500 Million

    8.1.6.  <u>Not Otherwise Completely Released Small Candy Manufacturer</u>: Total annual U.S. sales of Covered Products of less than $50 Million

    8.1.7.  <u>Large Retailer With Exposure Not Covered By a Downstream Release</u>: Total annual U.S. sales of Covered Products not subject to downstream release of $100 Million or more

    8.1.8.  <u>Small Retailer With Exposure Not Covered By a Downstream Release</u>: Total annual U.S. sales of Covered Products not subject to downstream release of less than $100 Million.

8.2    **Fee Reimbursement.** Within thirty (30) days of the Effective Date, the Initial Settling Defendants, or an entity acting on their behalves, shall collectively reimburse AYS's attorneys' fees, investigative costs, and other reasonable litigation costs and expenses in the aggregate amount of $900,000. The individual amounts set forth in Sections 8.2.1 through 8.2.8 shall apply to the calculation of fee reimbursement payments for Opt-In Settling Defendants pursuant to Section 7 and shall be reimbursed to the Initial Settling Defendants by AYS within sixty (60) days of the Court's action on the application AYS must file pursuant to Section 7.7. AYS shall make this reimbursement through a lump sum payment to Morrison and Foerster Client Trust LLP (or an alternate designee of the Initial Settling Defendants), which will distribute the funds on a pro rata basis based on each Initial Settling Defendant's total payments

made under this Section 8.2 relative to all other Initial Settling Defendants' total payments made under this Section 8.2 or pursuant to such other allocation as has been agreed upon among the Initial Settling Defendants.  In the event the amount provided to the Initial Settling Defendants under this Section 8.2 and Section 8.5 exceeds the fees and costs the Initial Settling Defendants have incurred with respect to this Consent Judgment, excluding any payments made under Sections 8.3, 8.4, or 8.6, but including the legal fees they have incurred in its development and approval and entry by the Court ("Settlement Related Costs"), the Initial Settling Defendants shall disgorge any such excess amount to the California Office of Environmental Health Hazard Assessment ("OEHHA").

       8.2.1.  <u>Large Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $95,000

       8.2.2.  <u>Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $45,000

       8.2.3.  <u>Small Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $20,000

       8.2.4.  <u>Not Otherwise Completely Released Large Candy Manufacturer</u>: $95,000

       8.2.5.  <u>Not Otherwise Completely Released Medium Candy Manufacturer</u>: $45,000

       8.2.6.  <u>Not Otherwise Completely Released Small Candy Manufacturer</u>: $20,000

       8.2.7.  <u>Large Retailer With Exposure Not Covered By a Downstream Release</u>: $12,500

       8.2.8.  <u>Small Retailer With Exposure Not Covered By a Downstream Release</u>: $10,000

    8.3  **Civil Penalties.**  Within thirty (30) days of the Effective Date, each Initial Settling Defendant, or an entity acting on their collective behalves, shall also make the following payments to AYS as civil penalties, pursuant to Health and Safety Code section 25249.7(b), as set forth in Sections 8.3.1 through 8.3.8.  The individual amounts set forth in Sections 8.3.1 through 8.3.8 shall also apply to the calculation of payments for Opt-In Settling Defendants pursuant to Section 7.  AYS shall remit 75% of the amount to the State of California pursuant to Health and Safety Code section 25249.12(b).  Settling Defendants shall have no liability if payments to the State of California are not made by AYS.

8.3.1. <u>Large Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $22,000

8.3.2. <u>Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $16,500

8.3.3. <u>Small Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $11,000

8.3.4. <u>Not Otherwise Completely Released Large Candy Manufacturer</u>: $22,000

8.3.5. <u>Not Otherwise Completely Released Medium Candy Manufacturer</u>: $16,500

8.3.6. <u>Not Otherwise Completely Released Small Candy Manufacturer</u>: $11,000

8.3.7. <u>Large Retailer With Exposure Not Covered By a Downstream Release</u>: $16,500

8.3.8. <u>Small Retailer With Exposure Not Covered By a Downstream Release</u>: $11,000.

8.4    **Additional Settlement Payments In Lieu Of Penalties.**  Additionally, within thirty (30) days of the Effective Date, each Initial Settling Defendant, or an entity acting on their collective behalves, shall make the following additional payments to AYS in lieu of additional civil penalties, as set forth in Sections 8.4.1 through 8.4.8.  The individual amounts set forth in Sections 8.4.1 through 8.4.8 shall also apply to the calculation of payments for Opt-In Settling Defendants pursuant to Section 7.  These additional settlement payments may be used by AYS for grants to California 501(c)(3) non-profit organizations and by AYS itself for research and educational purposes associated with reducing or remediating exposures to lead and cadmium contained in consumer products sold in California and/or to increase consumer awareness of the health hazards posed by these chemicals in consumer products sold in California and how such hazards may be mitigated, but may not be used by AYS or its grantees in support of litigation, or for public relations, directed at the Settling Defendants or their Covered Products.  In deciding among grantee proposals, the AYS Board of Directors ("Board") takes into consideration a number of important factors, including: (1) the nexus between the harm posed by lead and cadmium in consumer products sold in California and the grant program work; (2) the potential for lead or cadmium reduction, prevention, mitigation, remediation, or education benefits to California citizens from the proposal; (3) the budget requirements of the proposed grantee and the alternate funding sources available to it for its project; and (4) the Board's assessment of the

grantee's chances for success in its program work. AYS shall ensure that all funds will be disbursed and used in accordance with this Section 8.4, as well as with AYS's mission statement, articles of incorporation, bylaws, and applicable state and federal laws and regulations.  AYS shall obtain and maintain adequate records to document that the funds are spent on the activities described in this Section 8.4, and shall provide the Attorney General, within thirty (30) days of any request, copies of all documentation demonstrating how such funds have been spent.  No party to this Consent Judgment, or counsel of record, or spouse or dependent child thereof, has an economic interest in any entity or individual, besides itself, that is designated in this paragraph to receive all or a party of any Additional Settlement Payments. The payments required under this Section 8.4 are as follows:

8.4.1.  Large Grinders/Wholesalers/Chocolate Ingredient Suppliers: $3,875

8.4.2.  Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers: $2,125

8.4.3.  Small Grinders/Wholesalers/Chocolate Ingredient Suppliers: $500

8.4.4.  Not Otherwise Completely Released Large Candy Manufacturer: $3,875

8.4.5.  Not Otherwise Completely Released Medium Candy Manufacturer: $2,125

8.4.6.  Not Otherwise Completely Released Small Candy Manufacturer: $500

8.4.7.  Large Retailer With Exposure Not Covered By a Downstream Release: $2,125

8.4.8.  Small Retailer With Exposure Not Covered By a Downstream Release: $500.

8.5    **Payments to Fund Committee's Work.**  Additionally, within thirty (30) days of the Effective Date, as contemplated in Section 3.3.2, the Initial Settling Defendants, or an entity acting on their behalves, shall collectively tender to AYS an aggregate amount of $500,000 to fund the Committee investigation.  The individual amounts of payments set forth in Sections 8.5.1 through 8.5.8 shall apply to the calculation of payments towards the Committee's work for Opt-In Settling Defendants pursuant to Section 7.  The first $100,000 of payments received by AYS from Opt-In Settling Defendants pursuant to this Section 8.5 will be used exclusively to fund the remaining expense, if any, associated with the Committee's investigation and final report pursuant to Section 3.  Any portion of the $100,000 that is not required for the remaining

28

expense of the Committee shall be transferred to the Compliance Testing Fund established under Section 8.6. Any funds raised from Opt-In Settling Defendants pursuant to this Section 8.5 in excess of the $100,000 amount shall be paid to the Initial Settling Defendants by AYS within sixty (60) days of the Court's action on the application AYS must file pursuant to Section 7.7. AYS shall make this reimbursement through a lump sum payment to the Morrison and Foerster LLP Client Trust (or an alternate designees of the Initial Settling Defendants), which will distribute the funds on a pro rata basis based on each Initial Settling Defendant's total payments made under this Section 8.5 relative to all other Initial Settling Defendants' total payments made under this Section 8.5 or pursuant to such other allocation as has been agreed upon by the Initial Settling Defendants. If the funds raised from the Opt-In Settling Defendants under this Section 8.5 are not sufficient to generate the additional $100,000, the Initial Settling Defendants shall collectively tender the difference to AYS within one year of the Effective Date. The payments required by Opt-In Settling Defendants under this Section 8.5 shall be:

      8.5.1.  <u>Large Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $77,500

      8.5.2.  <u>Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $35,000

      8.5.3.  <u>Small Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $15,000

      8.5.4.  <u>Not Otherwise Completely Released Large Candy Manufacturer</u>: $77,500

      8.5.5.  <u>Not Otherwise Completely Released Medium Candy Manufacturer</u>: $35,000

      8.5.6.  <u>Not Otherwise Completely Released Small Candy Manufacturer</u>: $15,000

      8.5.7.  <u>Large Retailer With Exposure Not Covered By a Downstream Release</u>: $7,500

      8.5.8.  <u>Small Retailer With Exposure Not Covered By a Downstream Release</u>: $2,500.

    8.6    **Payments to Fund Compliance Verification Testing and Oversight Program.** Additionally, within thirty (30) days of the Effective Date, each Initial Settling Defendant, or an entity acting on their collective behalves, shall make the following additional payments to AYS to provide seed funding for the compliance verification testing and oversight program set forth in Sections 5.2 to 5.5 ("Compliance Testing Fund"). The individual amounts of payments set

forth in Sections 8.6.1 through 8.6.8 shall also apply to the calculation of payments towards the compliance verification testing and oversight program for Opt-In Settling Defendants pursuant to Section 7.  The payments received by AYS pursuant to this Section 8.6 shall be used exclusively to fund the compliance verification testing and oversight program described in Sections 5.2 through 5.5.  The payments required under this Section 8.6 shall be:

      8.6.1.  <u>Large Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $12,500

      8.6.2.  <u>Medium Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $10,000

      8.6.3.  <u>Small Grinders/Wholesalers/Chocolate Ingredient Suppliers</u>: $7,500

      8.6.4.  <u>Not Otherwise Completely Released Large Candy Manufacturer</u>: $12,500

      8.6.5.  <u>Not Otherwise Completely Released Medium Candy Manufacturer</u>: $10,000

      8.6.6.  <u>Not Otherwise Completely Released Small Candy Manufacturer</u>: $7,500

      8.6.7.  <u>Large Retailer With Exposure Not Covered By a Downstream Release</u>: $10,000

      8.6.8.  <u>Small Retailer With Exposure Not Covered By a Downstream Release</u>: $7,500.

      8.7    Initial Settling Defendants, or an entity acting on their collective behalves, shall issue all payments as required under this Section 8 with a check made payable to Shute, Mihaly & Weinberger LLP Client Trust Account and delivered to Ellison Folk, Shute, Mihaly & Weinberger LLP, 396 Hayes Street, San Francisco, CA 94102 or via wire or ACH electronic funds transfer if mutually arranged with Shute, Mihaly & Weinberger LLP in advance.  Funds tendered by the Opt-In Defendants for purposes of Section 8.2 shall be provided along with the other documentation and payments required under Section 7.4 and maintained in the Shute, Mihaly & Weinberger LLP Client Trust Account until disbursed for fee and cost reimbursement approved by the Court or, if there is a surplus, until disbursed to the Initial Settling Defendants.  Funds tendered for purposes of Section 8.5 shall be maintained in the Shute, Mihaly & Weinberger LLP Client Trust Account until disbursed for the Committee's expenses or, if there is a surplus, until disbursed to the Initial Settling Defendants.

30

8.8     Except as provided in Sections 5.5, 5.6, and 16.1, the payments made pursuant to this Section 8 shall be the only monetary obligation of Settling Defendants with respect to this Consent Judgment, including as to any fees, costs, or expenses AYS has incurred in relation to this Action.

## 9. COMPLIANCE WITH HEALTH & SAFETY CODE § 25249.7(f)

AYS agrees to comply with the reporting requirements referenced in California Health and Safety Code section 25249.7(f). Pursuant to the regulations promulgated under that section, AYS shall present this Consent Judgment to the California Attorney General's Office within two (2) days after receipt of all necessary Initial Settling Defendant signatures. The Parties acknowledge that, pursuant to Health and Safety Code section 25249.7, a noticed motion must be filed to obtain judicial approval of the Consent Judgment. Accordingly, a motion for approval of the Consent Judgment shall be prepared and filed by AYS within a reasonable period of time after the date this Consent Judgment is signed by all Parties.

## 10. MODIFICATION OF SETTLEMENT

This Consent Judgment may be modified by: (1) written agreement among the Parties and upon entry of a modified Consent Judgment by the Court thereon, or (2) motion of AYS or a Settling Defendant as provided by law and upon entry of a modified Consent Judgment by the Court thereon. All Parties and the California Attorney General's Office shall be served with notice of any proposed modification to this Consent Judgment in advance of its consideration by the Court.

## 11. APPLICATION OF CONSENT JUDGMENT

This Consent Judgment shall apply to and be binding upon AYS, acting in the public interest, and the Settling Defendants and the predecessors, successors or assigns of each of them.

## 12. CLAIMS COVERED/RELEASES

12.1     **Release of Settling Defendants.** This Consent Judgment is a full, final, and binding resolution between AYS, on behalf of itself and in the public interest, and the Settling Defendants, of any alleged violation of Proposition 65 for failure to provide Proposition 65 warnings of exposure to lead and/or cadmium in the Covered Products. AYS, on behalf of

itself, its affiliates, agents, officers, directors, representatives, attorneys, successors and/or assignees, and on behalf of the general public in the public interest, hereby releases and discharges:  (a) Settling Defendants and their parent companies, subsidiaries, affiliates, and divisions; (b) their respective joint venturers and partners; and (c) each of the respective officers, directors, shareholders, employees, agents, and representatives of the persons and entities described in (a) and (b) (including the predecessors, successors and assigns of any of them, are collectively referred to as the "Released Parties") from any and all claims, actions, causes of action, suits, demands, liabilities, damages, penalties, fees (including but not limited to investigation fees, attorneys' fees, and expert fees), costs, and expenses (collectively, "Claims") as to any alleged violation of Proposition 65 arising from the failure to provide Proposition 65 warnings regarding alleged exposures to lead and/or cadmium in the Chocolate Products manufactured, imported distributed, or sold before the Effective Date.

12.2   **Settling Defendants' Waiver and Release of Plaintiff.**  Settling Defendants, on behalf of themselves and their affiliates, agents, officers, directors, representatives, attorneys, successors and/or assignees, hereby release AYS and its affiliates, agents, officers, directors, representatives, attorneys, successors and/or assignees from and waive any claims against AYS for injunctive relief or damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed or which could have been claimed for matters related to the Notices or Complaint[s].

12.3   **Effect of Judgment.**  From the Effective Date forward, compliance with the terms of this Consent Judgment shall be deemed to constitute compliance by any Settling Defendant or Released Party with Proposition 65 regarding alleged exposures to lead and/or cadmium in the Covered Products.

12.4   **Downstream Release.**  A distributor, wholesaler, retailer, customer, user, or other entity that is downstream in the chain of commerce from a Settling Defendant or Released Party ("Downstream Entity") shall be released from any liability under Proposition 65 as to the lead or cadmium contribution from the cocoa-based ingredients or chocolate in a Covered Product provided that the cocoa-based ingredients or chocolate in the Covered Product contains

32

concentrations of lead and cadmium at or below the applicable warning trigger levels set forth in Section 6.2.1 and 6.6.2.  This release to Downstream Entities does not extend to the cocoa-based ingredients or chocolate used in the protein bar and nutritional drink products whose names appear on **Exhibit D**.

12.5    Nothing in this Section 12 shall affect or limit any Party's right to seek to enforce the terms of this Consent Judgment.

**13. RETENTION OF JURISDICTION**

This Court shall retain jurisdiction of this matter to implement this Consent Judgment.

**14. COURT APPROVAL**

If this Consent Judgment is not approved by this Court, it shall be of no force or effect and cannot be used in any proceeding for any purpose.

**15. DURATION OF CONSENT JUDGMENT**

15.1    At any time after the ~~seventh~~ tenth anniversary of the Effective Date, any Party may move for the Court to terminate the Consent Judgment for good cause shown and any Party may oppose such motion.

15.2    At least six (6) months prior to bringing a motion to terminate pursuant to Section 15.1, a Party shall first offer to meet and confer with all other Parties concerning the basis on which they intend to seek termination and set forth its position as to:  (a) how Section 6 of this Consent Judgment could be modified to address their position, and (b) why such modifications and the means to achieve them have become Feasible or why Feasible technologies or methods have not become available or proven Feasible.  To the extent that the meet and confer does not result in a stipulated modification of the Consent Judgment being submitted to the Court for approval pursuant to Section 10 within three (3) months after a Party gives notice of its intention to bring a motion for termination, the Party or Parties which elect to oppose the proposed motion for termination may seek to have the matter referred to a mutually acceptable mediator, to be paid for at its or their sole expense, who shall be given another three (3) months to attempt to resolve the matter in a manner that allows the Consent Judgment to remain in effect by mutual agreement.

33

15.3    The Committee's findings concerning Feasible measures or limits shall be admissible but not be dispositive for purposes of this Section 15.

15.4    The meet and confer and potential mediation deadlines specified under Section 15.2 may be modified in writing by the Parties pursuant to Section 10.

**16. ENFORCEMENT**

16.1    In the event that a dispute arises with respect to any provisions of this Consent Judgment, the respective Parties shall meet and confer within thirty (30) days of receiving written notice of the alleged violation.  In the event that the respective Parties are unable to resolve their dispute through the meet and confer process, this Consent Judgment may be enforced using any available provision of law.  If AYS is the prevailing Party in any dispute regarding compliance with the terms of this Consent Judgment, it may seek any fines, costs, penalties, or remedies provided by law for failure to comply with California Health and Safety Code sections 25249.5, et seq.  A prevailing Party in such a dispute regarding compliance with the terms of this Consent Judgment is entitled to seek recovery of its reasonable attorneys' fees and costs incurred in any such motion or proceeding pursuant to the provisions of Code of Civil Procedure section 1021.5.  Notwithstanding any language to the contrary in Sections 3, 5, or otherwise herein, AYS may disclose test results received from a Settling Defendant in a court filing in support of any motion to enforce this Consent Judgment provided that AYS first provides the Settling Defendant an opportunity to make a motion for leave to seal such data pursuant to a protective order.

16.2    In the event that a Settling Defendant misses any deadline required under this Consent Judgment for the submission of reports, testing, or of any other notifications to AYS, the Settling Defendant shall nonetheless be deemed to be in compliance with such a deadline if it submits the required information or notification to AYS within fourteen days of discovering the missed deadline. If AYS brings a missed deadline to the attention of a Settling Defendant, such Settling Defendant shall pay penalties to AYS in the amount of up to $5,000 per incident as may be reasonably requested by AYS given the nature of the deadline and materiality of the

34

timeliness of the information involved.  All missed deadlines within a calendar quarter shall be deemed to constitute a single "incident."

## 17. GOVERNING LAW

The terms of this Consent Judgment shall be governed by the laws of the State of California.

## 18. EXCHANGE IN COUNTERPARTS

Stipulations to this Consent Judgment may be executed in counterparts (and, without limitation, by facsimile or by electronic mail in "portable document format" (".pdf"), each of which shall be deemed an original, and all of which, when taken together, shall be deemed to constitute one and the same instrument.

## 19. NOTICES

All correspondence and notices required to be provided by a Party to the other Parties pursuant to this Consent Judgment shall be in writing and personally delivered or sent by: (a) first-class, registered mail, certified return receipt requested, or (b) by overnight or Two Day courier at the addresses set forth below.  AYS or the Settling Defendants may specify in writing to the other Parties a change of address to which all notices and other communications shall be sent.

Whenever notice or a document is required to be sent to AYS, it shall be sent to:

> Danielle Fugere
> President
> As You Sow
> 1611 Telegraph Ave, Suite 1450
> Oakland, CA 94612

and

> Ellison Folk
> Shute, Mihaley & Weinberger LLP
> 396 Hayes Street
> San Francisco, CA 94104

Whenever notice or a document is required to be sent to a Settling Defendant, it shall be sent to the contact name(s) and address(es) identified in **Exhibit E**, which shall also be completed and appended to each Opt-In Stipulation submitted pursuant to Section 7.3.

35

**20. SEVERABILITY**

If, subsequent to court approval of this Consent Judgment, any of the provisions of this Consent Judgment are held by a court to be unenforceable or preempted, the validity of the enforceable provisions remaining shall not be adversely affected.

**21. ENTIRE AGREEMENT**

This Consent Judgment contains the sole and entire agreement and understanding of the Parties with respect to the entire subject matter hereof, and any and all prior discussions, negotiations, commitments, and understandings related hereto.  No representations, oral or otherwise, express or implied, other than those contained herein have been made by any Party hereto.  No other agreements not specifically referred to herein, oral or otherwise, shall be deemed to exist or to bind any of the Parties.

**22. AUTHORIZATION TO ENTER INTO AGREEMENT**

Each signatory to this Consent Judgment certifies that he or she is fully authorized by the Party that he or she represents to enter into and execute the Consent Judgment on behalf of the Party represented and legally bind that Party.

DATED: _12/20/23_____          AS YOU SOW

Andrew Behar, CEO

DATED: _____          BARRY CALLEBAUT U.S.A., LLC

Name: Jerry Hagedorn

Title: EVP                    PM

36

1   DATED: _____December 1, 2023_____        BLOMMER CHOCOLATE CO.

2

3

4                                           Name: Robert W. Karr, Jr.

5                                           Title: Chief Legal Officer & SVP

6

7   DATED: _____               GUITTARD CHOCOLATE CO.

8

9

10                                          Name: _____

11                                          Title: _____

12  DATED: _____               THE HERSHEY COMPANY

13

14

15                                          Name: _____

16                                          Title: _____

17

18  DATED: _____               LINDT & SPRUNGLI (NORTH AMERICA) INC.

19

20

21                                          Name: _____

22                                          Title: _____

23

24

25

26

27

28

                                    37

1  DATED: _____          BLOMMER CHOCOLATE CO.

2

3

4                                  Name: _____
5                                  Title: _____

6

7  DATED: 11/17/2023               GUITTARD CHOCOLATE CO.

8

9

10                                 Name: Gary W Guittard
11                                 Title: CEO

12 DATED: _____          THE HERSHEY COMPANY

13

14

15                                 Name: _____
16                                 Title: _____

17

18 DATED: _____          LINDT & SPRUNGLI (NORTH AMERICA) INC.

19

20

21                                 Name: _____
22                                 Title: _____

23

24

25

26

27

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23        37
CASE NO. CGC-15-548791

1  DATED: _____        BLOMMER CHOCOLATE CO.

2

3

4                                  Name: _____

5                                  Title: _____

6

7  DATED: _____        GUITTARD CHOCOLATE CO.

8

9

10                                 Name: _____

11                                 Title: _____

12 DATED: November 28, 2023         THE HERSHEY COMPANY

13

14                                 _____

15                                 Name: Kathleen S. Purcell
                                   Title:   Assistant Corporate Secretary
16

17

18 DATED: _____        LINDT & SPRUNGLI (NORTH AMERICA) INC.

19

20                                 _____

21                                 Name: _____
                                   Title: _____
22

23

24

25

26

27

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1  DATED: _____        BLOMMER CHOCOLATE CO.

2

3                                _____

4                                Name: _____

5                                Title: _____

6

7  DATED: _____        GUITTARD CHOCOLATE CO.

8

9                                _____

10                               Name: _____

11                               Title: _____

12 DATED: _____        THE HERSHEY COMPANY

13

14                               _____

15                               Name: _____

16                               Title: _____

17

18 DATED: _____        LINDT & SPRUNGLI (NORTH AMERICA) INC.

19

20                               _____

21                               Name: Jessica Haefele

22                               Title: Head Legal, North America

23

24

25

26

27

28

37

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1  DATED: 12/14/2023        CARGILL, INC., on behalf of itself, its affiliates, and
2                                 subsidiaries

3

4                                 Name: KOJO AMOO-GOTTFRIED
5                                 Title: MANAGING DIRECTOR - CCNA

6

7  DATED: _____        MARS, INC.

8

9

10                                 Name: _____
11                                 Title: _____

12

13  DATED: _____       MONDELEZ GLOBAL LLC, as the United States
14                                 operating company for MONDELEZ
15                                 INTERNATIONAL, INC.

16

17                                 Name: _____
18                                 Title: _____

19

20  DATED: _____       NESTLÉ USA, INC.

21

22                                 _____
23                                 Name: _____
                                 Title: _____
24

25

26

27

28

38

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1  DATED: _____        CARGILL, INC., on behalf of itself, its affiliates, and
2                                    subsidiaries
3
4                                    Name: _____
5                                    Title: _____
6
7  DATED: 12/20/23                   MARS, INC.
8
9                                    Name: Anna Marciano
10                                   Title: General Counsel Mars Wrigley North America
11
12
13 DATED: _____        MONDELEZ GLOBAL LLC, as the United States
14                                   operating company for MONDELEZ
15                                   INTERNATIONAL, INC.
16
17                                   Name: _____
18                                   Title: _____
19
20 DATED: _____        NESTLÉ USA, INC.
21
22
23                                   Name: _____
24                                   Title: _____
25
26
27
28                                        38

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1   DATED: _____       CARGILL, INC., on behalf of itself, its affiliates, and
2                                 subsidiaries

3

4                                 _____
     Name: _____
5                                 Title: _____

6

7   DATED: _____       MARS, INC.

8

9                                 _____
10                                Name: _____
                                  Title: _____
11

12

13  DATED:  November 21, 2023      MONDELEZ GLOBAL LLC, as the United States
14                                 operating company for MONDELEZ
                                   INTERNATIONAL, INC.
15

16                                 DocuSigned by:

17                                 _____
                                   Name:   Kevin Brennan
18                                 Title:  Chief Counsel Litigation

19

20  DATED: _____        NESTLÉ USA, INC.

21

22

23                                 _____
                                   Name: _____
24                                 Title: _____

25

26

27

28
                                   38

```
 1   DATED: _____          CARGILL, INC., on behalf of itself, its affiliates, and
 2                                        subsidiaries
 3
 4                                        Name: _____
 5                                        Title: _____
 6
 7   DATED: _____          MARS, INC.
 8
 9
10                                        Name: _____
11                                        Title: _____
12
13   DATED: _____          MONDELEZ GLOBAL LLC, as the United States
14                                        operating company for MONDELEZ
15                                        INTERNATIONAL, INC.
16
17                                        Name: _____
18                                        Title: _____
19
20   DATED: 11/30/2023                    NESTLÉ USA, INC.
21
22
23                                        Name: Robert O. Winters
24                                        Title: Senior Counsel – Food Law
25
26
27
28
```

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1

# EXHIBIT A

2

3

## Initial Settling Defendants

4

Barry Callebaut USA, LLC

5

Blommer Chocolate Co.

6

7

Cargill, Inc.
(on behalf of itself, its affiliates, and subsidiaries)

8

Guittard Chocolate Co.

9

The Hershey Company

10

11

Lindt & Sprüngli (North America) Inc.
(on behalf of itself, its affiliates, and its subsidiaries, including Lindt & Sprüngli (USA) Inc.,
the Ghirardelli Chocolate Company, and Russell Stover Chocolates, LLC)

12

Mars Incorporated

13

14

Mondelez Global LLC
(as the United States operating company for Mondelez International, Inc.)

15

16

Nestlé USA, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

1

# EXHIBIT B

2

## Opt-In Stipulation

3

4  ELLISON FOLK (State Bar No. 149232)
   LAURA D. BEATON (State Bar No. 294466)
5  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
6  San Francisco, California 94102
   Telephone:   (415) 552-7272
7  Facsimile:   (415) 552-5816
   Folk@smwlaw.com
8  Beaton@smwlaw.com

9  Attorneys for AS YOU SOW

10

11

12

13                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                           COUNTY OF SAN FRANCISCO

15                             UNLIMITED JURISDICTION

16

17  AS YOU SOW,                          | Case No.      CGC-15-548791

18              Plaintiff,               | **STIPULATION FOR ENTRY OF**
                                         | **JUDGMENT**
19        v.

20  TRADER JOES COMPANY; and DOES 1
    through 150,
21
                Defendants.
22

23

24

25

26

27

28
                                        40

1      1.      The following constitutes the knowing and voluntary election and stipulation of

2  the entity named below ("Company" or "Opt-In Defendant") to join as a Settling Defendant

3  under the Consent Judgment previously entered by the Court in *As You Sow v. Trader Joe's*

4  *Company, et al.*, San Francisco Superior Court Case No. CGC-15-548791 ("Action") and to

5  be bound by the terms of that "Consent Judgment."

6      2.      At any time during the three (3)-year period prior to the filing of this Stipulation

7  ("Relevant Period"), the Company has employed ten or more persons on a full or part time

8  basis and manufactured, distributed, or offered for use or sale in California, or sold in

9  California, one or more Covered Products, as defined in the Consent Judgment Section 2.4.

10     3.      Based on information and good faith belief, the Company knows or has

11 reason to believe that one or more of its Covered Products has in the past contained or

12 presently may contain lead or cadmium in excess of an applicable drop down level set forth in

13 Section 6.2.1 or 6.2.2 of the Consent Judgment.

14     4.   The Company has not provided Proposition 65 warnings in conjunction with the

15 sale or use of its Covered Products in California at all times during the Relevant Period.

16     5.      The Company agrees to be bound by all terms of the Consent Judgment,

17 including, but not limited to, the injunctive relief provisions set forth in Section 6 of the

18 Consent Judgment.

19     6.      In conjunction with the execution of this Stipulation, the Company had provided

20 the payments required of it under the Consent Judgment and shall make all future payments

21 that may apply to the Company.

22     7.      At least 70 days prior to the submissions of this Stipulation to the Court for

23 entry, provided that it has been mailed to the address for notice shown in Exhibit E of the

24 Consent Judgment, a completed copy of which is attached to this Stipulation, the Company

25 agrees to be deemed to have accepted service of a 60-day notice letter from As You Sow

26 ("AYS") alleging certain violations of Proposition 65 with respect to sales of the Covered

27 Products.

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

8.     The Company hereby stipulates to be deemed to have voluntarily accepted service of the summons and complaint in this Action upon the filing of this Stipulation and, without waiving its rights to contest the issue in any other action, agrees to be subject to the jurisdiction of the Court for purposes of the Consent Judgment.

9.     The undersigned have read, and the person and/or entity named below knowingly and voluntarily agree to be bound by, all terms and conditions of this Stipulation and the Consent Judgment as it was previously approved and entered by the San Francisco County Superior Court in this Action.

10.     The undersigned has full authority to make the written representations above and to enter into this Stipulation for the person/entity on behalf of which he/she is signing.

**IT IS HEREBY STIPULATED AND AGREED TO:**

**On Behalf of Opt-In Defendant:**

Date:_____

By: _____
                (signature)

_____
            Name  (printed/typed)

_____
            Title  (printed/typed)

_____
        Company Name (printed/typed)

**On Behalf of Plaintiff, As You Sow:**

Date:_____

By:_____
        (signature and title)

42

# EXHIBIT C

## Scope of Work – Chocolate Consent Judgment[1]

### I.   Phases of Investigation and Committee Work

A. Phase 1: Scope of Root Cause

The Root Cause Phase of the investigation is intended to identify any potential sources of lead and cadmium in chocolate across all phases of the cacao and Chocolate Products process and supply chains. For each source that the Committee identifies, the Committee should also identify the likelihood that each source would contribute lead or cadmium to chocolate (e.g., "common source," "infrequent source," "rare source," etc.). The Committee's conclusions may be based on literature review; consultation with subject matter experts and chocolate industry personnel; testing for lead/cadmium in soil, water, beans, ingredients, equipment, packaging, tools, etc.; and any information the Committee deems relevant and reliable. The Committee should evaluate all of the following as potential sources of lead/cadmium contamination in chocolate:

1. Soil;

2. Water;

3. Potential lead or cadmium pollution sources proximate to significant cocoa growing or processing locations (such as smelters, incinerators, diesel traffic), or other historic or less proximate sources (such as prior use of leaded gasoline, or deposition patterns from other sources of pollution);

4. Cacao plant fertilization, pest, disease and weed control practice and materials; and irrigation sources and practices;

5. Cacao bean harvesting, fermentation, drying, and transportation practices and materials, including but not limited to:

    a.   harvesting tools;

    b.   bean transportation vessels, such as sacks, tarps, baskets, and buckets;

    c.   open-air drying and open-air transport of cocoa beans; and

    d.   fermentation tarps, racks, cloths, or other materials that come into contact with beans.

6. Cocoa bean processing and chocolate manufacturing practices that may introduce lead or cadmium, including but not limited to:

---

[1] All defined terms as used herein shall have the meaning assigned to them in the Consent Judgment. A glossary of such terms is provided in Attachment 1.

43

a.  processing water;

b.  sugar or other inclusions;

c.  factory conveyance implements;

d.  other factory equipment, such as roasters, winnowers, crushers, melangers, grinders, blenders, melters, molds, etc.;

e.  product packaging.

The Committee's investigation is not limited to these potential sources.  If the Committee identifies other potential sources of lead/cadmium in cocoa beans or Chocolate Products, it shall evaluate whether each additional potential source is a contributor of lead or cadmium, and what that source's likelihood and significance of contribution is.

B.  Phase 2: Scope of Reduction Recommendations

After identifying the likely sources of lead/cadmium in cocoa beans and Chocolate Products, the Committee will identify Feasible methods for reducing lead/cadmium in the Chocolate Products.  As with the Root Cause Phase of the investigation, the Committee's recommendations will be Consensus Based and result from the Root Cause Phase as well as further literature review, consultation with outside subject matter experts, review of test results, and any other information the Committee deems relevant and reliable.

The Committee should evaluate lead/cadmium reduction options for all of the following phases of the cocoa bean and Chocolate Product production and supply chain.  Then, it should identify which reduction measures are Feasible at each phase of the production process.

1.  Growing cacao, harvesting and fermentation of cocoa beans -- Some options for potential evaluation may include soil remediation, testing irrigation water and avoiding contaminated water, soil amendments to reduce heavy metal uptake, growing different varieties of cacao that uptake less heavy metals, changing fertilizers and pesticides/herbicides, etc.;

2.  Storage and transport of fermented cocoa beans -- Some options for potential evaluation may include changing storage and transportation implements; avoiding open-air drying near roads and other sources of pollution, etc.;

3.  Cacao bean processing and chocolate manufacturing -- Some options for potential evaluation may include comprehensive testing of a manufacturer's equipment, replacing outdated equipment, substituting  non-cacao ingredients, blending beans to lower lead/cadmium levels, implementing processes that extract lead/cadmium from the cacao beans or chocolate, and/or modifying product packaging.

If the Committee believes other options may prove Feasible, it should evaluate those options as well.

44

C.  Phase 3: Evaluation of Future Proposition 65 Warning Triggers

The Committee shall evaluate whether the levels to trigger warnings shall be modified from the "drop down" levels described in Sections 6.2.1 and 6.2.2 of the Consent Judgement.  The Committee shall make recommendations in this regard based on:

1.  The identification of Feasible reduction methods (Phase 2) that could reasonably lower levels of lead and cadmium in Chocolate Products below the drop down levels to trigger warnings.

2.  The inability to identify Feasible reduction methods (Phase 2) that could reasonably lower levels of lead and cadmium in Chocolate Products below the drop down levels to trigger warnings.

3.  The conclusion that the drop down levels to trigger warnings are not Feasible to achieve and an identification of the levels between the drop down levels and the initial levels which are Feasible.

In the event the Committee determines that levels other than the specified drop down levels are appropriate and can be achieved through Feasible measures, the Committee shall specify what those levels are,  when the levels of lead and/or cadmium in Chocolate Products can be expected to be reduced, and by whom.

As with the first two phases of the Scope of Work, the Committee's recommendations shall be Consensus Based and be based on literature review, consultation with outside subject matter experts, review of test results, and any other information the Committee deems relevant and reliable.

D.  Final Report Phase

The Committee shall prepare a final, written report to describe and explain its findings, conclusions, and recommendations for all three phases of its investigation.  The final report shall include supporting references with complete citations for the Committee's conclusions and identify any SMEs who advised the Committee during its deliberations.  The final report shall not be edited by any persons other than the members of the Committee.  The final report shall present all Consensus Based Committee findings and recommendations and may include an appendix setting forth significant areas where consensus could not be achieved and an appendix setting forth any significant conflicting opinions on aspects of a Consensus Based finding where they exist.

II.   **Deliverables and Schedule**

1.  Based on a schedule developed by the Project Manager, the Committee members will commit to standing meetings (by phone conference) on a periodic basis or on an as needed basis to ensure coordination and the efficient sharing of information.  The Project Manager shall develop a working agenda for each meeting and provide the Committee members with a brief written summary highlighting the discussion points and action items.

2.  After the investigative portion of each of the first three phases of the Scope of Work is complete (as agreed upon by the Committee members), an outline of the findings,

45

conclusions, and recommendations shall be produced by the Committee and Project Manager for each investigative phase. These interim documents will be used to assist in internal discussions of the Committee and will form the basis of the final report.

3. The Committee and the Project Manager, in providing quarterly reports as required under the Consent Judgment, will produce a list of all outside SMEs consulted with and a brief description of the information gathered.

4. The Committee will produce an alphabetized list of all information sources with complete citations, including Internet URLs when available, to be included in the final report appendix.

5. Following submission of the final report, the Committee may be asked to present an oral summary of its main findings, conclusions, and recommendations (including any alternative conclusions and recommendations by any Committee members) as deemed desirable by the Initial Settling Defendants and/or As You Sow.

6. The Committee, with the approval of the Initial Settling Defendants and As You Sow, may elect to prepare the final report for submission to an appropriate trade journal for public access. The Committee shall agree not to pursue this publication until all of its work as outlined in the Scope of Work and the final report has been submitted.

Unless otherwise agreed upon by the Initial Settling Defendants and AYS, the final report shall be delivered by the Committee through the Project Manager within 18 to 24 months of the kickoff meeting that will be held pursuant to Section 3.2.2 of the Consent Judgment.

## III.   Cost/Budget

Unless revisited by AYS and the Initial Settling Defendants, all work and deliverables set forth in this Scope of Work shall be completed at a cost of $90,000 for each Committee member plus some funds to set aside for a part time Project Manager and possible outside expert consultation, up to an aggregate cap of $500,000.

## IV.   Confidentiality

All work by the Committee members and the Project Manager shall be subject to the confidentiality provisions set forth in Sections 3.3.3 and 3.4.4 of the Consent Judgment.

46

1

## ATTACHMENT 1 to EXHIBIT C—GLOSSARY OF DEFINED TERMS

2

3   "**Chocolate Product**" means chocolate candy; chocolate bars, pieces, chips, beverages, and confections with or without inclusions; cocoa nibs and cocoa powder;
4   chocolate and cacao-based compounds in any form; and other products derived primarily (i.e., in excess of 50%) from cacao.  Chocolate Products include the preceding
5   as sold on a standalone basis and/or as sold to be used as ingredients in other foods into which they are incorporated.

6

7   "**Consensus Basis**" means a creative and dynamic way of reaching agreement between all members of a group.  Instead of simply voting for an item and having the
    majority of the group dictate the outcome, a group using consensus is committed to
8   finding solutions that each member of the group actively supports, or at least can live with and that all opinions, ideas and concerns are taken into account.  A Consensus
9   Basis does not reflect compromise or unanimity - it aims to go further by weaving together everyone's best ideas and key concerns.  It is an acceptable resolution, one
10  that can be supported, even if not the "favorite" of each individual.  Multiple concerns and information shall be shared until the sense of the group is clear.  Ideas and
11  solutions belong to the group; no names are recorded.  The group as a whole is responsible for the decision and the decision belongs to the group.  The goal is unity,
12  not unanimity.

13  "**Feasible**" means capable of being accomplished in a successful manner within a reasonable period of time, taking into account public health,  and economic,
14  environmental, social, and technological factors.  In considering whether an action or
    performance level is Feasible, consideration shall be given, among other things, to
15  scaling as to the size and resources of the potential implementing enterprise involved, the implementing enterprise's place and role within the chain of commerce, the prior
16  demonstration of the viability of the concept or technology at issue at both the research and actual commercial application scale, and the nature of the issue being addressed.
17

18  "**Settling Defendant**" means a defendant who is a party to the Consent Judgment at the time it is entered, or who opts in to the Consent Judgment any time after its entry.
19  The former are also specifically referred to herein as "Initial Settling Defendants" and the latter are also specifically referred to herein as "Opt-In Settling Defendants."

20

21

22

23

24

25

26

27

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

# EXHIBIT D

## Products Not Subject to Section 12.4 Downstream Release:

PowerBar Protein Plus Chocolate Peanut Butter

ZonePerfect Nutrition Bar Dark Chocolate Almond

Atkins Meal Cookies n' Crème Bar

Atkins Treat Nutty Fudge Brownie Bar

thinkThin High Protein Bar, Chocolate Fudge

thinkThin High Protein Bar, Brownie Crunch

QuestBar Protein Bar, Chocolate Brownie

MET-Rx Protein Plus, Chocolate Chocolate Chunk

MET-Rx Protein Plus, Super Cookie Crunch

Vega Sport Protein Bar, Chocolate Peanut Butter

Pure Protein Bar, Chocolate Deluxe

NuGo Dark Chocolate Coconut

NuGo Dark Mint Chocolate Chip

NuGo Dark Mocha Chocolate

Go Macro Macrobar Protein Pleasure, Peanut Butter Chocolate Chip

Go Macro Macrobar Everlasting Joy, Coconut + Almond Butter + Chocolate

Pro Bar Meal Chocolate Coconut

Vega One All-In-One Nutritional Shake, Chocolate

**EXHIBIT E**

Designees to Receive Notices Under Consent Judgment

Company Name: _____

Attention of: _____
Address: _____
_____
_____
Telephone: _____
Email: _____

(Optional) with a CC to:
Name: _____
(legal counsel or other designee)
Firm/Company: _____
Address: _____
_____
_____
Telephone: _____
Email: _____

49

# EXHIBIT F

### PROJECT PLAN

**Project Management**

Engage John Wilhelmi / ERG (or, if unavailable or unreasonably expensive) an agreed upon cost-effective alternative) to function as the Project Manager for the Project Plan. The Project Manager will be responsible for the following:

- Administratively guide the Project Plan Work Streams to ensure appropriate confidentiality and timeliness of deliverables;
- Periodically meet with Work Stream Leads to assess progress and resources needed, if any;
- Forward progress reports, including all lab results, received from Work Stream Leads to As You Sow (**AYS**) and to the Initial Settling Defendants (**ISDs**);
- Provide coordination, if needed, of the final reports for each Work Stream and, upon completion, forward the final reports to As You Sow (**AYS**) and to the Initial Settling Defendants (**ISDs**).

**Timing**: RFP to be issued to ERG upon mutual-agreement of the Project Plan by AYS and the ISDs

**Work Stream #1:  Manufacturing Practices for the Reduction of Lead**

An independent consultant with cocoa processing industry expertise) will be retained as Work Stream Lead to define and document optimal practices for bean processing facilities regarding Lead (Pb) control and testing during bean cleaning, breaking and/or winnowing. This work will be done in consultation with at least three (3) ISDs with cocoa-processing facilities.

This Work Stream shall address:

- Operational practices (e.g. maintenance, establishment of standard operating conditions);
- Verification and effectiveness testing of the identified practices relative to magnitude of Pb reduction results;
- Consideration of differences, if any, between large and small processors and equipment types;
- Compliance audit procedures; and
- Final report on results of the Work Stream

**Work Stream Lead:** Tim Ahn (or, if unavailable or unreasonably expensive, an agreed upon cost effective alternative)

**Timing:** Completion and publication of "best practices" documentation by December 15, 2023.

**Implementation Obligations of Initial Settling Defendants (ISDs):** Corrective actions in place for pilot testin Pb y at least three ISDs that process cocoa beans and reflect different size companies in the industry by not later than October 31, 2024; Verification/effectiveness testing completed by October 31, 2025.

**Obligations of Settling Defendants:** Both Initial and Opt-In Settling Defendants shall be obligated to comply with modified terms of Section 6.2.1 of the Consent Judgment reflecting the magnitude of the anticipated level of Pb reduction associated with implementation of the best practices as set forth in the prior expert committees' Final Report. Any Settling Defendant that does not comply with modified terms of the Consent Judgment will be subject to enforcement pursuant to Sections 15 and 16 of the Consent Judgment.

**Work Stream #2:  Technological Innovation for Cleaning and Winnowing Equipment to Reduce Lead**

51

**Objective:**  Reduce Pb by a significant magnitude in cocoa liquor and resulting Chocolate Products by identifying and developing technological innovation in bean cleaning and winnowing process equipment, including during cracking and breaking.

**Approach:**

- Work with industrial equipment manufacturers to develop modifications to existing cleaning and winnowing equipment to increase removal of Pb particles during these stages of cocoa bean processing, including during cracking and breaking.

- Challenge equipment suppliers to develop new cleaning and winnowing systems to further reduce Pb concentrations in chocolate liquor.

**Key Cocoa Equipment Manufacturers:**  Buhler; Kocotech/Duyvis/Lehmann; FoodMaster; Bauermeister

**Work Stream Outline:**

1. ISDs to form a team of at least three in-house industry experts to retain and work with an independent consultant to move the effort ahead.  The Team Leader will be selected by the assembled in-house team and the independent consultant will be retained by the 4th Quarter of 2023;

2. The Consultant and Team Leader to prepare project overview to clearly outline the project for presentation to suppliers by February 15, 2024 and provide brief interim report on same;

3. Present to each processing equipment supplier willing to engage on the project by end of 1st Quarter 2024. Include information regarding previous findings regarding lead removal and mobilization during processing stages in the Expert Committee's Reports.

4. Provide interim report, by end of 2nd Quarter 2024 on processing equipment supplier response to presentations and their willingness to pursue the project.  If no processing equipment suppliers indicate willingness to pursue the project, the ISDs the Consultant and Team Leader shall, by the end of the 3rd Quarter 2024, issue a request for proposal (RFP) to solicit an alternative candidate to pursue the project, including by engineering firms and/or academic institutions, and provide a further interim report, by the end of the 1st Quarter 2025 on responses received to the RFP.

5. Willing processing equipment suppliers or alternative candidates to initiate laboratory and pilot scale testing to identify improvements to existing systems or develop new cleaning and winnowing (includes breaking) prototypes.  (Estimated 18 to 24 months from end of 2nd Quarter 2024 or from the end of the 1st Quarter 2025 in the case of an alternative candidate.)

    a. Process will be iterative as suppliers evaluate processes to remove lead from cocoa beans and the resulting nib stream.

    b. Quarterly follow ups will be conducted with supplier to understand progress and give feedback on viability of the technology, with results of the follow-ups reflected in short interim reports.

    c. Once a significant improvement has been identified, the supplier will be advanced to the next level of development and be asked to provide a timeline for implementation of pilot testing and associated effectiveness testing;

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

**Work Stream #2:  Technological Innovation for Cleaning and Winnowing Equipment to Reduce Lead** (continued)

6.  Interim report on status of overall project, including results of pilot tests and what they suggest relative to magnitude of lead reductions in cocoa liquor and resulting Chocolate Products to be issued by end of 3rd Quarter 2026 (or by the end of the 1st Quarter 2027 in the case of an alternative candidate).

7.  Work with suppliers to retrofit existing cleaning/winnowing industrial process equipment or build manufacturing scale process equipment to demonstrate proof of concept of the new technology at a minimum of three processing facilities and obtain associated test results. (Estimated to take 12 to 24 months from end of 3rd Quarter 2026 or the end of the 1st Quarter 2027 in the case of an alternative candidate).

8.  Provide final report by the end of the 2nd Quarter 2028 (or the end of the 4th Quarter 2028 in the case of an alternative candidate) evaluating the new processes at the manufacturing scale for associated effectiveness/magnitude of Pb reduction and cost/feasibility.   If effectiveness and commercial-scale feasibility for different sizes of companies are mutually determined among the ISDs to warrant further pursuing this Work Stream, the report shall present a likely timetable for widespread implementation.

53

1

**Work Stream #3:  Bean Blending to Reduce Cd Levels**

2  All Settling Defendants (ISDs and Opt-Ins) may use bean blending practices where needed and not subject to
   FDA restrictions to achieve the Consent Judgment Cd levels.

3
   For Chocolate Products that cannot achieve the Consent Judgment's Cd levels via blending, Industry shall be
4  given a new option to be specified in the Consent Judgment to use a truncated warning.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

**Work Stream #4:  Study of Potential Effectiveness of Modified Fermenting and Drying Practices on Lead Reduction**

**Objective:**  Evaluate the potential effects on Pb levels in cocoa beans as a result of modifications to fermentation and drying practices at the farm level.

**Approach:**  After consultation with relevant Origin Governments and local NGOs, ISD-sponsored academically-focused research will be conducted at five (5) farms, at least three (3) of which will be located in Ivory Coast and/or Ghana unless the consent of the governments of those countries is not granted, to assess if significant changes occur to the magnitude of Pb content in cocoa beans as a result of changes in fermentation and drying practices.  If the consent of a government is withheld, the Parties will meet and confer regarding the selection of replacement farms.  The changes in practices shall include:

- ▪  Modification of coverings used during fermentation;

- ▪  Raised-table drying only (no drying on ground);

- ▪  No drying near roads.

**Work Stream Outline:**

1.  This Work Stream shall be executed by a limited number of ISDs (up to 3), which will have an option to engage a third party consultant with expertise in cocoa cultivation practices and heavy metals.  The Work Stream ISDs shall be identified and a Work Stream Lead selected among them by November 30, 2023.  If a consultant will be engaged, they will be identified and retained by the end of the 4th Quarter of 2023.

2.  By February 15, 2024, each Work Stream ISD will select suitable farms, for an aggregate total of 5 farms, from the farmer cooperatives in the selected origin countries; care will be needed in farm selection to ensure that a variety of farming practices are in place that can be subject to modification pursuant to the study;

3.  By the end of 1st Quarter 2024, the ISDs shall prepare and agree on a briefing document suitable for review with, and any necessary approval by, the relevant Origin Governments.  The Work Stream activities shall commence upon receipt of governmental approval.

4.  **Reporting**:  The Work Stream Lead and/or consultant if retained shall prepare a brief report upon completion of each of the following Work Stream Phases.

5.  **Baseline Phase**:  Within 90 days of governmental approval of the Work Stream, the Work Stream Lead and/or consultant if retained shall document the "as is" fermenting and drying practices at each of the 5 selected farms ("Farming Practices").  During the next main-crop harvest following government approval (i.e., October to March), and at the next mid-crop harvest (i.e., April to September) ("Baseline Harvests"), cocoa beans shall be tested for Pb levels at the following four stages:  (i) unfermented cocoa beans taken directly from the cabosse; (ii) at the end of fermentation; (iii) on Day Two of the drying cycle; and (iv) at the end of the drying cycle.  All testing shall be contracted with ISO 17025 certified labs that are accredited for heavy metal analysis and that employ inductively coupled plasma mass spectrometry ("ICP-MS"), or equivalent, utilizing scientifically appropriate adherence to the protocols set forth in AOAC Method 2015.01 with a LOD/LOQ of 0.010 ppm or less.  The data collected on Farming Practices and Pb levels shall form the baseline data for the study.

6.  **Design Phase**:  Upon completion of the documentation of the Farming Practices, the Work Stream ISDs together with the Work Stream Lead and/or consultant if retained shall design and document the modifications to Farming Practices to be implemented for the study.  These modifications, which may vary

55

1   from farm to farm, may include changes to fermentation practices, drying practices, and/or possible changes
2   to locations where both occur.  In all instances, the modifications must be practicable with respect to the
    working conditions and operation of the farms.

3   7.   **Implementation Phase**:  The Work Stream Lead and/or consultant if retained shall be responsible for farmer
4   training for the implementation of the modified Farmer Practices.  At the next ensuing main-crop harvest
    and mid-crop harvest (the "Research Harvests"), Pb levels in cocoa beans shall be tested again as was done
5   in the Baseline Phase.

6   8.   **Results Phase**:  The focus of the report for the Results Phase shall be to assess if significant changes occur to
    the magnitude of Pb content in cocoa beans as a result of changes in Farming Practices from the Baseline
7   Harvest to the Research Harvests.  The Results Phase report shall include a comparative exhibit for each
    farm.

8   **Work Stream Lead:**  TBD

56

CONSENT JUDGMENT AS MODIFIED ON 11/17/23
CASE NO. CGC-15-548791

## STIPULATION AND AGREEMENT

This stipulation and agreement ("Agreement") is entered into by and between *As You Sow* on the one hand and Barry Callebaut USA, LLC, Blommer Chocolate Co., Cargill, Inc., Guittard Chocolate Co., The Hershey Company, Lindt & Sprungli (North America) Inc., Mars, Incorporated, Mondelez Global LLC, and Nestle USA, Inc. (the "Initial Settling Defendants") on the other hand (collectively, As You Sow and the Initial Settling Defendants are referred to herein as "the Parties") with respect to certain matters relating to the consent judgment previously entered in the matter of *As You Sow v. Trader Joe's Company, et al.*, San Francisco Superior Court No. CGC-15- 548791 ("Consent Judgment") pursuant to the terms and conditions set forth below.

### 1.    EFFECTIVE DATE AND DEFINITIONS

The "Effective Date" shall be the date when all Parties have signed the Agreement.  Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Consent Judgment.

### 2.    OBLIGATIONS OF THE INITIAL SETTLING DEFENDANTS

**2.1**      The Initial Settling Defendants agree to stipulate to a motion by As You Sow to modify the terms of the Consent Judgment as set forth below.

**2.2**      Except as to the retention and payment of the Project Manager, the Initial Settling Defendants shall address, fund, and implement the project plan appended hereto as Exhibit A ("Project Plan").  The Project Plan shall also be appended as an exhibit to the motion by As You Sow to modify the Consent Judgment described in Section 3.1 below and, if the San Francisco Superior Court ("Court") grants the motion, shall be deemed incorporated into the Consent Judgment as a further exhibit (Exhibit F) thereto.  In the event a modification of the Consent Judgment pursuant to Section 3.1 below is not approved and entered by February 14, 2024, the obligations of the Initial Settling Defendants under this Section shall be suspended and tolled and the Parties shall meet and confer to discuss revising all scheduled dates and deadlines set forth in this Agreement.

**2.3**      Within sixty (60) days of notice of the Court's approval and entry of the modification of the Consent Judgment to incorporate the terms set forth in Section 3.1 below, the Initial Settling Defendants shall provide the Compliance Testing Fund established under the Consent Judgment with an additional $50,000 for As You Sow's anticipated legal fees and cost, testing costs and review of the reports to be provided pursuant to the Project Plan and related

discussions with the Initial Settling Defendants concerning the Project Plan's results.  The Initial Settling Defendants shall also provide As You Sow with $100,000 to retain and compensate an agreed upon Project Manager.  Except as to the enforcement of this Agreement, As You Sow shall not disclose the reports to be provided pursuant to the Project Plan or any related testing information without first obtaining the prior written consent of the Initial Settling Defendants to such proposed disclosure.

## 3.    OBLIGATIONS INCORPORATED INTO CONSENT JUDGMENT

**3.1**     Within forty-five (45) days following the Effective Date, As You Sow shall file a duly noticed motion based on stipulation, appending this Agreement and the Project Plan, seeking to modify the terms of the Consent Judgment as follows.  During the duration of this modification, As You Sow shall not otherwise unilaterally seek to modify the terms of the Consent Judgment.

**3.1.1**     Upon the Court's approval of the motion, the following language shall be added to the Consent Judgment as new Section 4.3:

Based on the outcome of the meet and confer process described in Section 4.1 above, the Initial Settling Defendants shall fund, implement, and share information with AYS as specified in the Project Plan attached to AYS's motion to modify this Consent Judgment.

**3.1.2**     The following language shall be added to the Consent Judgment as a new Section 4.4:

Within sixty (60) days of the ninth anniversary of the Compliance Date, As You Sow and the Initial Settling Defendants shall begin meeting and conferring to discuss the results of the implementation of the Project Plan with respect to Covered Products and the potential for further modifications to this Consent Judgment, including further reductions in the warning thresholds, based on the reports provided pursuant to the Project Plan and information then available to the Parties.  Such meet and confer period should extend for a period of at least ninety (90) days, unless AYS and the Initial Settling Defendants mutually agree to extend it, including to allow for the involvement of a mediator.  Following the conclusion of this meet and confer process, and no earlier than one hundred and twenty (120) days after the commencement of the meet and confer process, AYS and/or the Initial Settling Defendants may, as informed by the results of the Project Plan and information then available to the Parties, jointly stipulate to or individually move for a modification of this Consent Judgment pursuant to Section 10, including with respect to any further adjustments to Section 6 of the Consent Judgment.

**3.1.3**     The "drop down" warning triggers set forth in Sections 6.2.1 and 6.2.2 shall go into effect as previously scheduled and the following language shall be added to Section 6.2.1(a), Section 6.2(b), and Section 6.2(c) respectively:

*For Section 6.2.1(a) of the Consent Judgment:*

As of the seventh anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.060 ppm, and as of the eighth anniversary of the Compliance Date, the foregoing lead concentration level shall be

deemed to have been reduced to 0.055 ppm.

*For Section 6.2.1(b) of the Consent Judgment:*

> As of the seventh anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.095 ppm, and as of the eighth anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.090 ppm.

*For Section 6.2.1(c) of the Consent Judgment:*

> As of the seventh anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.195 ppm, and as of the eighth anniversary of the Compliance Date, the foregoing lead concentration level shall be deemed to have been reduced to 0.190 ppm.

**3.1.4**     Section 6.3 of the Consent Judgment shall be modified to add to its existing language, the following:

> For Covered Products that are not able to obtain the levels set forth in Section 6.2.1 of the Consent Judgment as of the seventh or eighth anniversary of the Compliance Date, but which do not exceed the levels Section 6.2.1 of the Consent Judgment specifies as requiring a Proposition 65 warning as of the sixth anniversary of the Compliance Date, the following alternative language is authorized:

> **CA WARNING**:  Risk of reproductive harm from exposure to lead - www.prop65warnings.ca.gov/food

**3.1.5**     The word "seventh" in Section 15.1 of the Consent Judgment shall be changed to "tenth."

## 4.     ENFORCEMENT OF THE AGREEMENT

The Parties shall meet their obligations under this Agreement on a timely basis and in good faith.  A violation of this Agreement shall be considered a violation of the Consent Judgment and may be enforced as such under the Consent Judgment.  However, in the event, a Party fails to meet its obligations under this Agreement, written notice of said breach shall be given within sixty [60] days and the Parties shall meet and confer within an additional sixty [60] days to attempt to rectify the breach or otherwise resolve the issue by means of further agreement.

5. **GOVERNING LAW AND CONSTRUCTION**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

6. **MODIFICATION OF AGREEMENT**

**6.1**      This Agreement may be modified only upon written agreement of the Parties.

7. **ENTIRE AGREEMENT**

The Parties declare and represent that this Agreement, its related stipulation and motion for modification of the Consent Judgment, and, if approved by the Court, the Consent Judgment as modified contain the entire agreement pertaining to the subject matter hereof.

8. **APPLICATION OF AGREEMENT**

This Agreement shall apply to and be binding upon the Parties hereto, their divisions, subdivisions and subsidiaries, and the successors or assigns of any of them.

9. **EXECUTION AND COUNTERPARTS**

This Agreement may be executed in one or more counterparts and by means of facsimile or portable document format (.pdf), which taken together shall be deemed to constitute one document.

10. **AUTHORIZATION**

Each signatory to this Agreement certifies that he or she is fully authorized by the Party he or she represents to stipulate to this Agreement and to enter into and execute the Agreement on behalf of the Party represented and legally bind that Party.  The undersigned have read, understand, and agree to all of the terms and conditions of this Agreement.

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

**For *As You Sow***

By: _____

DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated:  9/18 , 2023

**For *the Initial Settling Defendants***

By: _____

ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  9/17 , 2023

**AS YOU SOW**

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated:  9/20 , 2023

**Company Name:**  Barry Callebaut U.S.A. LLC

By:  Jerry Hagedorn

Name:  Jerry Hagedorn

Title:  EVP

PM

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

For *As You Sow*

By: _____

DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: __9/18__, 2023

For *the Initial Settling Defendants*

By: _____

ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  __9/17__, 2023

AS YOU SOW

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated:  __9/25__, 2023

Company Name:  BLOMMER CHOCOLATE COMPANY

By: _____

Name:  Mark Okita

Title:  Chief Operating Officer

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

**For** *As You Sow*

By:  _____
      DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: **9/18** , 2023

**For** *the Initial Settling Defendants*

By:  _____
      ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  __9/17__ , 2023

**AS YOU SOW**

By:  _____

Name:  ANDREW BEHAR

Title:  CEO

Dated:  __9/25__ , 2023

**Company Name:** _CARGILL  INC._
By: _K. Amod-Gottl_
Name: _KOJO AMOD-GOTTFRIED_
Title: _MANAGING DIRECTOR - COCOA & CHOCOLATE N.A._

- 5 -

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

For *As You Sow*

By: _____
DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: 9/18 , 2023

For *the Initial Settling Defendants*

By: _____
ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  9/17 , 2023

**AS YOU SOW**

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated: 9/27 , 2023

Company Name: Guittard Chocolate

By: _____

Name: GARY W GUITTARD

Title: CEO

- 5 -

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

**For** *As You Sow*

By: _____
DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated:  9/18 _____, 2023

**For** *the Initial Settling Defendants*

By: _____
ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  9/17 _____, 2023

**AS YOU SOW**

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated: September 19, 2023

Company Name: **THE HERSHEY COMPANY**

By: _____

Name:  Kathleen S. Purcell

Title:  **Assistant Corporate Secretary**

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

For *As You Sow*

By: _____
DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: _**9/18**_, 2023

For *the Initial Settling Defendants*

By: _____
ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  _9/17_, 2023

AS YOU SOW

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated: _9/26_, 2023

**Company Name:**  Lindt & Sprungli (North America) Inc.

By: _____

Name: Jessica Haefele

Title: Head Legal, North America

**APPROVED AS TO FORM:**

Dated: September 17, 2023

**For** *As You Sow*

By: _____

DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: 9/18 , 2023

**For** *the Initial Settling Defendants*

By: _____

ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated: 9/17 , 2023

**AS YOU SOW**

By: _____

Name: ANDREW BEHAR

Title: CEO

Dated: 10/2 , 2023

**Company Name:** Mars Incorporated

By: _____

Name: Anna Marciano

Title: General Counsel, Mars Wrigley NA

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

**For *As You Sow***

By: _____

DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: _9/18_____, 2023

**For *the Initial Settling Defendants***

By: _____

ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated:  _9/17_____, 2023

**AS YOU SOW**

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated: _September 19, 2023_____, 2023

**Company Name:** ~~Mondelez Global LLC~~

By: _____

Name: ___Kevin Brennan_____

Title: _____Chief Counsel Litigation_____

**APPROVED AS TO FORM:**

Dated:  September 17, 2023

For *As You Sow*

By: _____
DANIELLE FUGERE

Attorneys for AS YOU SOW

Dated: 9/18 , 2023

For *the Initial Settling Defendants*

By: _____
ROBERT FALK

Attorney for the National Confectioners Association

**SO AGREED:**

Dated: 9/17 , 2023

**AS YOU SOW**

By: _____

Name:  ANDREW BEHAR

Title:  CEO

Dated: 9/26 , 2023

Company Name: *Nestlé USA, Inc.*

By: *Robert O. Winters*

Name: *Robert O. Winters*

Title: *Senior Counsel, Food Law*

Exhibit 6

**State of California - Department of Justice - Attorney General's Office - Proposition 65 Enforcement Reporting**
**Attention:  Prop 65 Coordinator, 1515 Clay Street, Suite 2000, Oakland, CA  94612**
PRIVATE ENFORCEMENT FILING - Health and Safety Code section 25249.7(e) and (f)

FORM JUS 1501
(03-01)

# REPORT OF SETTLEMENT

*Please print or type required information*     ☐ Original Filing   ☐ Supplemental Filing   ☐ Corrected Filing

**PARTIES TO THE ACTION**

PLAINTIFF(S)

DEFENDANT(S) INVOLVED IN SETTLEMENT

**CASE INFO**

COURT DOCKET NUMBER

COURT NAME

SHORT CASE NAME

**REPORT INFO**

INJUNCTIVE RELIEF

PAYMENT: CIVIL PENALTY

PAYMENT: ATTORNEYS FEES

PAYMENT: OTHER

WILL SETTLEMENT BE SUBMITTED TO COURT?  ☐ Yes  ☐ No

IF YES, AFTER ENTRY OF JUDGMENT BY COURT, REPORT OF ENTRY OF JUDGMENT MUST BE SUBMITTED TO ATTORNEY GENERAL

DATE SETTLEMENT SIGNED   /   /

For Internal Use Only

COPY OF SETTLEMENT MUST BE ATTACHED

**FILER INFO**

NAME OF CONTACT

ORGANIZATION

TELEPHONE NUMBER ( )

ADDRESS

FAX NUMBER ( )

CITY     STATE   ZIP     E-MAIL ADDRESS

**FILING INSTRUCTIONS:** This form can be completed online and printed.  If electronic filing is not available, mail the completed form with a copy of the settlement to the attention of the Prop 65 Coordinator at the address shown above.  If you need additional space to complete this form please use an attachment.

1  BARBARA J. CHISHOLM (SBN 224656)
   DANIELLE LEONARD (SBN 218201)
2  ALTSHULER BERZON LLP
   177 Post Street, Suite 300
3  San Francisco, CA 94108
   Tel:  (415) 421-7151
4  Fax:  (415) 362-8064
   bchisholm@altshulerberzon.com
5  dleonard@altshulerberzon.com
   tlopresti@altshulerberzon.com
6
   Attorneys for Plaintiff As You Sow
7

8  PATRICK J. CAFFERTY, JR. (SBN 103417)
   MIRIAM KIM (SBN 238230)
9  ALLISON M. DAY (SBN 308777)
   MUNGER, TOLLES & OLSON LLP
10 560 Mission Street
   Twenty-Seventh Floor
11 San Francisco, CA  94105-2907
   patrick.cafferty@mto.com
12 miriam.kim@mto.com
   allison.day@mto.com
13
   Attorneys for Defendant Abbott Laboratories
14

15 ELLEN RICHMOND (SBN 277266)
   CONRAD & METLITZKY LLP
16 Four Embarcadero Center, Suite 1400
   San Francisco, CA  94111
17 Tel: (415) 343-7104
   Fax: (415) 343-7101
18 erichmond@conradmetlitzky.com

19 Attorneys for Defendant Abbott Laboratories

20               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

21                    **FOR THE COUNTY OF ALAMEDA**

22

23 AS YOU SOW,                                Case No. RG16822576

24            Plaintiff,                      **[PROPOSED] CONSENT JUDGMENT**

25      v.                                    Assigned for All Purposes to:
                                              Judge Winifred Smith
26 ABBOTT LABORATORIES,                       Dept. 21

27            Defendant.

28

---
[PROPOSED] CONSENT JUDGMENT, Case No. RG16822576

40000606 1

This Consent Judgment is entered into by and between Plaintiff *As You Sow* ("Plaintiff") and Defendant Abbott Laboratories ("Defendant"), to resolve claims raised against Defendant in the Complaint filed in the above-captioned action on July 8, 2016, and in the amended complaint filed on January 4, 2019. This Consent Judgment shall be effective upon entry. *As You Sow* and Defendant (collectively "the Parties," and separately a "Party") agree to the terms and conditions set forth below.

1.   **INTRODUCTION**

**1.1**      *As You Sow* is a non-profit corporation dedicated to, among other causes, the protection of the environment, the promotion of human health, the improvement of worker and consumer rights, environmental education, and corporate accountability. *As You Sow* is based in Oakland, California, and is incorporated under the laws of the State of California.

**1.2**      Defendant produces, distributes, and/or sells ZonePerfect Nutrition Bar Double Dark Chocolate ("Double Dark Chocolate Bar") and ZonePerfect Nutrition Bar Dark Chocolate Almond ("Dark Chocolate Almond Bar") (collectively, the "Covered Products") in California.

**1.3**      *As You Sow* alleges in the Complaint that the Covered Products contain lead, which is a chemical listed by the State of California as known to cause birth defects or other reproductive harm pursuant to the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), California Health and Safety Code §25249.5 *et seq.*

**1.4**      On September 25, 2015 and August 11, 2017, *As You Sow* sent 60-day Notices of Violation to Defendant and to public enforcers as required by Health and Safety Code section 25249.7, alleging that Defendant violated Proposition 65 by failing to provide clear and reasonable warnings before exposing persons to lead contained in the Double Dark Chocolate Bar and Dark Chocolate Almond Bar, respectively.

**1.5**      The Parties agree that the September 25, 2015 Notice of Violation covers only the Double Dark Chocolate Bar and that the August 11, 2017 Notice of Violation covers only the Dark Chocolate Almond Bar. The Parties further agree that neither of those Notices pertain to any other nutrition, snack, meal replacement, or protein bars that are manufactured, distributed, or sold by Abbott. The Parties also agree that past, present, or future nutrition, snack, meal replacement,

1  or protein bars containing chocolate that are manufactured, distributed, or sold by Abbott, other

2  than the Covered Products, are subject to the provisions of the Consent Judgment in *As You Sow v.*

3  *Trader Joe's Co., et al.*, San Francisco County Superior Court, Case No. CGC-15-548791 (Feb.

4  15, 2018) ("Trader Joe's Consent Judgment") insofar as the provisions are applicable to the

5  ingredients contained in those bars, and the Trader Joe's Consent Judgment remains in effect.

6      **1.6**      The Parties have agreed to enter into this Consent Judgment to settle Plaintiff's

7  claims with regard to the Covered Products and to avoid further litigation and the attendant time

8  and resources such litigation would require.

9      **1.7**      Defendant denies the material allegations contained in the Notices, Complaint,

10  and Amended Complaint and maintains that it has not violated Proposition 65.  Nothing in this

11  Consent Judgment shall be construed as an admission by Defendant of any fact, finding, issue of

12  law, or violation of law; nor shall compliance with this Consent Judgment constitute or be

13  construed as an admission by Defendant of any fact, finding, conclusion, issue of law, or violation

14  of law, such being specifically denied by Defendant.  However, this section shall not diminish or

15  otherwise affect the obligations, responsibilities, and duties of Defendant under this Consent

16  Judgment.

17      **1.8**      The only products covered by this Consent Judgment are the Covered

18  Products, and the only chemical covered by this Consent Judgment is lead as it relates to the

19  Covered Products. *As You Sow* is not aware of any other chemical in either of the Covered

20  Products that would require a warning under Proposition 65.

21  **2.**    **JURISDICTION AND VENUE**

22      For purposes of this Consent Judgment only, the Parties stipulate that this Court has

23  jurisdiction over the allegations contained in the Complaint and Amended Complaint and personal

24  jurisdiction over Defendant; venue is proper in Alameda County; the Court has jurisdiction to

25  enter this Consent Judgment as a full and final resolution of all Proposition 65 claims up through

26  and including the Effective Date as to the Covered Products; and the Court shall retain jurisdiction

27  to enforce this Consent Judgment.

28  **3.**    **DEFINITIONS**

**3.1**    "Compliance Date" means the date 30 days after the Effective Date.

**3.2**    "Effective Date" means the date the Court enters this Consent Judgment.

**3.3**    "Lot" means all units of a Covered Product bearing the same lot number, best-by, or sell-by date.

4.    **LEAD CONCENTRATION LIMITS AND TESTING**

**4.1**    The "Lead Concentration Limit" for the Covered Products shall be 0.0355 parts per million. The maximum size of the Covered Products shall be 45 grams per bar.

**4.2**    When testing the Covered Products for lead concentration under this Section 4, Defendant shall randomly select 10 samples of each of the Covered Products. The randomly selected samples for each Covered Product shall come from separate Lots that are randomly chosen, to the extent that the necessary number of lots are available. These samples shall be identified in Defendant's request to the laboratory for testing as being submitted pursuant to this Consent Judgment. Defendant shall also be permitted to perform up to two replicate tests on each of the samples of the Covered Products that are tested. Except as set forth in Paragraph 4.4, if Defendant chooses to perform replicate tests, Defendant must perform the same number of replicate tests on each of the 10 randomly selected samples. The arithmetic mean of the original test result and the replicate test result(s) shall be the effective result for each of the samples.

**4.3**    Defendant shall test each of the Covered Products for lead concentration within 30 days of the Compliance Date and then once every year for three more years. For purposes of determining whether a Covered Product is above or below the Lead Concentration Limit, the arithmetic mean of the sample test results for that Covered Product shall be compared to the Lead Concentration Limit. The testing conducted pursuant to this Section 4, and the comparison conducted pursuant to this Paragraph 4.3, shall be the sole means of determining whether the Covered Products are above or below the Lead Concentration Limit.

**4.4**    If the result of the testing of any of the 10 samples collected pursuant to 4.2 above exceeds 0.044 parts per million of lead for that sample, the result shall be deemed a potential "outlier" test result. At Abbott's option, any single potential outlier test result may be subject to validation before it is deemed to be an effective result for purposes of this Consent

1  Judgment.  The validation process shall consist of two steps:

2      (a)      First, the laboratory from which the test result in question was obtained

3  shall be required to check its equipment, test processes, validation procedures, potential laboratory

4  contamination, potential operator error, and any other factors which could have produced an

5  erroneous result.  If the result is determined by the laboratory to be erroneous due to testing error

6  or failure to satisfy quality assurance or quality control procedures, the result shall be discarded

7  and not used for any purpose under this Consent Judgment.  Any testing result that has been

8  discarded under this paragraph 4.4(a) must be replaced with a new test result taken from the

9  original sample of the Covered Product, which must be obtained within 30 days of the date that

10 the original testing result is discarded.

11     (b)      Second, if the steps in paragraph 4.4(a) have not invalidated a potential

12 outlier test result, Defendant, at its option, may test up to two additional randomly selected

13 samples of the Covered Product from the same Lot as the sample that is the source of the potential

14 outlier test result.  The arithmetic mean of the two additional test results (for the two additional

15 randomly selected samples from the same Lot) and the original potential outlier test result shall be

16 deemed the "final validated result" for that sample and shall replace the original potential outlier

17 test result as the effective result for that sample for purposes of this Consent Judgment.  If Abbott

18 chooses not to exercise its option to test additional samples pursuant to this paragraph 4.4(b)

19 within 60 days of receiving the original testing result, the potential outlier testing result shall be

20 deemed the final validated result for that sample.

21     **4.5**     If the arithmetic mean of all of the sample test results, as discussed in 4.3 above, for

22 a Covered Product exceeds the Lead Concentration Limit of 0.0355 parts per million, Defendant

23 shall have 240 days from the date of completing the testing required under Section 4.3 to reduce

24 the lead concentration levels in that Covered Product.  Defendant may, within this time period,

25 establish for purposes of Paragraph 4.3 that the lead concentration levels do not exceed the Lead

26 Concentration Limit by conducting an additional round of testing that complies with the

27 requirements of this Section 4.  If Defendant elects to perform this additional testing, the

28 assessment of whether the lead concentration levels in that Covered Product do or do not exceed

the Lead Concentration Limit will not be final for purposes of this Section 4 until that additional testing is complete within this 240 day period.  If, after the 240 day period has ended and the additional testing set forth in this paragraph have been completed, the additional test results demonstrate that the arithmetic mean of such test results is above the Concentration Limit set forth in paragraph 4.1, Defendant shall make an election to either cease distribution of the Covered Product or provide a warning for that Covered Product as provided for in Section 5 below.

**4.6**    Testing pursuant to this Section 4 shall be conducted on Covered Products that are in final form and intended for sale to the end-user.

**4.7**    Testing pursuant to this Section 4 shall be performed using the analytical methods set forth in AOAC Method 2015.01 or EPA Methods 6020, 6020a, as those test methods might be reasonably modified by the laboratory.  The laboratory must digest at least 0.5 grams of each sample with a level of detection, and a reporting limit, of at least 10 parts per billion.  The sample preparation method must use a microwave- or heat-assisted acid digestion method.

**4.8**    Testing pursuant to this Section 4 shall be performed by an independent third-party laboratory certified by the California Environmental Laboratory Accreditation Program for the analysis of heavy metals or an independent third-party laboratory registered with the Environmental Protection Agency.

**4.9**    Defendant shall retain all test results and documentation of testing for lead concentration in the Covered Products for a period of at least three years from the date of the test.

**4.10**    Within 60 days of the Compliance Date and each year thereafter within 60 days of the anniversary of the Compliance Date, *As You Sow* may submit a written request for copies of the results of any testing for lead concentration in the Covered Products.  Defendant agrees to deliver full laboratory reports with the results of any testing for lead concentration in the Covered Products pursuant to this Section, including all accompanying quality assurance/quality control ("QA/QC") documentation, to *As You Sow* within 30 days of the date that Defendant receives *As You Sow's* written request.  *As You Sow* shall keep these test results and information confidential, except as may be necessary to enforce this Consent Judgment, subject to the terms of the protective order in this case.  Defendant agrees to notify *As You Sow* of its election to use any of

1  the replicate or additional testing provisions set forth in this Section 4 at the time it delivers any

2  initial test results.

3  **5.    WARNING STATEMENT**

4      **5.1**        Following testing pursuant to Section 4 of this Consent Judgment, Defendant

5  shall within 30 days after the 240 day period set forth in Section 4.5, either (i) cease the

6  distribution of that Covered Product or (ii) include a Proposition 65 warning consistent with the

7  requirements of this Section, if the lead concentration in that Covered Product as determined under

8  Section 4 exceeds the Lead Concentration Limit.  If Defendant continues to distribute that

9  Covered Product and therefore to include a Proposition 65 warning pursuant to this Section 5.1,

10  the individual bar and box packaging for the Covered Product shall contain the following Warning

11  Statement:

12      ⚠ **WARNING:** This product can expose you to lead, which is known to the State of
     California to cause birth defects or other reproductive harm.  For more information, go to

13      www.P65Warnings.ca.gov.

14      **5.2**        When a warning is required pursuant to Paragraph 5.1, the Warning Statement

15  shall be prominently affixed to the Covered Products' individual bar and box packaging.  In

16  compliance with 27 Cal. Code of Regulations Section 25601(c), the Warning Statement shall be

17  displayed with such conspicuousness, as compared with other words, statements, designs, or

18  devices on the packaging so as to render it likely to be read and understood by an ordinary

19  individual under customary conditions of purchase and use.

20      **5.3**        If Defendant sells the Covered Products via an internet site controlled by

21  Defendant to customers located in California, and a Warning Statement is required under

22  Paragraph 5.1, Defendant shall, in addition to complying with the labeling requirements in

23  Paragraph 5.2, prominently display the Warning Statement on the internet site in conjunction with

24  the Covered Products as set forth below.  Such a statement shall be displayed in the same type size

25  as the surrounding, non-heading text, either: (a) on the same page, without scrolling, as the

26  description of the Covered Products; (b) on the same page, without scrolling, as the order form for

27  the Covered Products; (c) on the same page, without scrolling, as the price for the Covered

28  Products; or (d) in a dialogue box that appears and is visible when a California address for

delivery is provided by the consumer, so long as the dialogue box appears prior to completion of the internet sale and requires the consumer to affirmatively accept receipt of the statement set forth in the dialogue box as a condition precedent to completing the sale.  For purposes of option (d), the text of the statement shall be displayed in the same type size as the surrounding, non-heading text on the screen at the time of the appearance of the dialogue box.

5.4     If Defendant sells the Covered Products through the website of any internet retailer, and a Warning Statement is required under Paragraph 5.1, Defendant shall send by first class mail or overnight delivery, no more than two weeks after a determination that a Warning Statement is required, a letter requesting that the internet retailer provide the Warning Statement in Paragraph 5.1 in the same manner as required under Paragraph 5.3.  The letter shall state that failure to provide this statement may result in liability for the internet retailer.  In the letter, Defendant shall request that the internet retailer respond with a written acknowledgement that it will comply with Defendant's request.

5.5     If Defendant sells the Covered Products via mail order to customers located in California, and a Warning Statement is required under Paragraph 5.1, Defendant shall prominently display the Warning Statement in the mail order catalogue in conjunction with the Covered Products.  The Warning Statement shall appear either on the same page on which the Covered Products are displayed, or on the same page upon which the Covered Products' prices are listed, in the same type size as the surrounding, non-heading text.  The Warning Statement shall be added in the first print run of the mail order catalogue on or after the Compliance Date or such later time as it is determined a Warning Statement is required.

5.6     Any changes to the text, format, or placement of the Warning Statement required under Paragraphs 5.1 – 5.5 shall be made only after Court approval and following written notice to Plaintiff and to the Attorney General.

6.     **SETTLEMENT PAYMENTS**

6.1     <u>Civil Penalty</u>: Within thirty days of the Effective Date, Defendant shall pay $15,000 in the form of a check made payable to *As You Sow*, as a civil penalty pursuant to Health and Safety Code section 25249.7(b).  *As You Sow* shall remit seventy-five percent (75%) of this

1   amount to the State of California pursuant to Health and Safety Code section 25249.12(b).

2   **6.2**   <u>Additional Settlement Payment</u>: Within thirty days of the Effective Date,

3   Defendant shall pay $10,000 in the form of a check made payable to *As You Sow*, with this amount

4   to be used by *As You Sow* for grants to California 501(c)(3) non-profit organizations and by the *As*

5   *You Sow* Environmental Enforcement Fund.  These funds shall be used to educate and/or reduce or

6   remediate consumer exposures to toxic chemicals such as lead and to increase consumer, worker,

7   and community awareness of the health hazards posed by toxic chemicals in California.  In

8   deciding among grant proposals, the *As You Sow* Board of Directors ("Board") takes into

9   consideration a number of important factors, including: (1) the nexus between the harm done in

10  the underlying case(s) and the grant program work; (2) the potential for toxics reduction,

11  prevention, remediation, or educational benefits to California citizens from the proposal; (3) the

12  budget requirements of the proposed grantee and the alternate funding sources available to it for

13  its project; and, (4) the Board's assessment of the proposed grantee's ability to perform the funded

14  activities.  *As You Sow* shall ensure that all funds will be disbursed and used in accordance with

15  this paragraph, as well *As You Sow*'s mission statement, articles of incorporation, bylaws, and

16  applicable state and federal laws and regulations.  *As You Sow* shall obtain and maintain adequate

17  records to document that the funds are spent on the activities described in this paragraph, and shall

18  provide to the Attorney General, within thirty days of any request, copies of all documentation

19  demonstrating how such funds have been spent.  No Party to this Consent Judgment or counsel of

20  record, or spouse or dependent child thereof, has an economic interest in any individual or entity,

21  besides itself, that will receive all or part of an Additional Settlement Payment.

22  **6.3**   Within thirty days of the Effective Date, Defendant shall pay $325,000 in the

23  form of a check made payable to Altshuler Berzon LLP, as reimbursement for Plaintiff's

24  attorneys' fees, investigation costs, and other reasonable litigation costs and expenses.

25  **7.   MODIFICATION OF THIS CONSENT JUDGMENT**

26  **7.1**   This Consent Judgment may only be modified by written agreement and

27  stipulation of the Parties.  If either Party seeks to modify the Consent Judgment, then it shall

28  provide written notice to the other Party, and the Parties shall meet and confer within 30 days of

1  receipt of such meet and confer notice.  Neither Party shall unreasonably withhold agreement to

2  any modification requested by the other Party based on an amendment to Proposition 65 or its

3  supporting regulations or a change in the law.  If despite their meet-and-confer efforts, the Parties

4  are unable to reach agreement on a stipulated modification, either Party may file a noticed motion

5  for modification with the Court for good cause shown, provided a copy of the motion is also

6  served on the other Party and the Attorney General.

7      **7.2**      If the Parties reach agreement as to modification of the Consent Judgment,

8  such stipulation shall be reported to the Attorney General at least 21 days in advance of its

9  submission to the Court for approval.

10  **8.    DISPUTE RESOLUTION AND ENFORCEMENT**

11      The Parties may, by motion filed in this Court, enforce the terms and conditions of this

12  Consent Judgment.  In the event a dispute arises with respect to any of the provisions of this

13  Consent Judgment, and prior to the filing of any such motion, the Parties shall meet and confer

14  within 14 days after either Party receives written notice of an alleged violation of this Consent

15  Judgment or other dispute.

16  **9.    CLAIMS COVERED AND RELEASE**

17      This Consent Judgment is a full, final, and binding resolution between Plaintiff, on behalf

18  of itself and in the public interest, as well as Plaintiff's parents, subsidiaries, officers, directors,

19  employees, agents, insurers, representatives, successors and assigns (“*As You Sow* Releasees”),

20  and Defendant and its respective officers, directors, shareholders, employees, agents, parent

21  companies, subsidiaries, affiliates, divisions, franchisees, licensees, customers, distributors,

22  wholesalers, retailers, and all other upstream and downstream entities in the distribution chain of

23  the Covered Product, and the predecessors, successors, and assigns of any of them (collectively,

24  “Defendant's Releasees”).  Plaintiff hereby fully releases and discharges Defendant's Releasees

25  from any and all claims, actions, causes of action, suits, demands, liabilities, damages, penalties,

26  fees (including fees of attorneys, experts, and others), costs, and expenses asserted, or that could

27  have been asserted from the handling, use, or consumption of the Covered Products, as to any

28  alleged violation of Proposition 65 or its implementing regulations arising from the failure to

1  provide Proposition 65 warnings on the Covered Products regarding lead up to and including the

2  Effective Date, other than as set forth in this Consent Judgment.  Defendant hereby releases *As*

3  *You Sow* from, and waives any claims against *As You Sow* and *As You Sow* Releasees for

4  injunctive relief or damages, penalties, fines, sanctions, mitigation, fees (including attorneys' fees,

5  experts and others), costs, expenses, or any other sum incurred or claimed or which could have

6  been claimed for matters related to the Notices of Violation or Complaint.

7  **10.    GOVERNING LAW AND CONSTRUCTION**

8          This Consent Judgment shall be governed by, and construed in accordance with, the laws

9  of the State of California.

10 **11.    COURT APPROVAL**

11         **11.1**       Unless otherwise stipulated by the Parties, the Court shall either approve or

12 disapprove of this Consent Judgment in its entirety, without alteration, deletion or amendment.

13         **11.2**       Unless otherwise stipulated by the Parties, if the Court fails to approve and

14 order entry of the Consent Judgment without any alteration, deletion or amendment, this Consent

15 Judgment shall become null and void upon the election of either Party, and shall not be introduced

16 into evidence or otherwise used in any proceeding for any purpose.

17 **12.    ENTIRE AGREEMENT**

18         The Parties declare and represent that no promise, inducement or other agreement has been

19 made conferring any benefit upon any Party except those contained herein and that this agreement

20 contains the entire agreement pertaining to the subject matter hereof.

21 **13.    APPLICATION OF CONSENT JUDGMENT**

22         This Consent Judgment shall apply to, be binding upon, and benefit the Parties and their

23 respective officers, directors, shareholders, employees, agents, parent companies, subsidiaries,

24 divisions, franchisees, licensees, customers, distributors, wholesalers, retailers, predecessors,

25 successors, and assigns.

26 **14.    ATTORNEYS' FEES**

27         Except as specifically provided in this Consent Judgment, each Party shall bear its own

28 attorneys' fees and costs incurred in connection with the 60-day Notices of Violation and

[PROPOSED] CONSENT JUDGMENT, Case No. RG16822576

1   Plaintiff's Complaint and Amended Complaint.

2   **15.   COMPLIANCE WITH HEALTH AND SAFETY CODE §25249.7**

3          Plaintiff shall comply with the reporting requirements referred to in Health and Safety

4   Code section 25249.7(f) (and established in Title 11 of the Code of Regulations sections 3000-

5   3008), and shall move for approval of this Consent Judgment pursuant to the terms thereof.

6          The Parties shall use their best efforts to support entry of this Consent Judgment.  If the

7   Attorney General objects to any term in this Consent Judgment, the Parties shall use their best

8   efforts to resolve the concern in a timely manner, and if possible, prior to the hearing on the

9   motion to approve this Consent Judgment.

10  **16.   PROVISION OF NOTICE**

11         All correspondence and notices required by this Consent Judgment to the Parties shall be

12  sent to:

13  <u>Plaintiff *As You Sow*</u>

14  *As You Sow* Foundation
    Attn:  Danielle Fugere, President and Chief Counsel
    1611 Telegraph Street, Suite 1450
15  Oakland, CA 94612
    Tel.:  (510) 735-8158

16

17  <u>With a copy to:</u>

18  Barbara Chisholm
    Danielle Leonard
19  Altshuler Berzon LLP
    177 Post Street, Suite 300
20  San Francisco, CA  94108
    Tel.:  (415) 421-7151

21

22  <u>Defendant Abbott Laboratories</u>

23  Patrick Cafferty
    Miriam Kim
    Allison Day
24  Munger, Tolles & Olson
    560 Mission Street
25  Twenty-Seventh Floor
    San Francisco, CA  94105-2907
26  Tel.: (415) 512-4000

27  Ellen Richmond
    Conrad & Metlitzky
28  Four Embarcadero Center, Suite 1400

40000506.1

San Francisco, CA  94111
Tel.: (415) 343-7104

## 17.    TERM

This Consent Judgment shall remain in effect through and until seven years after the Effective Date.  If one party seeks to maintain the Consent Judgment in this matter in effect thereafter, that party shall send a written notice requesting a meet and confer and such meet and confer shall occur within 45 days of such notice. If the parties do not reach agreement on extending the duration of the Consent Judgment, then the party requesting the extension may file a motion seeking that extension following the procedure set forth in Section 7.1. Upon termination of this Consent Judgment pursuant to the terms of this section, the Parties agree that the Covered Products shall become subject to the Trader Joe's Consent Judgment insofar as the provisions are applicable to the ingredients in those bars, and the Trader Joe's Consent Judgment remains in effect.

## 18.    EXECUTION AND COUNTERPARTS

This Consent Judgment may be executed in one or more counterparts and by means of facsimile or portable document format (.pdf), which taken together shall be deemed to constitute one document.

## 19.    DRAFTING

The terms of this Consent Judgment have been reviewed by the respective counsel for each Party prior to its signing, and each Party has had an opportunity to fully discuss the terms and conditions with legal counsel.  The Parties agree that, in any subsequent interpretation and construction of this Consent Judgment, no inference, assumption, or presumption shall be drawn, and no provision of this Consent Judgment shall be construed against any Party, based on the fact that one of the Parties and/or one of the Parties' legal counsel prepared and/or drafted all or any portion of the Consent Judgment.  It is conclusively presumed that all of the Parties participated equally in the preparation and drafting of this Consent Judgment.

## 20.    AUTHORIZATION

Each signatory to this Consent Judgment certifies that he or she is fully authorized by the Party he or she represents to stipulate to this Consent Judgment and to enter into and execute the

12

1   Consent Judgment on behalf of the Party represented and legally bind that Party.  The undersigned

2   have read, understand, and agree to all of the terms and conditions of this Consent Judgment.

3

4   **APPROVED AS TO FORM:**

5

6   Dated: __1/4__, 2018

7

8                                    **ALTSHULER BERZON LLP**

    By: _____

9

    BARBARA J. CHISHOLM
    DANIELLE LEONARD
10   ALTSHULER BERZON LLP

11   Attorneys for Plaintiff AS YOU SOW

12

13   Dated: __12/31__, 2018

14                                   **MUNGER, TOLLES & OLSON LLP**

    By: _____
15

    PATRICK CAFFERTY
16   MIRIAM KIM
    ALLISON DAY
17

18   Attorneys for Defendant ABBOTT LABORATORIES

19

20   **SO AGREED:**

21

22   Dated: __1/3__, 2019

                                     **AS YOU SOW**
23

    By: _____
24
    Name: __ANDREW BEHAR__
25   Title: __CEO__

26

27

28

1

Dated: _Dec. 28_, 2018          **ABBOTT LABORATORIES**

2

By: _Robert S. O'Meara_

3

Name: _Robert S. O'Meara_

4

Title: _Senior Counsel_

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT JUDGMENT, Case No. RG16822576

1

**[PROPOSED] ORDER**

2

**IT IS SO ORDERED AND ADJUDGED:**

3

The Court hereby incorporates the terms of this Consent Judgment into this Order.  The

4

Court retains jurisdiction over this matter.

5

6

Dated: _____, 2019                    _____

7

                                           HON. _____
                                           JUDGE OF THE SUPERIOR COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify that on **August 20, 2024**, I electronically transmitted the foregoing

3

document to the Clerk's Office using the CM/ECF System for filing and service via transmittal

4

of a Notice of Electronic Filing.

5

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

6

7

Executed on **August 20, 2024**, at Los Angeles, California.

8

9

*/s/ Nicholas J. Hoffman*

10

Nicholas J. Hoffman
McGuireWoods LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 24-cv-04203-MMC